IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CR. NO. 20-121-1 (CJN) |
| v. | : | |
| TAVONTE WILLIAMS, | : | |
| Defendant. | : | |

## MOTION TO SUPPRESS IDENTIFICATION

Defendant Tavonte Williams hereby moves this Court to suppress his identification by the undercover officer in this case, and any subsequent in-court identification by that officer, under the Fourteenth and Fourth Amendments to the United States Constitution.

### Background

On July 21, 2020, a grand jury charged Mr. Williams with one count of unlawful possession of a firearm and ammunition under 18 U.S.C. § 922(g)(1). The alleged facts underlying the single count in this case are that Mr. Williams gave a backpack to co-defendant Theodore Douglas, who "hurriedly" concealed the backpack under his outer coat and then handed cash to Mr. Williams with a handshake. The only evidence of this alleged exchange is the testimony of a lone undercover officer ("UC"), who obviously did not see the exchange accurately, because when Mr. Williams was searched just moments later he had no cash on him at all.

The radio transmission in this case shows that the UC's initial lookout for the subject who "sold" the backpack to Mr. Douglas was for a black male, gray coat, puffy hair, real messy hair. That lookout, which is generic at best, appears to have matched other individuals present

1

on the scene according to police body-worn cameras. The lookout for Mr. Douglas, on the other hand, which included a blue puffy jacket concealing a backpack, matched Mr. Douglas when officers encountered him.

After the UC radioed other officers, they arrived almost immediately on the scene. The officers stopped Mr. Douglas, cuffed him, and one officer (Poupart) squeezed the back of Mr. Douglas' outer coat in an attempt to feel what was underneath. The officer asked Mr. Douglas if he had any knives or weapons on him. Mr. Douglas stated that he had a glasses case. The squeezing officer asked if he could check the bag, and when Mr. Douglas again stated it was a glasses case, the squeezing officer stated, "I don't know if that's glasses, man." Later, the officer would claim that he felt a gun through the coat, sweatshirt, and backpack separating his hand from the objects inside. The police conducted a search of the backpack. In that search the officers found a gun and, according to the squeezing officer's testimony at Mr. Douglas' preliminary hearing, they also found a glasses case.

According to Officer Poupart's testimony at the preliminary hearing in this matter, shortly after radioing for other officers to arrive to investigate this alleged hand-to-hand transaction, the UC moved locations and lost sight of the subjects. Officer Gabster then arrived on the scene. His camera footage shows that when he arrived in the parking lot near where Mr. Douglas was already stopped by Officer Poupart, as many as 15 officers were milling around the scene. Officer Gabster walked past Mr. Douglas as many as 100 feet or more out into the street beyond the adjacent apartments, where he encountered Mr. Williams and other individuals. Officer Gabster appeared to not know which of the multiple individuals present he should stop, but for some reason (it does not appear any radio call directed him at that moment) he chose Mr. Williams. At that point, it appears from the audio from Officer Gabster's body-worn camera that

officer Gabster, who had Mr. Williams in cuffs and was now able to see more closely what he was wearing, suggested an additional identifying factor of "orange hood."  After that suggestion, it appears the UC affirmed and added "orange hood" to his now-evolving description, when his original description conspicuously omitted this distinctive detail.  Based on the location of Mr. Williams and Mr. Douglas at that time, and the surrounding buildings, it appears the UC could not have had a line-of-sight on both the location of the alleged exchange and also Mr. Williams' location.  Officers then relocated Mr. Williams to a location somewhat closer to Mr. Douglas where, presumably, the UC from some distance positively identified him as he was handcuffed and surrounded by officers.  Officers searched Mr. Williams, and despite the alleged "transaction" having just occurred, the police found no cash on Mr. Williams.  They did find, however, that Mr. Williams was in possession of Mr. Douglas' phone.

The UC was clearly wrong about what he claims to have seen.  Mr. Williams had only an innocent interaction with Mr. Douglas in which he sought to borrow Mr. Douglas' phone.  This interaction did not involve transferring the gun-bag to Mr. Douglas in exchange for cash, and that is why Mr. Williams had no cash on his person, but he did have Mr. Douglas' phone.

For the reasons discussed below, the identification of Mr. Williams was improper, and should be suppressed.  In addition, the UC has no independent, untainted basis for making an in-court identification of Mr. Williams, and any such identification should also be precluded.

## Law

In determining whether to suppress the UC's identification of Mr. Williams under the Due Process Clause, the Court must perform a two-step analysis.  *United States v. Rattler*, 475 F.3d 408, 411, (D.C. Cir. 2007).  First, the court must determine "whether the identification procedure 'was impermissibly suggestive.'"  *Id.* (quoting *United States v. Washington*, 12 F.3d

1128, 1134, (D.C. Cir. 1994)).  If the procedure was impermissibly suggestive, the court must decide "whether, under the totality of the circumstances," the identification was nonetheless "sufficiently reliable to preclude 'a very substantial likelihood of irreparable misidentification.'"  *Id.* (quoting *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977).  The key factors at the second step are "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation."  *Id.* (quoting *Manson*, 432 U.S. at 114).  The court must weigh these factors against "the corrupting effect of the suggestive identification itself."  *Id.* (quoting *Manson*, 432 U.S. at 114) (emphasis omitted).

