**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v.        : | Criminal No. 20-cr-121 (CJN) |
| : | |
| TAVONTE WILLIAMS and : | |
| THEODORE DOUGLAS,   : | |
| : | |
| **Defendants.**   : | |

### GOVERNMENT'S OMNIBUS OPPOSITION TO
### DEFENDANTS' MOTIONS TO SUPPRESS IDENTIFICATIONS

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to Defendant Williams' (ECF #30) and Defendant Douglas' (ECF #33) motions to suppress identification.[1] In support of this opposition motion, the government relies on the points and authorities set forth below, and any additional points and authorities, which may be cited at a hearing on this motion.

### FACTUAL BACKGROUND

On Wednesday, April 22, 2020, at approximately 2:59 p.m., members of the Metropolitan Police Department (MPD), Narcotics and Special Investigations Division (NSID), were conducting an observation post in the 2300 block of 15th Street, Northeast, Washington, D.C. An undercover officer (UC 2268) observed an individual, later identified as Theodore Douglas, standing in the walkway between 2315 and 2317 15th Street, Northeast. An individual, later

---

[1] Defendant Douglas late filed his motion to suppress identification, which was not opposed by the government. However, in his motion defense counsel asserts he "had not been informed that a witness had made an out-of-court identification." ECF #33 at 1, n.1. It should be noted that the statement of the offense to the complaint, along with the police reports, radio run, and officer BWC footage disclosed in discovery include multiple references to the identification of the defendants made by the undercover officer. Accordingly, defense counsel for Defendant Douglas has been on notice since the inception of this case that an identification procedure had been utilized.

1

identified as Defendant Tavonte Williams, approached Defendant Douglas. Defendant Williams handed Defendant Douglas a black bag with shoulder straps. Defendant Douglas appeared to UC 2268 to be in a hurry to take off the blue jacket he was wearing, put the black bag just handed to him by Defendant Williams onto his back, and then put his blue jacket on over the black bag. UC 2268 then observed Defendant Douglas give Defendant Williams an unknown amount of U.S. currency, completing the exchange with a handshake. UC 2268's training and experience, as well as what appeared to be Defendant Douglas's hurried attempt to remove his jacket and conceal the backpack under the jacket, led UC 2268 to believe that Defendant Douglas had just purchased something illegal from Defendant Williams.

UC 2268 alerted other officers in the area and officers moved in to stop both Defendant Williams and Defendant Douglas. Defendant Douglas was stopped by Officer Poupart and Defendant Williams was stopped by Officer Gabster. Both individuals stopped were later positively identified by UC 2268 as the individuals observed exchanging the backpack and U.S. currency.  In the initial broadcast lookout, UC 2268 stated the following:

> 2300 block of 15th Street in that walkway that leads to Montana.  A black make with a gray coat just handed a black male with, like a blue puffy coat a bag.  He gave him money.  It's a book bag . . . He's in that walkway, 2300 block of 15th that leads to Montana, if I can get somebody to stop him.

*See Radio Run, April 22, 2020* (Exhibit A) at 00:06:00 – 00:06:29.[2]  Seconds later, after providing a more detailed lookout for the male he observed receiving the book bag, UC 2268 provided a more detailed lookout for the male he observed handing off the book bag:

---

[2] Government's exhibits A-C consist of the radio run, Officer Poupart's body worn camera (BWC) footage, and Officer Gabster's BWC footage.  These exhibits will be emailed to chambers at the time this pleading is filed.  Government's exhibits A-C have been previously turned over to the defendants in discovery.

2

> If I can get somebody to stop a black male with a gray coat with puffy hair. His hair is real messy.

*Id.* at 00:06:53 – 00:07:08.  A short time later, UC 2268 supplemented the lookout for both suspects, stating:

> Somebody come up to the walkway right across the street from the rec. center.  Black make, blue coat, um, blue jeans standing next to a black male with like a grayish coat with orange hood.

*Id.* at 00:07:24 – 00:07:39.  At 00:08:13 of the radio run, the UC asked if the "blue coat" was stopped, and Officer Poupart responded in the affirmative.  *Id.*  A review of Officer Poupart's BWC footage (Exhibit B) confirms that Defendant Douglas matched the description of the UC's lookout and was located in the area the UC had directed him to.  At this time, the other suspect (who handed off the bag) had still not been stopped by Officer Gabster, yet it is clear from the radio run that the UC had already provided a detailed description of the suspect, including reference to the "orange hood."