In addition, under the Fourth Amendment, if a show-up identification is held while the subject is in custody following an illegal *Terry* stop (or brief investigative detention) any resulting identification must be suppressed as the fruit of the illegal stop.  *See United States v. Crews*, 445 U.S. 463, 472-73; *Young v. Conway*, 698 F.3d 69, 84-85 (2d Cir. 2012).  A stop, or brief investigative detention, is illegal unless the officers "ha[ve] a reasonable, articulable suspicion that 'criminal activity may be afoot.'"  *United States v. Edmonds*, 240 F.3d 55, 59 (D.C. Cir. 2001) (quoting *Terry v. Ohio*, 392 U.S. 1 (1968)).  To "seize[] a person on less than probable cause," an officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, support a reasonable and articulable suspicion that the person seized is engaged in criminal activity."  *United States v. Castle*, 825 F.3d 625, 634 (D.C. Cir. 2016) (internal quotation marks omitted).  When making a reasonable suspicion determination, courts are instructed to view the "totality of the circumstances."  *United States v. Arvizu*, 534 U.S. 266, 274 (2002).  "When the government conducts an unconstitutional search or

seizure, the Court must exclude any evidence obtained as the 'fruit' of that search or seizure." *United States v. Sheffield*, 799 F. Supp. 2d 22, 28 (D.D.C. 2011) (citing *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)).  As stated above, this includes identifications that result from the illegal stop.  The party challenging the alleged seizure "bears the burden of demonstrating that he was seized." *Castle*, 825 F.3d at 633. The government bears the "burden to provide evidence sufficient to support reasonable suspicion." *Id*. at 634.

Finally, "[i]f an out-of-court identification is held inadmissible, any subsequent in-court identification by the same witness will be barred, unless the prosecution can show an independent, untainted source of the in-court identification." *United States v. Lawson*, 410 F.3d 735, 739 n.3 (D.C. Cir. 2005), (citing *United States v. Wade*, 388 U.S. 218, 241 (1967)).

## Argument

### Mr. Williams' Identification Was Unduly Suggestive and Unreliable and Should Be Suppressed

The identification of Mr. Williams was unduly suggestive.  While all show-up identifications are inherently suggestive, in this case the procedure conducted by Officer Gabster was impermissibly suggestive to the extent he influenced and added to the description initially given by the UC.  Officer Gabster could have simply said over the radio that he needed additional details regarding the subject who allegedly sold the backpack to Mr. Douglas.  Such an open-ended question would undoubtedly avoid undue suggestiveness.  But instead, apparently recognizing the generic description of the UC was not enough, Officer Gabster appeared to add to the description and fill in the blanks for the UC by suggesting an orange hood as an identifying factor.  Thereafter, when the UC apparently viewed Mr. Williams who was surrounded by police and wearing a barely visible orange hood, it is no surprise that he affirmed Mr. Williams' identification as the alleged person who handed Mr. Douglas a backpack.

In light of the improper suggestiveness in the procedure involving Officer Gabster and the UC, the analysis turns to whether the UC's identification is so unreliable that it should be suppressed. In this case, the UC's entire observation of the events was not accurate, and reveals that he was not in fact in a position to see what he claimed took place. The UC stated that Mr. Douglas received a backpack from someone, and then handed cash to that someone. Any transaction involving the backpack, if one even occurred, did not involve Mr. Williams. Instead, Mr. Williams simply borrowed Mr. Douglas' phone, and gave him nothing at all. Further, the UC's generic description of the subject who allegedly handed Mr. Douglas a bag would have matched many black males on the street that day. The description, until it was influenced by Officer Gabster, had no distinctive characteristics. Finally, Mr. Douglas' comments about the glasses case call into question whether any transaction occurred with regard to the backpack at all, let alone a transaction involving Mr. Williams. It appears from the government's own witness and body-worn cameras that this backpack was already in Mr. Douglas' possession prior to Mr. Williams borrowing Mr. Douglas' phone in the first place.

Even though the government has not disclosed the location and vantage-point of the UC, it is obvious that the UC could not see what actually happened in this case, and if the UC was wrong about the most basic of facts, it is clear that the UC's identification is not reliable.

### Mr. Williams' Identification Followed an Illegal Stop and Should be Suppressed

Officer Gabster's body-worn camera conclusively shows that he seized Mr. Williams prior to the identification procedure involving the UC. Officer Gabster walked up to a group of individuals on the street and evaluated them. He then turned to Mr. Williams, handcuffed him, and walked him in the direction of Mr. Douglas.

6

Because Mr. Williams was seized, the government bears the burden of showing reasonable articulable suspicion existed to justify that detention based on all of the facts and circumstances. But the government has not and cannot do so. The information relayed by the UC, at least as related to Mr. Williams, was not correct. Mr. Williams did not receive any cash from Mr. Douglas. In addition, when police approached Mr. Williams, he was cooperative, informed them that he did not have "anything" on him, agreed to a frisk and held out his arms, and continually, but calmly, stated that he had not done anything wrong. He asked the officers why they were stopping him, and he did not act in any manner to suggest criminal activity was afoot. For these reasons, the officers had no reasonable articulable suspicion to stop Mr. Williams, and given this illegal seizure, the subsequent identification of Mr. Williams by the UC should be suppressed.

### Any Subsequent In-Court Identification Should Also Be Precluded

The UC, who did not even have a legitimate and reliable basis to identify Mr. Williams on the scene, has no basis to identify Mr. Williams in court as the person who allegedly handed Mr. Douglas the backpack. Without an independent, untainted basis for identification, such as familiarity with Mr. Williams or some unmistakable feature, the Court must preclude the UC from making any in-court identification of Mr. Williams in addition to suppressing the out-of-court identification.

### Conclusion

For the reasons stated above, Mr. Williams asks that the Court suppress the show-up identification of Mr. Williams by the UC on the scene, and further preclude the UC from making any in-court identification of Mr. Williams.

Dated: August 21, 2020					Respectfully Submitted,

/s/ John Marston
John P. Marston, DC Bar No. 493012
Foley Hoag, LLP, 1717 K Street, NW
Washington, DC 20006
Telephone: 202-261-7321
Cell: 202-253-1104
Fax: 202-785-6687
jmarston@foleyhoag.com

8