A review of both Officer Poupart's BWC and Officer Gabster's (BWC) (Exhibit C) establishes that the UC had already provided the more detailed description of Defendant Williams, including the mention of the orange hood, before Officer Gabster was ever in a position to observe Defendant Williams.  The still shot below is from Officer Poupart's BWC, which clearly shows Defendant Douglas on the left wearing a blue puffy coat and blue jeans, and Defendant Williams on the right wearing what appears to be a dark gray coat with an orange hood standing in close proximity to Defendant Douglas as they approach:



The time on Officer Poupart's BWC (Exhibit B) in the still shot above is 19:02:31. At approximately 19:04:26 of Officer Poupart's BWC, the UC can be overheard on the radio providing the aforementioned description of Defendant Williams that includes mention of the orange hood. *See* Exhibit B at 19:04:26 – 19:04:35. As shown by the still shot below, Officer Gabster's BWC at the same time shows him approaching the walkway where Officer Poupart had Defendant Douglas stopped:



By this time, Defendant Williams is no longer standing near the walkway, because he has walked toward Montana Avenue and out of view. The audio from Officer Gabster's BWC, which only activates at 19:04:26 due to the automatic two-minute delay when the BWC is activated, picks up the tail end of the UC's broadcast that provides the description of Defendant Williams, including mention of the orange hood. This clearly occurred before Officer Gabster makes it to the walkway and prior to when Defendant Williams could have come into his view. *See* Exhibit C at 19:04:26 – 19:04:35. As discussed further *infra,* it is not until Officer Gabster proceeds through the walkway onto Montana Avenue that Defendant Williams becomes visible.

Defendant Douglas was wearing a backpack under his jacket, as observed by UC 2268 and confirmed by Officer Poupart's BWC footage.[3] Officer Gabster proceeded down the walkway to Montana Avenue, where he observed an individual matching the description of the other suspect

---

[3] A detailed description of Officer Poupart's encounter with Defendant Douglas is set forth in the Government's Opposition to Defendant Douglas's Motion to Suppress Tangible Evidence (ECF # 34 at p. 2-3). The Government hereby incorporates by reference herein the factual summary and legal arguments made in its opposition.

given by the UC. This person, later identified as Defendant Williams, was standing in the street near two other individuals and a truck. Exhibit C at 19:04:36 – 19:05:04. Officer Gabster greets Defendant Williams and the other two males, and asks Williams, "You don't got anything on you, do you?" Williams replied, "nope, you could find out yourself. I ain't got nothing." Two additional officers approach and Williams gives consent to Officer Gabster to check him for weapons. *Id.* at 19:05:04 – 19:05:17. Once Officer Gabster completed the pat down of Defendant Williams, he stated over the radio, "So orange hood gave it." *Id.* at 19:05:29.[4] Officer Gabster then began to walk Defendant Williams back to the 2300 block of 15th Street where Defendant Douglas was being detained, and as Williams told the officers to "get off me," he was placed in handcuffs. *Id.* at 19:05:33 – 19:06:13. At 19:07:15 of his BWC, Officer Gabster can be heard confirming the positive ID of Defendant Williams by the UC.

     Defendant Williams and Defendant Douglas were placed under arrest. Defendant Douglas was also determined to have a bench warrant. The firearm that was recovered from the backpack was determined to be a Sig Sauer, model P320, .40 caliber semiautomatic handgun with an obliterated serial number. When the firearm was recovered, it was loaded with one (1) round in the chamber and twelve (12) rounds in a thirteen (13) round capacity magazine. During a search incident to arrest of Defendant Williams, officers recovered two iPhones, one of which was later determined to belong to Defendant Douglas. Officers did not recover any money from Williams's person at the time of his arrest.

---

[4] The radio run (Exhibit A) makes clear that Officer Gabster said, "So orange hood gave it," to which the UC replied, "affirm" and explained "orange hood" (Williams) was the one who handed Douglas the book bag in exchange for money. Exhibit A at 00:09:40. Approximately 48 seconds later, the UC stated over the radio that he had seen both defendants and positively identified both as the individuals he observed engage in the transaction. *Id.* at 00:10:28.

On July 21, 2010, a grand jury returned an indictment that charged the defendants with one count of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1).

Both defendants now move this Court to suppress the UC's identification of them on two grounds: (1) the identification procedure violated due process in that it was unduly suggestive and unreliable; and (2) the identification was the product of an unlawful stop for which the police lacked reasonable suspicion.  *See* Def. Williams Motion [ECF #30] at 5-6; Def. Douglas Motion [ECF #33] at 1, n.1, 3.  With respect to the identification procedure, Defendant Williams falsely asserts that Officer Gabster "suggested [to the UC] an additional identifying factor of 'orange hood'" that the UC had not previously mentioned, and that "it appears the UC affirmed and added "orange hood" to his own now-evolving description."  ECF #30 at 3 [brackets added].  As summarized *supra*, the BWC footage of both Officers Poupart and Gabster, along with the radio run, conclusively establish that the UC made his observations and provided his descriptions of Defendant Williams, independently and without aid from Officer Gabster or anyone else.  It would appear that the Defendant Williams is seeking to mislead the Court by making scurrilous claims that the officers engaged in some nefarious behavior that even a cursory review of the recordings reveals are untrue.  Further, as discussed more fully in the Government's Opposition to Defendant Douglas' Motion to Suppress Tangible Evidence (ECF # 34), the police had reasonable suspicion to conduct an investigatory stop of both defendants based upon the UC's observations, and the fact that both defendants matched the detailed description given by the UC.  Accordingly, both defendants were lawfully stopped at the time the UC positively identified them and their motions to suppress the evidence of the identifications should be denied.

**ARGUMENT**

*i.  The Identifications Made by the Undercover Officer of Both Defendants were Reliable and Not Suggestive.*

Defendants argue that the show-up procedure involving UC 2268 was unduly suggestive, and therefore not reliable. It is the reliability of a witness's identification that is the key to its admissibility. *Manson v. Brathwaite*, 432 U.S. 98 (1977). Factors to be considered in determining the reliability of an identification procedure include: "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers*, 409 U.S. 188, 199 (1972). Courts have further noted that if a trained law enforcement officer, who is "expert" in observing criminals, is the individual making the identification, that factor bolsters the reliability of the identification. *United States v. Dring*, 930 F.2d 687, 693 (9th Cir. 1991), *cert. denied*, 506 U.S. 836 (1992); *Singleton v. United States*, 702 F.2d 1159, 1165-66 (D.C. Cir. 1983).

Courts have noted that that show-up identifications such as the one used in this case are suggestive. *See, e.g., Singleton*, 702 F.2d at 1166-67; *Russell v. United States*, 408 F.2d 1280, 1284 (D.C. Cir. 1968); *cert. denied*, 395 U.S. 928 (1969). However, such methods have been long approved as being a reliable method for the identification of suspects. *Singleton*, 702 F.2d at 1166; *Russell*, 408 F.2d at 1284; *Wise v. United States*, 383 F.2d 206, 209 (D.C. Cir. 1967); *cert. denied*, 390 U.S. 964 (1968). In fact, the Court in *Russell* recognized, "[b]alancing all the doubts left by the mysteries of human perception and recognition, it appears that prompt confrontations . . . will 'if anything, promote fairness by assuring reliability . . .'" *Russell*, 408 F.2d at 1284.

Evidence found to be reliable is admissible, and the suggestiveness of the procedure goes to the weight of evidence, which is for the jury to decide. *Singleton*, 702 F.2d at 1166. In the

instant case, the identifications of the defendants by the UC are very reliable. First, the UC is a trained undercover officer who understands the importance of his role in identifying the correct individual. Second, the UC had ample opportunity to view the defendants while the transaction between them was being conducted. Third, because he understood the importance of a correct identification, the UC's degree of attention to the defendants was very high. Fourth, the descriptions he provided of the defendants just prior to the defendants being stopped were detailed, and the defendants were the only ones in that area who fit those descriptions. Fifth, the UC was certain he identified the right individuals-- the individuals he had just observed exchange the backpack for money. Finally, the time between when the UC observed the transaction and the show-up was very short, just a matter of minutes, and thus the transaction was still very fresh in his memory.

Thus, the only thing that could defeat the reliability, and thus the admissibility, of the UC's identifications is if the show-up procedure "was so unnecessarily suggestive and conducive to irreparable mistaken identification that [defendant] . . . was denied due process of law." *Russell*, 408 F.2d at 1284 (internal quotations and citations omitted). However, the *Russell* court also stated that "we have previously held that absent special elements of unfairness, prompt on-the-scene confrontations do not entail due process violations." *Id.* There are no special elements of unfairness in this case, and defendants cannot point to any, to warrant the suppression of the out-of-court, or in-court, identifications of the defendants by the UC. As discussed *supra,* the evidence from the radio run and the BWC establishes that the UC's identifications were based upon his own, independent observations, and not the result of any suggestive behavior by the officers involved in the stop of the defendants.

9

> ii. *The Initial Stops of Both Defendants Were Based Upon Reasonable Articulable Suspicion, and Therefore, the Identifications Are Not Subject to Suppression as the Fruit of an Illegal Stop.*

### a. **Defendant Williams**

As discussed more fully in the Government's Opposition to Defendant's Douglas' Motion to Suppress Tangible Evidence, in determining whether reasonable suspicion exists, officers are to consider whether all the facts "taken together [warrant] further investigation" and may consider behavior that would normally be innocent conduct. *Terry v. Ohio,* 392 U.S. 1, 22. Officers are permitted to take into account a wide range of factors in making the reasonable suspicion determination. *Id.* (officers can take account of strange or atypical behavior).[5]

In the instant case, the UC observed Williams engage in a hand-to-hand transaction of a backpack with Douglas in exchange for money. The UC observed additional behavior that appeared suspicious, including Douglas appearing to hurriedly remove his jacket, put the backpack over his shoulders, and then put the coat over the backpack in an apparent attempt to conceal it. *United States v. Lovelace,* 357 F. Supp. 2d 39, 43-44 (D.D.C 2004). Furthermore, it is anticipated that testimony will establish that the area where the UC made these observations is in an area known for high crime, and specifically narcotics trafficking and possession of firearms. All of these factors gave rise to reasonable suspicion that both defendants had committed a crime, to wit, the exchange of illegal contraband. Based upon the detailed lookout provided by the UC for Williams, once the officers located him only a short distance away from where the UC observed

---

[5] *See also Wardlow v. Illinois*, 528 U.S. 119, 125 (2000) (officers may take account of the fact that an individual is in a high crime area because they need not "ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation"); *United States v. Laing,* 889 F.2d 281, 286 (D.C. Cir. 1989) (time of day, the "high crime" nature of an area, and furtive hand movements are all relevant to the reasonable suspicion inquiry).

the transaction occur, the officers had sufficient reasonable articulable suspicion to conduct an investigatory stop in order to allow the UC the opportunity to make an identification.[6] Neither the basis for the stop nor the length of time (merely a few minutes at most) were unreasonable under *Terry*.

        **b.**    **Defendant Douglas**

For the reasons set forth in the Government's Opposition to Defendant Douglas' Motion to Suppress Tangible Evidence, the police also had reasonable articulable suspicion to conduct a *Terry* stop of Douglas and to arrest him. Accordingly, the UC's identification of Douglas should also be admissible at trial.

Since the out-of-court identifications are admissible because they were reliable and not suggestive, there is no basis to exclude any in-court identifications made by the UC.

---

[6] To support his assertion that there were insufficient facts to justify the stop of Defendant Williams, defense counsel asserts, without evidence, that his client was merely borrowing Co-defendant Douglas' phone. Setting aside the fact that there is no credible evidence in the record to support this assertion, this argument fails to account for the fact that Defendant Williams was found in possession of his own cellphone in addition to Douglas' phone. Furthermore, the fact that officers did not find any cash on Defendant Williams is not significant, since Officer Poupart's BWC footage makes it clear that Williams was aware of the presence of the police, that the police had stopped his co-defendant, and Williams had ample opportunity to dispose of the cash he received from Douglas before he was stopped by police on Montana Avenue. In any event, since none of these facts could have been known to the officers prior to their stopping the defendants, it is not evidence that can be considered by the Court in evaluating the validity of the stop of both defendants. *See Ornelas v. United States,* 517 U.S. 690, 696 (1996).

## CONCLUSION

**WHEREFORE,** for the reasons stated above the United States respectfully submits that the defendants' motions to suppress identifications should be denied.

                                      Respectfully submitted,

                                      MICHAEL R. SHERWIN
                                      United States Attorney
                                      N.Y.S. Bar No. 4444188

By:          /S/
             STEVEN B. WASSERMAN
             D.C. Bar No. 453251
             Assistant United States Attorney
             555 Fourth Street, N.W., Fourth Floor
             Washington, D.C. 20530
             Telephone: (202) 252-7719
             E-mail: steve.wasserman@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was served via ECF on counsel for Defendant, on this 4th day of September 2020.

                                      /S/
                                    Steven B. Wasserman
                                    Assistant United States Attorney