```
 1                   IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
 2

 3   UNITED STATES OF AMERICA,              CR Action
               Plaintiff,                   No. 1:20-121
 4
         vs.                                Washington, DC
                                            October 20, 2020
 5   TAVONTE WILLIAMS,
     THEODORE B. DOUGLAS                     10:55 A.M.
 6             Defendants.
     _____/
 7
                        TRANSCRIPT OF MOTION HEARING
 8               BEFORE THE HONORABLE CARL J. NICHOLS
                      UNITED STATES DISTRICT JUDGE
 9
     APPEARANCES:
10
     For the Plaintiff:       STEVEN B. WASSERMAN
11                            U.S. ATTY'S OFC. FOR THE D OF C
                              555 Fourth Street, NW
12                            Washington, DC 20530
                              (202) 252-7719
13                            steve.wasserman@usdoj.gov

14

15   For Defendant Williams: JOHN PETER MARSTON
                              FOLEY HOAG, LLP
16                            1717 K Street, NW
                              Washington, DC 20006
17                            (202) 261-7321
                              jmarston@foleyhoag.com
18

19   For Defendant Douglas:  EUGENE OHM
                              FED. PD FOR THE DISTRICT OF COLUMBIA
20                            625 Indian Avenue, NW
                              Suite 550
21                            Washington, DC 20004
                              (202) 208-7500
22                            eugene_ohm@fd.org

23   Reported By:       LORRAINE T. HERMAN, RPR, CRC
                        Official Court Reporter
24                      U.S. District & Bankruptcy Courts
                        333 Constitution Avenue, NW
25                      Room 6710
                        Washington, DC 20001
```

1

**I N D E X**

2   **WITNESS**          **PAGE**

3   OFR. ISAAC JACKSON

| | |
|---|---|
| Direct Examination by Mr. Wasserman | 7 |
| Cross Examination by Mr. Marston | 57 |
| Cross Examination by Mr. Ohm | 86 |
| Redirect Examination by Mr. Wasserman | 123 |

OFR. MAXWELL POUPART

| | |
|---|---|
| Direct Examination by Mr. Wasserman | 131 |
| Cross Examination by Mr. Ohm | 156 |
| Redirect Examination by Mr. Wasserman | 185 |

OFR. BRIANNA TAYLOR

| | |
|---|---|
| Direct Examination by Mr. Ohm | 191 |
| Cross Examination by Mr. Wasserman | 199 |

**EXHIBITS**          **PAGE**

| | |
|---|---|
| Government's Exhibit No. 1-A was admitted | 22 |
| Government's Exhibit No. 1-B was admitted | 23 |
| Government's Exhibit No. 2 was admitted | 25 |
| Government's Exhibit No. 3 was admitted | 41 |
| Government's Exhibit No. 4 was admitted | 46 |
| Government's Exhibit No. 4-A was admitted | 47 |
| Government's Exhibit No. 4-B was admitted | 146 |
| Government's Exhibit No. 5 was admitted | 49 |
| Government's Exhibit No. 6-A was admitted | 148 |
| Government's Exhibit No. 6-B was admitted | 148 |
| Government's Exhibit No. 7 was admitted | 154 |
| Government's Exhibit No. 8 was not marked or ID'd | *** |
| Government's Exhibit No. 9 was admitted | 155 |

| | |
|---|---|
| Defendant Williams' Exhibit No. 1 was admitted | 70 |
| Defendant Williams' Exhibit No. 2 was admitted | 73 |

| | |
|---|---|
| Defendant Douglas' Exhibit No. 1 was admitted | 204 |
| Defendant Douglas' Exhibit No. 2 was admitted | 204 |
| Defendant Douglas' Exhibit No. 3 was admitted | 204 |
| Defendant Douglas' Exhibit No. 4 was admitted | 194 |

1                      **P R O C E E D I N G S**

2              CLERK:  This is criminal case year 2020-121,

3    United States of America versus Tavonte Williams, Defendant

4    number 1, and Theodore B. Douglas, Defendant number 2.

5    Counsel, please come forward and introduce yourselves

6    beginning with the Government.

7              MR. WASSERMAN:  Good morning, Your Honor.  Steven

8    Wasserman on behalf of the United States.

9              THE COURT:  Mr. Wasserman, good morning.

10             MR. WASSERMAN:  Good morning.

11             MR. OHM:  On behalf -- I wanted to thank Your

12   Honor and court staff and marshals for accommodating us this

13   morning on behalf of Mr. Douglas.

14             THE COURT:  Thank you.

15             MR. MARSTON:  John Marston for Mr. Williams who is

16   present.

17             THE COURT:  Mr. Marston, thank you.

18             Obviously, these are strange times.  We are in the

19   ceremonial courtroom to spread out as much as possible,

20   consistent with the Court's standing orders around COVID.

21   We are going to do our very best to remain masked and to,

22   generally, follow the standing order.

23             I think just in terms of that question, I would

24   like, to the maximum extent possible, for everyone speaking

25   to remain masked, except the witness or witnesses who I will

1    permit to wear either no mask or a face guard, if we have

2    them in the courtroom, and I think we do.

3              So I'd like, again, this is all strange times, but

4    I think we'll be fine with masks, except for the witnesses.

5              Other than that, I would like to try to conduct

6    this hearing just like if we were in my courtroom without

7    masks, eight months ago.

8              I realize that we have pending four different

9    motions, some defense motions, some Government motions.

10   Some of them obviously implicate evidentiary questions and

11   testimony, some don't.

12             I probably have a view about how I would like to

13   proceed, but I didn't know if the parties had discussed an

14   order of operations or a proposal for how we would begin.  I

15   am happy to hear from you, Mr. Wasserman, if you either

16   discussed that question with defense counsel or have a

17   proposal.

18             MR. WASSERMAN:  I haven't discussed it with

19   defense counsel.  I guess I assumed that we would proceed

20   with the evidentiary motions because, obviously, if the

21   evidence were somehow suppressed, it would moot out at least

22   for now, the other two motions, Government's motion and I

23   believe the motion to sever; so that would be my

24   recommendation.  I don't know, you know, what defense

25   counsel's position is.  I also want to apprise the Court and

1    the marshals, I have the evidence here in the courtroom,

2    which also consists of the firearm and the ammunition, which

3    are in separate packaging and the firearm has been cleared

4    by the marshals downstairs.  I just wanted to mention that.

5                THE COURT:  Thank you.  I will say the following,

6    I tend to think we should just do the evidentiary issues

7    first.  I am very likely to take even evidentiary motions

8    under advisement and write something on them and on the

9    other motions.  So I don't think the question of the

10   evidentiary motion mooting out the other motions is

11   relevant, but I think it makes sense to do them first in any

12   event.  I didn't want to necessarily decide that until I

13   heard from defense counsel.

14               MR. WASSERMAN:  I am still fine with that.

15               THE COURT:  Mr. Ohm?

16               MR. OHM:  That makes sense to me, Your Honor.

17               THE COURT:  Mr. Marston?

18               MR. MARSTON:  I agree.

19               THE COURT:  Okay.  Why don't we start there.

20               Do you want to begin with argument or witnesses,

21   Mr. Wasserman?

22               MR. WASSERMAN:  Your Honor, I would just begin

23   with witnesses.

24               THE COURT:  Okay.  Let's do that.

25               MR. WASSERMAN:  The Government would call Officer

1    Isaac Jackson.

2              Your Honor, ordinarily we would have the touch

3    screen.  To the extent that I anticipate having Officer

4    Jackson mark some exhibits, I am going to have to approach

5    him and have him probably just do it the old-fashioned way.

6              THE COURT:  That's fine.  We will figure it out.

7              MR. WASSERMAN:  Okay.  Thank you.

8              THE COURT:  Not a problem.

9              CLERK:  Please raise your right hand.  Do you

10   solemnly swear to tell the truth, the whole truth and

11   nothing but the truth, so help you God?

12             THE WITNESS:  I do.

13             MR. WASSERMAN:  Your Honor, I don't know if you

14   want to address him with respect to the mask and face cover

15   and shield?

16             THE COURT:  Officer Jackson, you are free to go

17   forward with the mask.  Since you are the witness, you are

18   the one person who could, if you would prefer, put on a face

19   shield and remove the mask.  I am happy for you to proceed

20   either way.  I suppose one question is whether the defense

21   counsel has a strong preference for his wearing the face

22   shield for credibility issues?

23             MR. OHM:  No preference, Your Honor.  Whatever

24   suits the witness is fine.

25             MR. MARSTON:  Same for me, Your Honor.

1          THE COURT:  Officer Jackson, if you would like to

2     put on a face shield and take off the mask, that's not a

3     requirement.

4          THE WITNESS:  I am fine with this.

5          MR. OHM:  Before the Government begins, Your

6     Honor, I forgot to tell Mr. Douglas if he wants to

7     communicate with me, that he should raise his hand.  We have

8     the phone and can have a conversation.

9          THE COURT:  Yes.  We have -- everyone should know

10    we have what I think has to be a relatively elaborate setup

11    for clients and counsel to communicate as well as for me to

12    be able to communicate with counsel in what would be

13    something like a bench conference but a virtual one.

14          I think if anyone feels the need to communicate

15    with someone who he or she is not sitting next to, that's

16    basically everyone, go ahead, especially if it's a

17    defendant.  Please raise your hand.  We will pause.  We will

18    make sure you can communicate, and then we will just resume.

19          MR. WASSERMAN:  Thank you, Your Honor.

20                    **DIRECT EXAMINATION**

21    **BY MR. WASSERMAN:**

22     **Q.**   Good morning.

23     **A.**   Good morning.

24     **Q.**   Can you introduce yourself to the Court and spell

25    your first and last name for the court reporter.

1    **A.**   Officer Isaac Jackson.  First name Isaac,

2    I-s-a-a-c.  Last name Jackson, J-a-c-k-s-o-n.

3    **Q.**   Where are you currently employed?

4    **A.**   Metropolitan Police Department in Washington, D.C.

5    **Q.**   How long have you been employed with MPD?

6    **A.**   Approximately 20 years.

7    **Q.**   And what is your position with MPD?

8    **A.**   I am an officer.

9    **Q.**   And what is your current assignment with MPD?

10   **A.**   I am currently assigned to the narcotics

11   enforcement unit, which is out of NSID, Narcotics Special

12   Investigation.

13   **Q.**   How long have you been with NSID or the narcotics

14   enforcement unit?

15   **A.**   On and off 10 years.

16   **Q.**   And prior to being assigned to NSID, what other

17   assignments have you had?

18   **A.**   I was assigned to sixth district vice unit and

19   then that turned into sixth district team and that's pretty

20   much it.

21           THE COURT:  I am seeing that the court reporter

22   she is having trouble hearing.

23           Officer Jackson, I think one of the reasons she is

24   having a hard time is because of your mask.  Would you mind

25   putting on a face shield?

1            THE WITNESS:  Not at all.

2            (Witness was assisted by the Deputy Clerk.)

3            THE COURT:  You can go ahead.

4            MR. WASSERMAN:  Okay.  Your mask is off?  Okay.

5            THE COURT:  Thank you, Ms. Lesley.  Thank you,

6   Officer Jackson.

7            THE WITNESS:  You're welcome.

8   BY MR. WASSERMAN:

9       Q.   I was asking you, prior to your assignment with

10  NSID, what other assignments have you had with MPD?

11      A.   Sixth district vice and served some time in sixth

12  district patrol.

13      Q.   And your positions when you were in six D, what

14  types of cases or investigations did you work?

15      A.   Primarily narcotics investigations, other

16  investigations and some prostitutions as well.

17      Q.   What types of investigations do you work on

18  currently with NSID?

19      A.   Narcotics investigations.

20      Q.   And as part of your assignment for your experience

21  as an MPD officer, have you received any training in

22  connection with narcotics investigations and firearms

23  investigations?

24      A.   Yes, sir.  I served some time on-the-job training

25  as well as some training in DEA, which is based out of

1    Quantico at the time.  We did some training there.  Also,

2    some training at the police academy as well.

3        Q.   And, as part of your current assignment at NSID,

4    is there yearly training that's provided?

5        A.   Yes.  We have a training course, which is called

6    EDT, and we train at least twice a year, and we familiarize

7    ourselves with narcotics investigations as well as firearms.

8        Q.   All right.  Can you describe for the Court what an

9    observation post is?

10       A.   Sure.  An observation post can be -- I could be

11   out walking, in a vehicle or also in a building.  There are

12   observations made by undercover officers, undercover

13   officers would be looking to observe for any type of illegal

14   activity and, like I said before, probably be in the

15   building, on foot or sometimes in the vehicle.

16       Q.   Okay.

17            MR. WASSERMAN:  I'm sorry.  Is he coming over the

18   speaker?  I am not hearing him too well.  Is the mic working

19   that well?

20            THE COURT:  I agree.  I can hear him but I don't

21   think he is being transmitted on the speaker.

22            (The witness was provided a microphone.)

23   BY MR. WASSERMAN:

24       Q.   Okay.  All right.  You indicated that observation

25   post can be either on foot or in a vehicle; is that what you

1    said?

2         **A.**   Yes, sir.

3         **Q.**   And have you actually personally worked

4    observation post, as an observation post officer?

5         **A.**   Yes, sir.

6         **Q.**   And what, generally, are you looking for in terms

7    of criminal activity as an OP officer?

8         **A.**   We go to areas and we will look for hand-to-hand

9    interactions.  People engaging in -- usually start with

10   individuals engaging in conversation and after that

11   conversation person would probably go to a stash, which is

12   somewhat near them, which could be on their person.  Also, I

13   would look for hand movements between those two people.

14   After that I would give a look out.

15        **Q.**   So for the OP it is typically narcotics then that

16   you are looking for?

17        **A.**   Yes, sir.

18        **Q.**   All right.  And how about firearms?

19        **A.**   Firearms as well.  I would look for any type of

20   movements or indication or characteristics of anybody that

21   could possibly be armed with a firearm; arm or hand

22   gestures, movements upon their waistband or on their person,

23   and things like that.

24        **Q.**   And how many times do you think you worked an OP

25   case as an OP officer?

1      **A.**   I can say more than 500.

2      **Q.**   Okay.  That is over the course of your 20-year

3      career?

4      **A.**   Yes, sir.

5      **Q.**   All right.  When you are working in OP, do you

6      sometimes use any tools to enhance your vision?

7      **A.**   Yes, sir.

8      **Q.**   All right.  And what types of tools might you use?

9      **A.**   If available, I can use a set of binoculars.

10     **Q.**   Do you always use these?

11     **A.**   No.

12     **Q.**   Are there situations where -- well, let me --

13     describe what situations you might not use binoculars to

14     enhance your vision?

15     **A.**   Like I said before, usually on observation post if

16     I am out on foot or if I am in the vehicle and I am in the

17     presence of other individuals or nearby, I would try to

18     blend in by being in an undercover capacity.  I cannot pull

19     out a set of binoculars without bringing attention to

20     myself.

21     **Q.**   What is the arrest team?

22     **A.**   The arrest team is nearby police officers; they

23     will be wearing police insignia in unmarked vehicles and

24     they are constantly transmitting on radio lookouts and

25     monitoring those lookouts and monitoring my transmissions so

1      that they can move into the area if I give a lookout.  But

2      they do wear police insignia.

3           **Q.**   When you use the term "lookout", is that a

4      reference to someone you've identified as being someone

5      suspected to participate in a criminal transaction or

6      criminal activity?

7           **A.**   Yes, sir.

8           **Q.**   Okay.  And lookout, what is that?

9           **A.**   A lookout can be a description.  A description of

10     an individual who I saw engage in what appeared to be

11     illegal activity.  It could be clothing description, race,

12     age approximately sometimes, what the person is wearing or

13     anything that sticks out and things like that.

14          **Q.**   All right.  When someone is stopped by officers of

15     the arrest team as a result of your observations, is there

16     typically an identification procedure that you use to

17     determine whether the officers have stopped the correct

18     person?

19          **A.**   Yes.

20          **Q.**   Can you just describe how that ID procedure is

21     typically conducted in your experience?

22          **A.**   Sure.  The officers will have an individual stop

23     that is matching the lookout that I have given previously.

24     If I can, at the time, I would come across the radio and say

25     positive ID; that's the person I need to be stopped, and

1   there appears to be illegal activity.

2       **Q.**   All right.  And when you are operating an OP, how

3   important is it for you to provide an accurate description

4   to the arrest team of what and whom you are observing?

5       **A.**   It is very important so that the right person is

6   stopped, and I don't want anybody who is not involved in my

7   observations to be stopped.

8       **Q.**   Okay.  When you voice an initial lookout for the

9   arrest team, are you typically concerned about trying to be

10  sure that the arrest team is trying to stop the person or

11  persons before they leave the area?

12      **A.**   Yes.

13      **Q.**   Are there times when you will provide additional

14  descriptive detail after you first broadcast a lookout for

15  somebody?

16      **A.**   Yes.

17      **Q.**   All right.  Based upon your training and

18  experience, are you familiar with some of the signs or

19  behaviors exhibited by a person engaged or people engaged in

20  sort of a typical hand-to-hand transaction for drugs?

21      **A.**   Yes.

22      **Q.**   Can you kind of just describe some of those

23  characteristics or behaviors?

24      **A.**   Um, in most times, um, people are trying to be --

25  well, people I am observing are in a discreet type of

1    nature.  They are trying to be secretive and they are

2    reaching upon their person.  Sometimes I will look for the

3    exchange of currency, money.  Also, I will look to see if a

4    person is reaching on their person or possibly going to a

5    stash location, where they could get their narcotics or

6    drugs from and subsequently go back to that person and give

7    that item to them.  It is just hand movement, secretive and

8    things like that.

9         Q.   When you use the term "secretive" in terms of the

10   behaviors of the individuals that you may observe engaging

11   in hand-to-hand, what, if any, behaviors do you typically

12   see them exhibit beyond the sort of reaching on their person

13   and the actual exchange?

14        A.   Looking around.  I do recognize that people engage

15   in a hand-to-hand transaction will not hold out the drugs so

16   that everybody can see it.  Just trying to be discreet,

17   looking around, holding upon their person in a manner that

18   is not, um -- so that somebody cannot see right away.

19        Q.   All right.  And with respect to firearms, you

20   eluded to this a little bit earlier, but in terms of

21   observing somebody who may be in possession of a firearm on

22   their person, what are the types of behaviors that you

23   typically look for?

24             MR. OHM:  Objection, Your Honor, foundation.  He

25   has only testified to his training and experience in

1    narcotics.

2              THE COURT:  Can you repeat the question?

3              MR. WASSERMAN:  With respect to your observations

4    of individuals that you suspect are in possession of

5    firearms, what are the types of behaviors and

6    characteristics that you typically look for?

7              THE COURT:  I'll allow the question.

8              THE WITNESS:  Hand/arm movement, person trying to

9    conceal something up against their waistband and sometimes

10   even in their pockets.  For instance, I carry a firearm on

11   and off duty and I carry it upon my waistband.  Sometimes I

12   would hold it up against my waistband while using my arm,

13   just to try to conceal it and things like that.  Someone

14   trying to conceal their waistband area with their arms and

15   hand movement and things like that.

16      Q.    In your training and experience, how common is it

17   for individuals engaged in drug trafficking to possess

18   firearms?

19      A.    It is very common.

20      Q.    In your experience as PO officer, when there is an

21   arrest or seizure, what types of contraband are commonly

22   involved?

23      A.    U.S. currency, other narcotics, empty Ziplocs,

24   plastics and firearms as well.

25      Q.    Are you familiar with the size, shape, weight and

1    other characteristics of your typical handgun?

2        **A.**   Yes.

3        **Q.**   Is that through your training and experience as a

4    police officer?

5        **A.**   Yes, sir.

6        **Q.**   In your experience, have you had cases as an OP or

7    heard of cases where transactions or transfers of bulk

8    quantities of narcotics or of a firearm occur in the type of

9    hand-to-hand transaction that you earlier described?

10       **A.**   Yes, I've had instances like that.

11       **Q.**   In those instances, are they -- where we are

12   talking about bulk transfers of narcotics or firearms, have

13   you heard of cases where this is done out in the open where

14   people are actually handing them to each other or --

15       **A.**   No.  Are you finished with the question?

16       **Q.**   No.  How, in your experience, are those types of

17   transactions or exchanges conducted?

18       **A.**   Usually in a vehicle if large quantities or

19   firearms usually in a bag or I have been a part of instances

20   where those transactions took place in the vehicle, the

21   building, like, sometimes in a free area outside in a

22   particular area; that's pretty much it.

23       **Q.**   All right.  Would you expect then somebody to out

24   in the open, in the street, hand somebody a kilo of coke or

25   a handgun out in the open?

1      **A.**   No.

2      **Q.**   All right.  Prior to April of 2020 this year, how

3   frequently have you worked as a police officer in the fifth

4   police district?

5      **A.**   Quite frequently.

6      **Q.**   In your 20 years of experience as a police officer

7   with MPD, what types of crimes occur most frequently in the

8   fifth district?

9           MR. OHM:  Object to the question.  Experience from

10   2000 to 2015 is broad.

11           THE COURT:  Why don't we narrow it a little bit

12   chronologically.

13   **BY MR. WASSERMAN:**

14      **Q.**   Going back to, say, 2015 to the present, what

15   types of crimes, in your experience, in the fifth district,

16   most frequently occur?

17      **A.**   We've had violent crimes, shootings take place

18   narcotics transactions and things like that.

19      **Q.**   All right.

20      **A.**   Are you asking the nature of the crime?

21      **Q.**   Yes, the nature of the crime?

22      **A.**   Violent crimes, people who have been victims of

23   gunshots, things like that, robberies, and things like that.

24      **Q.**   And you indicated -- is there drug trafficking as

25   well?

1       **A.**   Yes.  And drug transactions as well, yes.

2       **Q.**   In your experience between, say, 2015 and 2020,

3   how does the frequency of the drug and violent crimes in 5D

4   compare to similar offenses in terms of frequency in the

5   first, second, third and fourth police stations?

6       **A.**   In my experience and my time in the area, it is

7   more frequent than those districts.  First district, second

8   district, third district and fourth district, the fifth

9   district would be more frequent than those districts.

10      **Q.**   How about with respect to sixth and seventh?

11      **A.**   It wouldn't be, in my experience, as frequent but

12  it's somewhat almost similar.

13      **Q.**   All right.  I want to direct your attention to

14  shortly before 3:00 p.m. on April 22nd of 2020 this year.

15  Were you on duty that day?

16      **A.**   Yes.

17      **Q.**   What was your assignment that day?

18      **A.**   I was operating an undercover capacity, utilizing

19  an unmarked vehicle on an observation post.

20      **Q.**   What street or block was your OP, your observation

21  post, located?

22      **A.**   2300 block of 15th Street Northeast.

23      **Q.**   You indicated you were in an unmarked vehicle?

24      **A.**   Yes, sir.

25      **Q.**   And was anyone with you in the vehicle?

20

1      **A.**   No.

2      **Q.**   Can you generally describe what's located in that

3  block, the 2300 block of 15th Street Northeast?

4      **A.**   The 23rd block of 15th Street, if you are going

5  southbound on 15th Street, there is a set of row houses on

6  your left.  Then on the right-hand side, there is a

7  recreational center, a playground and that's pretty much it.

8      **Q.**   Are you familiar with this area?

9      **A.**   Yes.

10     **Q.**   How are you familiar with that area?

11     **A.**   Just based on past instances conducting

12  investigations, operations and just basic patrolling in that

13  area.

14     **Q.**   How often have you worked as a police officer in

15  this particular area?

16     **A.**   Quite often.  Since my time at NSID, it was quite

17  frequent.  I would say more than -- I would say about five

18  years on and off.

19     **Q.**   Five years?

20     **A.**   Yeah, five years.

21     **Q.**   And in terms of frequency, can you estimate the

22  number of times you sort of patrolled or have been involved

23  in investigations in that area?

24     **A.**   I can say close to 200.

25              (Government's Exhibit 1-A was marked for

1    identification.)

2              MR. WASSERMAN:  I want to show you what I have

3    marked for identification as Government's Exhibit 1-A.

4    Officer Jackson, do you recognize what is on the screen

5    marked as Government's Exhibit 1-A?

6              THE WITNESS:  Yes.

7              Real quick.  I would much rather take the mask

8    (sic) off.  It's fogging up and affecting my ability to see

9    and since I have the microphone I can use -- would that be

10   better?

11             THE COURT:  Why don't we try that.  Why don't you

12   put the mask back on and take the shield off, use the

13   microphone.  We will confirm with the court reporter that

14   that's --

15             THE WITNESS:  That's much better as far as my

16   vision is concerned.

17   BY MR. WASSERMAN:

18        **Q.**   Do you recognize the area depicted in 1-A?

19        **A.**   Yes, sir.

20        **Q.**   What is that area?

21        **A.**   This is the 2300 block of 15th Street Northeast.

22        **Q.**   And is this the area where you were conducting

23   your OP on April 22nd of this year?

24        **A.**   Yes, sir.

25        **Q.**   Is that a fair and accurate depiction of the

1    general appearance of that area on that date?

2        **A.**   Yes, sir.

3            MR. WASSERMAN:  Your Honor, I would move for

4    Government's Exhibit 1-A into evidence.

5            MR. MARSTON:  No objection.

6            MR. OHM:  No objection.

7            THE COURT:  So admitted.

8            (Government's Exhibit 1-A was admitted.)

9            (Government's Exhibit 1-B was marked for

10   identification.)

11   **BY MR. WASSERMAN:**

12       **Q.**   Showing you Government's Exhibit 1-B for

13   identification.  Do you recognize that photograph?

14       **A.**   Yes, sir.

15       **Q.**   And what is that -- what is depicted in that area?

16       **A.**    This is the same 2300 block of 15th Street

17   Northeast, but it is the back side of the row houses that I

18   previously mentioned, along with the walkway that leads to a

19   back parking lot.

20       **Q.**   And is the area depicted in 1-B a fair and

21   accurate depiction of that area as it appeared on April 22nd

22   of this year?

23       **A.**   Yes, sir.

24            MR. WASSERMAN:  Your Honor, I move Government's

25   Exhibit 1-B into evidence.

1          MR. MARSTON:  No objection.

2          MR. OHM:  No objection, Your Honor.

3          THE COURT:  We will admit 1-B as well.

4          (Government's Exhibit 1-B was admitted.)

5  **BY MR. WASSERMAN:**

6      **Q.**  Officer Jackson, in your training and experience

7  do you know if this particular block is known as a high

8  crime area?

9      **A.**   In my training and experience, yes, it is known as

10 a high crime area.

11     **Q.**   What types of criminal activities are most common

12 in this block, this area that is depicted in 1-A and 1-B?

13     **A.**   Narcotic sales.

14     **Q.**   Anything else?

15     **A.**   Narcotic sales and there has been some violent

16 crimes that took place in this particular area.

17     **Q.**   Okay.  With respect to the vehicle that you were

18 stationed in, what type of vehicle was it?  Was it a sedan

19 or SUV?

20     **A.**   It was a sedan type of vehicle.

21     **Q.**   And were the windows tinted?

22     **A.**   No.

23     **Q.**   Where inside of the vehicle were you seated while

24 you were making your observations?

25     **A.**   In the driver's seat.

1    **Q.**    Were you using binoculars or any other tools to

2    enhance your vision?

3    **A.**    No, sir.

4    **Q.**    On April 22nd of 2020, did you have a prescription

5    for eyeglasses or contacts?

6    **A.**    No.

7    **Q.**    Do you recall having any problems with your vision

8    that day?

9    **A.**    No.

10         (Government's Exhibit No. 2 was marked for

11    identification.)

12    **BY MR. WASSERMAN:**

13    **Q.**    Okay.  I want to show you Government's Exhibit No.

14    2, if we can bring that up on the screen.  Do you recognize

15    that photograph?

16    **A.**    Yes, sir.

17    **Q.**    And looking at that photograph, Exhibit No. 2, are

18    you able to actually see the vehicle that you were in on

19    April 22nd?

20    **A.**    Yes, sir.

21    **Q.**    All right.  What I am going to do is, I am going

22    to -- I actually have to bring you a hard copy of this

23    photograph, and I am going to ask you to circle where your

24    vehicle is.

25    **A.**    Sure.

1            MR. WASSERMAN:  Your Honor, may I approach?

2            THE COURT:  Please.

3            THE WITNESS:  Circle it now?

4    **BY MR. WASSERMAN:**

5        **Q.**   Yeah.  All right.

6            Officer Jackson, do you see the green circle where

7    my finger is?

8        **A.**   Yes, sir.

9        **Q.**   And that vehicle that you circled, was that your

10   OP vehicle on April 22nd?

11       **A.**   Yes, sir.

12       **Q.**   And that photograph, is that a fair and accurate

13   depiction of the scene in the area, the 2300 block of 15th

14   Street, as it appeared to you on that date?

15       **A.**   Yes, sir.

16            MR. WASSERMAN:  Your Honor, I would move

17   Government's Exhibit No. 2 into evidence.

18            MR. MARSTON:  No objection.

19            MR. OHM:  No objection, Your Honor.

20            THE COURT:  Admitted with the circle?

21            MR. WASSERMAN:  Yes, thank you.  I appreciate

22   that.

23            (Government's Exhibit No. 2 was admitted.)

24   **BY MR. WASSERMAN:**

25       **Q.**   And that particular exhibit, number 2, is that

1     actually from one of the officer's body worn cameras?

2         **A.**   Yes, sir.

3         **Q.**   And the area that the officer whose body worn

4     camera we are seeing here, what is that particular area?

5         **A.**   This is the walkway where I was making

6     observations and saw a hand-to-hand exchange.

7         **Q.**   Where are you parked?

8         **A.**   On 15th Street, the 2300 block, facing southbound.

9         **Q.**   Okay.  And just so we are clear, with respect to

10    this particular photograph from the body worn camera, was

11    that a photograph or a still shot that was recorded after

12    you made your observations in this case?

13        **A.**   Yes, sir.

14        **Q.**   And where you circled your vehicle with the green

15    circle there, is that the location where your vehicle was

16    when you made the observations that led to the arrests in

17    this case?

18        **A.**   Yes, sir.

19        **Q.**   I want to show you Exhibit No. 1.  If I can put

20    that -- oops.  Hang on a second.  On Exhibit 1-A, do you see

21    the walkway that you just were referring to?

22        **A.**   Yes, sir.

23        **Q.**   And can you see on 1-A the approximate location of

24    where your vehicle was stationed on April 22nd?

25        **A.**   Yes, sir.

1    **Q.**   All right.  I am going to ask you to go ahead and

2    circle -- and just so we are clear, was this photograph one

3    that was taken on the day you did the OP?

4    **A.**   Was this?

5    **Q.**   Yes.

6    **A.**   No.

7    **Q.**   All right.  So in terms of the vehicles that are

8    parked on that street, you don't know whether they were

9    there on the day of the 22nd?

10   **A.**   No.  No.

11   **Q.**   Okay.  I will ask you to circle the approximate

12   location of where your vehicle was stationed on 1-A, if you

13   can.

14   **A.**   It would be around in this area.  (Indicated)

15   **Q.**   So you've -- looking at 1-A you marked with a

16   green circle on Exhibit 1-A.  Is there a speed bump sort of

17   near the green circle?

18   **A.**   Yes, sir, and sort of, like, the upper left corner

19   there is a speed bump.

20   **Q.**   All right.  And your vehicle was parked in front

21   of that speed bump?

22   **A.**   Yes.  Yes.

23   **Q.**   Was there a particular area that you were focused

24   on that afternoon?

25   **A.**   That afternoon I was looking at two different

1   locations.  I was originally looking at a group on the right

2   side, which would be -- do you want me to further explain it

3   on this picture?

4       **Q.**   If you say right side, is the rec center where my

5   finger is?

6       **A.**   Yes, sir.

7       **Q.**   You were looking over there at times?

8       **A.**   Yes, sir.

9       **Q.**   And what was the other area you were focused on?

10      **A.**   And towards the left side, which would be the

11   walkway.

12      **Q.**   All right.  And is this what you are referring to,

13   where my finger is?

14      **A.**   Yes, sir.

15      **Q.**   And for the record, it's the sort of long paved

16   pathway between the two buildings on one end; is that right?

17      **A.**   Yes, sir.

18      **Q.**   Looking at -- well, let me ask you this:  Did

19   there come a point when you noticed some activity that

20   raised your suspicions?

21      **A.**   Yes.

22      **Q.**   Where was that generally, that activity located?

23      **A.**   In the walkway.

24      **Q.**   All right.  I am going to show you -- go back to

25   Exhibit No. 2, Government's Exhibit No. 2, the photograph or

1       the location of the officer's body worn camera, how does

2       that compare with the location of where you observed this

3       activity?

4           **A.**    This is where my observation post was which was in

5       the vehicle and I am looking up across, across the street

6       into that walkway; is that what you were asking?

7           **Q.**    Yeah.  In terms of where the officer is positioned

8       with the body worn camera, how does that compare with where

9       the activity you observed actually happened?

10          **A.**    That is my line of sight, from where I can see.

11          **Q.**    And in terms of that particular location, that

12      walkway, have you had prior experiences in other cases of

13      criminal activity occurring in that walkway?

14          **A.**    Yes.

15          **Q.**    What types of criminal activity?

16          **A.**    Drugs, drug transactions.

17          **Q.**    Okay.  Was there a point between -- excuse me.  Is

18      there a point shortly before 3:00 p.m. that you observed

19      something that caught your attention in that walkway?

20          **A.**    Yes, sir.

21          **Q.**    Can you just describe what you saw?

22          **A.**    Sure.  I saw an individual along with maybe, I

23      would say, one to two other individuals standing in the

24      walkway.  I didn't think anything of it until another

25      individual appeared in my line of sight and handed a book

1    bag over to one of the individuals in that walkway.

2        **Q.**    And after the hand off of the book bag occurred,

3    what, if anything, did you observe the individual who

4    received the book bag do?

5        **A.**    After that, he took off his jacket, placed the

6    book bag on his person, actually put the straps on his

7    shoulders, and then put the jacket over top of the book bag.

8        **Q.**    Was there anything about that conduct that struck

9    you as being unusual?

10       **A.**    Yes.

11       **Q.**    What?

12       **A.**    It appeared that this individual was trying to

13   conceal whatever was in that book bag, trying to hide the

14   book bag on his person by covering it up with his jacket.

15       **Q.**    And with respect to -- I may have missed this --

16   did the individual -- was there any exchange between the

17   individual who received the backpack to the individual who

18   handed it over?

19       **A.**    Yes.  It appeared that the individual who received

20   the backpack gave that individual, the one who gave him the

21   book bag, it appeared he could have given him some sort of

22   U.S. currency, some money.  After that action, it was

23   followed up by some sort of handshake.

24       **Q.**    All right.  What led you to believe, based on your

25   observations, the handoff from the individual who received

1    the backpack to the individual that gave it to him, that it

2    was U.S. currency?

3         **A.**    It was just color and nature.  It just happened so

4    fast.  When I looked at his hand, I could see that after

5    receiving the money, it was just light in color and then he

6    cuffed his hand and that was it.  That's pretty much all I

7    can remember.

8         **Q.**    Could you be certain that it was U.S. currency?

9         **A.**    I can't be certain.

10        **Q.**    When this exchange was occurring -- and just so we

11   are clear and sort of have a little bit of a reference

12   point, do you recall generally what the person who received

13   the backpack was wearing?

14        **A.**    Yes, sir.

15        **Q.**    What was that individual wearing?

16        **A.**    It was like a bluish jacket, blue coat.  I believe

17   dark-colored pants.  I don't remember the color of the

18   shirt.  When he took the coat off, I don't remember the

19   color of the shirt.

20        **Q.**    What angle did you have of the male in the blue

21   coat when this exchange was occurring?

22        **A.**    I could see his back.

23        **Q.**    I'm sorry?

24        **A.**    I could see his back.  Do you mean which part of

25   his body can I see?

1    **Q.**    Yeah.

2    **A.**    When I see him taking off his jacket -- I couldn't

3    see one side.  I could just see him taking off the coat and

4    putting the book bag on his person and covering it up with

5    the coat.

6    **Q.**    And the other individual, can you describe what

7    the other individual looked like who handed off the

8    backpack?

9    **A.**    Sure.  I remember it was like a bushy-ish sort of

10   hair, and he had a grayish or patterned jacket or coat, and

11   that is the best I can remember, and an orange hood.

12   **Q.**    All right.  What angle did you have of that

13   individual?

14   **A.**    Just --

15   **Q.**    From your view.

16   **A.**    From my view, I can see the left side of this

17   individual.

18   **Q.**    His left side?

19   **A.**    Yes, sir.

20   **Q.**    And in terms of the exchange that occurred when

21   you saw what you believed might have been U.S. currency, can

22   you describe what angle you had of both men?

23   **A.**    I just had the right side of the individual

24   wearing the blue coat, and I had the left side of the

25   individual wearing the grayish jacket with the orangish

1     hood.  I could originally see the right hand.  I could see

2     orange hood's right hand.

3          **Q.**   The guy giving the backpack?

4          **A.**   Yes.

5          **Q.**   His right hand?

6          **A.**   Yes.

7          **Q.**   What hand did you observe the individual in the

8     blue coat who received the backpack handoff?

9          **A.**   The back side of his right arm.  The back side of

10    his right hand.

11         **Q.**   The back side of his right hand?

12         **A.**   Yes.  Are you talking about the one with the blue

13    coat?

14         **Q.**   The one with the blue coat.

15         **A.**   Yeah.  When he made a gesture I could see his

16    right arm extended.

17         **Q.**   Okay.  So just so I am clear, which -- looking at

18    Exhibit 2 where my finger -- well, which side of the fence

19    is the individual with the blue coat that received the

20    backpack standing?

21         **A.**   Do you want me to point?

22         **Q.**   Well, you are not going -- was it between --

23         **A.**   Between your two fingers right there.

24         **Q.**   This finger or that finger?

25         **A.**   The, um --

1      Q.    Was it the side of the fence closer to you or --

2            THE COURT:  Can we start with inside of the fence

3      on the walkway?  Were they inside of the fence on the

4      walkway?

5            THE WITNESS:  Yes, the individual with the blue

6      coat was on the walkway.  When I originally saw the

7      individual with the grayish coat and orange hood, I believe

8      he was on the other side of the fence.

9      **BY MR. WASSERMAN:**

10     Q.    Let me go ahead and bring up Exhibit 1-B.  Looking

11     at Exhibit 1-B, do you see from where -- well, where was it

12     that you saw -- first saw the individual with the orange

13     hood and the backpack coming?

14     A.    Coming from the lower portion of this photograph,

15     up into the walkway leading up, if you go further up.  I

16     couldn't see -- where your finger is, I couldn't see him

17     coming from that -- I couldn't see him at that point.  You

18     have to keep going up.

19     Q.    I'm sorry?  When did you first notice him?

20     A.    I would say mid-point into the center of this

21     photograph where the walkway is.

22           THE COURT:  Can we be a little clearer for the

23     record what the witness is describing?  I think the witness

24     is describing the individual was walking from the bottom of

25     the photograph toward the top of the photograph in that

1    direction.  Correct?

2              THE WITNESS:  Yes, Your Honor.  Yes.

3              MR. WASSERMAN:  Thank you, Your Honor.

4              THE COURT:  I think the problem is with finger

5    pointing, it will not appear on the record.  Let's talk

6    directionally about the photo.

7              MR. WASSERMAN:  I appreciate that, Your Honor.

8    **BY MR. WASSERMAN:**

9         **Q.**   And the individual that had the backpack, when you

10   saw that individual, was he in the walkway or -- when you

11   first saw him inside of the walkway between the fence or was

12   he outside of the fence?

13        **A.**   Which individual are you referring to?

14        **Q.**   The individual who handed off the backpack.

15        **A.**   I remember that individual being on the other side

16   of the fence.  Not in the walkway.

17        **Q.**   Okay.  And did the handoff occur while the

18   individual with the orange hood was outside of the fence or

19   in the walkway?  Did he hop the fence?

20        **A.**   I believe he did hop the fence at some point.

21        **Q.**   Okay.  So where did the actual exchange occur?

22        **A.**   In the walkway.  The individual with the blue

23   coat, he was in the walkway.

24        **Q.**   All right.  So again, looking at Exhibit No. 2,

25   you see your vehicle circled in green.  Was the individual

1      in the blue jacket who received the backpack standing on the

2      fence line closer to you or further away from where you were

3      positioned?

4          **A.**   Closer to me.  I would say closer to me.

5          **Q.**   Okay.  And to back up, when you saw the exchange

6      between the two individuals, of what you believe was

7      currency, which side of the individual in the blue jacket

8      were you able to see?

9          **A.**   Just the back right side.

10         **Q.**   Okay.  And which hand, if you can recall, do you

11     think the individual in the blue jacket extended to hand the

12     object or potential currency?

13         **A.**   If I can remember, I believe it was his right

14     hand.

15         **Q.**   His right hand?

16         **A.**   Yes, sir.

17         **Q.**   I am going to, actually, ask you to mark on

18     Exhibit 1-B if you can, the approximate location of where

19     you saw the exchange?

20         **A.**   (Complied.)

21         **Q.**   Looking at Exhibit 1-B, and you circled -- do you

22     see the green circle there?

23         **A.**   Yes, sir.

24         **Q.**   And is that the approximate location where you

25     observed the exchange occur?

1      **A.**    Yes, sir.

2      **Q.**    And just for the record, the green circle is

3  towards the top of the walkway at the top of the photograph

4  closer to 15th Street; is that accurate?

5      **A.**    Yes, sir.

6      **Q.**    Was there anything obstructing your line of sight

7  when you observed the exchange?

8      **A.**    No, not at that moment.

9      **Q.**    Was there anything distracting your attention away

10  from the exchange that you were observing at that time?

11      **A.**    No.

12      **Q.**    About how long do you think the interaction was

13  between the two individuals, person in the blue coat and

14  person in the orange hood, when they did this exchange?

15      **A.**    I would say close to 20 to 30 seconds.  No more

16  than a minute.

17      **Q.**    And at the time of this exchange, you indicated

18  earlier that you initially noticed the individual in the

19  blue jacket with one or two other males?

20      **A.**    Yes.

21      **Q.**    Were those other two males still standing in that

22  area at the time of the exchange, if you can recall?

23      **A.**    If I can recall, I can maybe recall maybe one.

24      **Q.**    Did any of these -- this other individual that you

25  mentioned appear to participate in any way in this exchange

1     that you observed?

2          **A.**   No.

3          **Q.**   Did you observe any exchange or interaction

4     between either the individual in the blue coat or the

5     individual in the orange hood with this third person?

6          **A.**   Can you repeat that?

7          **Q.**   Did you see any exchange or physical interaction

8     between the individual in the blue coat or the individual in

9     the orange hood with this third person?

10         **A.**   Oh, no.  No.

11         **Q.**   Prior to observing the exchange of the backpack in

12    the walkway, do you recall approximately how long the male

13    in the blue coat had been standing in the walkway before the

14    exchange occurred?

15         **A.**   I would say maybe one to two minutes, but that was

16    back and forth just in and out of my sight, just walking up

17    and down the walkway.

18         **Q.**   About how long had you been in that location in

19    your OP vehicle before you observed the exchange?

20         **A.**   The best of my recollection, about 10 to 15

21    minutes.

22         **Q.**   When you observed the exchange that you just

23    described, what if anything did you suspect had occurred?

24         **A.**   I suspected that some sort of -- some transaction

25    had taken place, illegal transaction.  I suspected it could

1    have been either a large quantity of narcotics or possibly a

2    firearm.

3         Q.   And what, based upon your observations, what

4    caused you to believe that?

5         A.   Well, the way that the individual, after receiving

6    the bag, tried to conceal the book bag, he took off his

7    jacket, put the book bag on and covered the book bag with

8    his jacket so that it could not be seen, and also the hand

9    gestures, what appeared to be the exchange of U.S. currency.

10   I recognized this to be some sort of transaction.

11        Q.   After you observed the exchange of the backpack

12   for the money, what, if anything, did you observe the

13   individual in the blue coat do?

14        A.   After taking off -- he took off his jacket.

15        Q.   After he put his jacket back over the backpack.

16        A.   Oh, okay.  He stood there for some time.  Then

17   shortly after, walked out of my sight.

18        Q.   And what about the individual, who handed him the

19   backpack, in the orange hood?  What did that individual do?

20        A.   He had walked out of my sight as well.

21        Q.   And do you remember about how long they remained

22   in your sight after the initial exchange?

23        A.   I would say no more than a minute.  I would say

24   maybe 30 to 45 seconds.

25        Q.   Okay.  And looking at Exhibit 1-B, which direction

1    did they walk when they, you know, eventually were out of

2    your sight?

3        **A.**    They walked further down the middle portion of the

4    exhibit displayed.  They walked further in the walkway out

5    of my sight towards the parking lot.  They would be walking

6    further down to the bottom portion of this exhibit.

7        **Q.**    Okay.  Is there a parking lot in Exhibit 1-B near

8    the row houses; is that what you are referring to?

9        **A.**    Yes, sir.

10       **Q.**    What did you do?

11       **A.**    I broadcast the lookout and advised the arrest

12   team I needed to move in and stop the individuals involved.

13       **Q.**    At the time that you broadcast the lookout, did

14   you remain in the same location that you made those

15   observations?

16       **A.**    Yes, I did.

17       **Q.**    At the time that you first broadcast the lookout

18   over the radio, was there anything obstructing your view of

19   the two males that you described do the exchange?

20       **A.**    No.

21       **Q.**    Prior to this hearing, have you had an opportunity

22   to listen to the radio communications you had that day after

23   seeing the exchange?

24       **A.**    Yes.

25       **Q.**    All right.  I am going to play you a portion of

1    Government's Exhibit No. 3 starting at, I guess, the six

2    minute mark.

3              (Played audio.)

4              Officer Jackson, do you recognize the voice on

5    that recording?

6         **A.**   Yes.

7         **Q.**   Whose voice is that?

8         **A.**   That's mine.

9         **Q.**   And is that your recording of your lookout or the

10   beginning of your lookout from April 22nd of this year?

11        **A.**   Yes, sir.

12        **Q.**   And was that -- is that a fair and accurate

13   recording of your transmissions, radio transmissions, that

14   day?

15        **A.**   Yes, sir.

16             MR. WASSERMAN:  Your Honor, I move for

17   Government's Exhibit No. 3 into evidence.

18             MR. MARSTON:  No objection.

19             MR. OHM:  No objection.

20             THE COURT:  It is admitted.

21             (Government's Exhibit No. 3 is admitted.)

22             MR. WASSERMAN:  Thank you.

23             If you can continue playing until about 6:30.

24             (Played audio.)

25

1    **BY MR. WASSERMAN:**

2        **Q.**   Officer Jackson, at the time that you gave this

3    lookout that you just listened to, were both suspects still

4    in your view?

5        **A.**   Yes.

6            MR. WASSERMAN:  I want to direct your attention

7    now to -- or ask to play Government's Exhibit No. 3 from

8    about the 6:29 mark to 7:08 of the recording.

9            THE COURT:  If you could possibly turn the sound

10   down a little bit, which may result in having a little less

11   static.  Let's see if that makes it a little easier to hear.

12           (Played audio.)

13   **BY MR. WASSERMAN:**

14       **Q.**   Officer Jackson, at this point of the radio run,

15   do you know where each suspect was located?

16       **A.**   Can you repeat that?

17       **Q.**   At the time you broadcast this additional lookout,

18   do you know where your subject was located?

19       **A.**   At that time I couldn't see him.  I believe they

20   walked further in the walkway out of my sight towards the

21   parking lot.

22       **Q.**   All right.

23           THE COURT:  Can you put the volume back up,

24   please?  Thank you.

25           MR. WASSERMAN:  I will ask to play now from 7:28

1      to about 7:39 of Exhibit 3.

2                     (Played audio.)

3      **BY MR. WASSERMAN:**

4          **Q.**   All right.  Do you recall if you were able to see

5      both suspects at this time based on that lookout?

6          **A.**   At that time I couldn't see them.

7          **Q.**   All right.  Backing up then to the previous clip

8      we played you, which was from 6:29 to 7:08, do you recall --

9      you initially said you thought they may have walked off?

10         **A.**   Yes.

11         **Q.**   Do you still have that recollection?  In other

12     words, did they walk off and then come back into your view?

13         **A.**   It was pretty much back and forth.  I could see

14     them because arresting hadn't moved in yet.  I saw them

15     reappear again but then they walked back out of my sight

16     again.

17         **Q.**   All right.  When they walked back out of your

18     sight for the second time, which direction did they go?

19         **A.**   Back towards the parking lot.

20         **Q.**   All right.  Away from 15th Street?

21         **A.**   Yes, sir.

22         **Q.**   Now, in the transmission we just listened to, 7:28

23     to 7:39, you mentioned that the male with the grayish coat

24     had an orange hood --

25         **A.**   Yeah.

1        Q.   -- that you had not mentioned in your first two

2   lookouts.  Was your reference to the orange hood based upon

3   your own observations?

4        A.   Yes.

5        Q.   Did anybody tell you that this individual was

6   wearing an orange hood?

7        A.   No.

8        Q.   Do you recall why you didn't mention the orange

9   hood in your initial lookout description?

10       A.   I was trying to hurry up -- I was more focused on

11  the individual wearing the blue coat because I knew he was

12  in the possession of that book bag.  I was trying to

13  expedite the situation by telling arresting, Look, I need

14  you to get here right now.  I think at the time I probably

15  didn't give that portion of the lookout because I just

16  needed the arresting to pretty much get into the area.  And

17  it may have -- I didn't mention the hood at all but I just

18  -- I was more concerned with the individual wearing the blue

19  coat.

20       Q.   Did there come a point or you indicated there came

21  a point when both males, both individuals that you just

22  described, moved out of your line of sight?

23       A.   Yes.

24       Q.   All right.

25            (Government's Exhibit No. 4 was marked for

1    identification.)

2          MR. WASSERMAN:  I am going to show you what we've

3    marked for identification as Government's Exhibit No. 4.

4    And I'm going to ask to probably fast forward there to about

5    19:02:29 --

6          The Court's indulgence.

7          MR. WASSERMAN:  I'm sorry.  19:02 to :31.

8    **BY MR. WASSERMAN:**

9       **Q.**   Do you recognize -- did you have an opportunity to

10   view Officer Poupart's body worn camera from April 22nd of

11   this year?

12      **A.**   Yes, sir.

13      **Q.**   Was that prior to today?

14      **A.**   Yes, sir.

15      **Q.**   Was Officer Poupart on the scene as part of the

16   arrest team?

17      **A.**   Yes, sir.

18      **Q.**   And was the footage that you reviewed from Officer

19   Poupart's body worn camera a fair and accurate recording as

20   part of the events of that day?

21      **A.**   Yes, sir.

22          MR. WASSERMAN:  Your Honor, I move Government's

23   Exhibit No. 4 into evidence at this time.

24          MR. MARSTON:  No objection.

25          MR. OHM:  No objection.

1          THE COURT:  So moved.

2          (Government's Exhibit No. 4 was admitted.)

3          MR. WASSERMAN:  Thank you, Your Honor.

4   **BY MR. WASSERMAN:**

5     **Q.**   I am going to show you Government's Exhibit No.

6   4-A.  Is that on your screen?

7     **A.**   Yes, sir.

8     **Q.**   Do you recognize that still shot?

9     **A.**   Yes.

10    **Q.**   And is that a still shot from Officer Poupart's

11  body worn camera?

12    **A.**   Yes.

13    **Q.**   Who is depicted in this still shot that you are

14  looking at?

15    **A.**   The individual with the blue coat that would be

16  Defendant Douglas, and the individual with the grayish/dark

17  brown coat would be Defendant Williams.

18    **Q.**   And is this a fair and accurate depiction of part

19  of Officer Poupart's body worn camera?

20    **A.**   Yes.

21          MR. WASSERMAN:  Your Honor, I move Government's

22  Exhibit 4-A into evidence.

23          MR. MARSTON:  No objection.

24          MR. OHM:  No objection.

25          THE COURT:  4-A is admitted.

1          (Government's Exhibit No. 4-A was admitted.)

2    **BY MR. WASSERMAN:**

3      **Q.**   And do you see -- or can you see the time stamp in

4    the upper right-hand corner?

5      **A.**   Yes.

6      **Q.**   What does it say?

7      **A.**   It says 2:312, the date is 4-22-2020 and then --

8      **Q.**   I'm sorry.  You said you see the time stamp?

9      **A.**   Yes.  2:31 -- I'm sorry.  19:02:312.

10     **Q.**   Yes.  Okay.

11          Just so we are clear, do you know whether the body

12    worn camera time stamp is different -- is it in eastern

13    standard time?

14     **A.**   Yes, it is.

15     **Q.**   Are you sure about that?

16     **A.**   I am not 100% sure.

17     **Q.**   You are not sure?

18     **A.**   [SHAKES HEAD]

19     **Q.**   All right.

20          MR. OHM:  On behalf of Mr. Douglas and for clarity

21    we will stipulate that it is eastern standard time.

22          THE COURT:  Thank you.

23    **BY MR. WASSERMAN:**

24     **Q.**   Was this a little after 3:00 p.m. when this

25    happened?

1    **A.**   Yes.

2    **Q.**   Thank you.  Looking at Exhibit 4-A, which person

3    in the photo was the person that received the backpack and

4    handed off the, you know, suspected currency?

5    **A.**   The individual wearing the bluish coat with blue

6    hood, and that would be Defendant Douglas.

7    **Q.**   And what about -- who actually stopped this

8    individual?

9    **A.**   To my recollection Officer Poupart.

10   **Q.**   And which person in the photo was the individual

11   you observed hand off the backpack and receive the suspected

12   currency?

13   **A.**   The one wearing the orangish hood and reddish

14   brown colored jacket, Defendant Williams.

15   **Q.**   You said dark colored.  Is there anything else

16   that would distinguish it?

17   **A.**   Light-colored jeans and the bushy hair.

18   **Q.**   All right.  And is that individual to the left or

19   to the right of Mr. Douglas?

20   **A.**   He is to the right of Mr. Douglas.

21   **Q.**   Have you had an opportunity to review a portion of

22   Officer Andrew Stout's body worn camera?

23   **A.**   Yes.

24

25              (Government's Exhibit No. 5 was marked for

1    identification.)

2    **BY MR. WASSERMAN:**

3       **Q.**   I will show you what I have marked for

4    identification Government's Exhibit No. 5.  I move that to

5    19:02:29.  And is Exhibit 5 a fair and accurate depiction of

6    a portion of the events that occurred on April 22nd of this

7    year?

8       **A.**   Yes.

9          MR. WASSERMAN:  Your Honor, I move Government's

10   Exhibit No. 5 into evidence.

11         MR. MARSTON:  No objection.

12         MR. OHM:  No objection.

13         THE COURT:  Exhibit 5 is admitted.

14         (Government's Exhibit No. 5 was admitted.)

15         MR. WASSERMAN:  And if we can play from 19:02:29

16   to 19:03:41.

17         (Played audio.)

18   **BY MR. WASSERMAN:**

19      **Q.**   All right.  Officer Jackson, are you able to see

20   in Exhibit 5 the individual in the orange hood that you

21   described in the radio transmission?

22      **A.**   Yes.

23      **Q.**   Was that person in the video wearing the orange

24   hood standing next to the male in the blue coat?

25      **A.**   Is he there?

1      **Q.**   Is he in the same position as when you initially

2   observed him?

3      **A.**   No.

4      **Q.**   All right.  What area is that relevant to where

5   you made the observations of the exchange?

6      **A.**   So if you -- actually, if you see where the

7   individual in this photograph -- I'm sorry -- where the

8   still is, the individual with the black coat and fur on it,

9   it would be a little bit further in front of that

10   individual.

11      **Q.**   All right.

12          MR. WASSERMAN:  And this is 19:03:01 of Exhibit 5.

13   If we can continue to play this until 19:03:39 seconds.

14          (Played audio.)

15   **BY MR. WASSERMAN:**

16      **Q.**   All right.  Officer Jackson, do you see anyone in

17   this part of the video that you recognize?

18      **A.**   Yes.

19      **Q.**   And who is that?

20      **A.**   That individual is Defendant Williams.

21      **Q.**   And which direction does Mr. Williams appear to be

22   walking at this point?

23      **A.**   Towards 15th Street.

24      **Q.**   And at this point, do you recall where you were

25   located?

1    **A.**   I believe I was still in my observation, I was

2    still in the block.  Let me see.  I believe I was still

3    there on 15th Street.

4    **Q.**   All right.  Are you sure about that or just from

5    this video or -- let me ask you this:  Did there come a

6    point when you left that location?

7    **A.**   Yes.

8    **Q.**   All right.  And do you remember -- where did you

9    go?

10   **A.**   I went around -- so I went southbound on 15th

11   Street towards W and then I came back around on Montana

12   Avenue so I can do the observation process.

13   **Q.**   And at the time that -- if you can recall, at the

14   time that Mr. Williams, the individual in the orange hood,

15   was stopped by police, were you -- do you recall whether you

16   were still in your OP location or had you moved?

17   **A.**   I moved.  I was gone at that point.

18   **Q.**   All right.  So did you actually observe

19   Mr. Williams getting stopped by the officers?

20   **A.**   No, I did not.

21   **Q.**   Okay.  I want to play you now Government's Exhibit

22   No. 3 starting at the 9:40 mark.

23          (Played audio.)

24   **BY MR. WASSERMAN:**

25   **Q.**   Based upon this transmission that you just

1    listened to, that was your voice; is that correct?

2        **A.**    Yes, sir.

3        **Q.**    What, if anything, did you conclude regarding

4    whether the officers had stopped the individual with the

5    orange hood that you described?

6        **A.**    They just wanted clarification.  Clarification on

7    what happened, what probable cause existed for this

8    individual to be arrested.

9        **Q.**    Was it your understanding that they had stopped

10   that individual?

11       **A.**    Yes, sir.

12       **Q.**    All right.  What does 1-800 mean?

13       **A.**    That is our code word for firearm.

14       **Q.**    So what were you explaining to the officer when

15   you said, "orange hood was good to go for 1-800".

16       **A.**    I was saying the orange hood was the one

17   originally passing the book bag off.  At that point they did

18   confirm that there was a firearm in the book bag.  So what I

19   was saying was, this individual is good to go for passing

20   off that firearm that I observed.

21       **Q.**    All right.  Was there a point in which you were

22   able to view both males who had been stopped by police to

23   see if you can make a positive identification of the two

24   individuals you observed engage in the transaction of the

25   backpack?

1    **A.**    Yes.

2    **Q.**    Where were you located when you were viewing the

3    individual you observed receive the backpack?

4    **A.**    At that time I was in the parking lot off of

5    Montana.

6    **Q.**    I'm sorry.  You were parked in the parking lot?

7    **A.**    Yeah.  The parking lot where the arresting team

8    was moving into.

9    **Q.**    Okay.  And do you remember about the distance you

10   were from where this individual was located, the blue coat?

11   **A.**    From the time I gave the positive identification?

12   **Q.**    When you were doing the identification.

13   **A.**    I would say 15 to 20 yards. I was pretty much at

14   the mouth of that parking lot on Montana.  I am still trying

15   to maintain an undercover capacity.

16   **Q.**    Were you located in your vehicle?

17   **A.**    Yes, sir.

18   **Q.**    Were there any obstructions of your view of the

19   individual in the blue coat when you made the

20   identification?

21   **A.**    No.

22   **Q.**    Do you have any doubts about your identification?

23   **A.**    No.

24   **Q.**    The accuracy of the identification?

25   **A.**    No.

1      **Q.**   Where were you when you were viewing the

2    individual you observed hand the backpack off?

3      **A.**   On 15th Street.

4      **Q.**   I'm sorry.  Where were you when you were doing the

5    ID procedure?

6      **A.**   ID procedure?

7      **Q.**   Yeah, of the individual who handed the backpack

8    off.

9      **A.**   Oh, still in the parking lot area.

10     **Q.**   Same location?

11     **A.**   Same location.

12     **Q.**   And any obstructions of your view of that

13   individual?

14     **A.**   No.

15     **Q.**   Do you have any doubts about the accuracy of your

16   identification of the individual handing the backpack off?

17     **A.**   No.

18           MR. WASSERMAN:  I am going to ask that

19   Government's Exhibit No. 2 at 10:28 -- I'm sorry.

20   Government's Exhibit No. 3.

21           (Played audio.)

22   **BY MR. WASSERMAN:**

23     **Q.**   All right.  Was that your statement indicating a

24   positive identification of both males?

25     **A.**   Yes, sir.

1      **Q.**   And at the time that you were viewing both of

2      these individuals, did anyone on the scene do or say

3      anything to you to suggest who you should identify?

4      **A.**   No.

5      **Q.**   Do you see the individual who handed the backpack

6      off in exchange for the suspected currency anywhere in the

7      courtroom?

8      **A.**   Yeah.

9      **Q.**   Can you identify that person by their location in

10     the courtroom and an article of clothing they are wearing?

11     **A.**   I can just by the hair alone, the individual

12     wearing the pink sweat shirt, gray jacket and the hair.

13          MR. WASSERMAN:  Your Honor, I would ask that the

14     record reflect the in-court identification of Defendant

15     Williams.

16          THE COURT:  I would like the Defendant to remove

17     his mask.

18     **BY MR. WASSERMAN:**

19     **Q.**   Having observed this individual that you mentioned

20     had the pink sweat shirt on, remove his mask, is that -- are

21     you able to recognize that individual?

22     **A.**   Yes, sir.

23     **Q.**   Who do you recognize that individual as?

24     **A.**   As Defendant Williams.

25     **Q.**   Is that the person you observed hand the backpack

1      off?

2              **A.**    Yes, sir.

3                      MR. WASSERMAN:  Your Honor, I ask that the record

4      reflect the in-court identification of Defendant Williams.

5                      THE COURT:  The record does reflect that.

6      **BY MR. WASSERMAN:**

7              **Q.**    Do you see the individual who you observed receive

8      the backpack and hand the suspected currency to Defendant

9      Williams in the courtroom?

10             **A.**    Yes, sir.

11             **Q.**    Can you identify that individual by an article of

12     clothing they are wearing and the location in the courtroom?

13             **A.**    To my left wearing an orange jumpsuit, to my left

14     of the witness stand.

15                     THE COURT:  I would, again, ask that the Defendant

16     Douglas please remove his mask so there is no question that

17     you can see his face.

18                     THE DEFENDATN:  Yes, Your Honor.

19                     MR. WASSERMAN:  Having had Mr. Douglas remove his

20     face mask, do you continue to indicate that that was the

21     individual that you observed receive the backpack?

22                     THE WITNESS:  Yes, sir.

23                     MR. WASSERMAN:  Your Honor, again, I would move

24     that the record reflect the in-court identification of

25     Defendant Douglas.

1          THE COURT:  Thank you.  The record does reflect

2     that.  Thank you.

3          MR. WASSERMAN:  Your Honor, that is all I have.

4          THE COURT:  Thank you.  Counsel?

5          MR. MARSTON:  Thank you, Your Honor.

6                    **CROSS EXAMINATION**

7     **BY MR. MARSTON:**

8     **Q.**   Good afternoon, sir.  Officer Jackson, I am John

9     Marston.  I represent Mr. Williams.  How are you doing

10    today?

11    **A.**   Pretty good.

12    **Q.**   I appreciate you being here with everything that

13    is happening.

14          Officer Jackson, let me make sure I understand.

15    You say you got to this location on 15th Street, 2300 block

16    about 10 or 15 minutes before you observed this exchange of

17    a backpack; is that right?

18    **A.**   Yes, sir.

19    **Q.**   All right.  And had you been anywhere else that

20    day earlier, for work while on duty?

21    **A.**   Probably a couple blocks away making observations.

22    **Q.**   What time did you start work that day?

23    **A.**   Our tour of duty started at 1300 hours.

24    **Q.**   Thirteen hundred is?

25    **A.**   1:00 p.m.

1     **Q.**   1:00?

2     **A.**   Yes, sir.

3     **Q.**   Okay.  This is a couple hours later?

4     **A.**   Yes, sir.

5     **Q.**   What time was it when this exchange happened?

6     **A.**   I can't remember.

7     **Q.**   It was right about 3:00; is that right?

8     **A.**   Yes, sir.

9     **Q.**   I mean, we were watching the body worn camera

10    footage and you called it a 2, but it is a Z after the time,

11    which stands for zulu, which is universal time.  Does that

12    make sense?

13    **A.**   Yes, sir.

14    **Q.**   When it says 19:02, for example, universal time,

15    that time of year you have to subtract 4 hours; 19 becomes

16    15 that is 3:00.  Sound right?

17    **A.**   Yes, sir.

18    **Q.**   Okay.  So here we are a little after 3:00 that

19    day.  Is that when you saw this happen?

20    **A.**   Yes, sir.

21    **Q.**   All right.  And you mentioned the person you later

22    identify as Mr. Williams walking up into the -- I guess a

23    grassy area on the other side of the fence from Mr. Douglas;

24    is that right?

25    **A.**   Yes.

1    **Q.**    Where did he come from?

2    **A.**    I don't know.

3    **Q.**    Which direction?  From the parking lot direction?

4    **A.**    I believe it was from the area of the walkway

5    where there is a parking lot, in back of the row houses

6    there is another walkway.  So I am estimating he probably

7    came from that walkway.

8    **Q.**    You couldn't see back there from where you were.

9    Right?

10   **A.**    Correct.  Correct.

11   **Q.**    So he came from the direction of the parking lot.

12   Who knows from where back there; is that right?

13   **A.**    Yes.

14   **Q.**    You don't know.

15   **A.**    No, I don't know.

16   **Q.**    Oh, okay.  And in other words, that was the first

17   time you had seen him; is that right?

18   **A.**    Yes.

19   **Q.**    He wasn't out in front of those buildings on 15th

20   Street at any point while you were there in the 10 or 15

21   minutes; is that right?

22   **A.**    To my recollection, no.

23   **Q.**    All right.  When Mr. Williams walked up in that

24   grassy area, what did he have?

25   **A.**    A little bag.

1      **Q.**   Where was he?  Was he holding it?  Was he wearing

2   it?

3      **A.**   He was holding it.  He wasn't wearing it.  He just

4   had it in his hand.

5      **Q.**   How was he holding it?

6      **A.**   Holding it out by his arm.

7      **Q.**   Down by his side?

8      **A.**   No, when I first saw him, his arm was extended

9   with the bag towards Defendant Douglas.

10      **Q.**   So he was handing it off when you first saw it?

11      **A.**   Yes.

12      **Q.**   So you did not see him with the book bag when he

13   walked up?

14      **A.**   Yes, I did.  But then he eventually handed it off.

15      **Q.**   Well, you just told us you didn't see where it

16   was, whether it was by his side or on his back or whatever;

17   you said the first time you saw it was when he was handing

18   it off.  It was extended, you said.

19      **A.**   Yes.

20      **Q.**   So then you did not see, before then?

21      **A.**   Are you asking where he came from with it?  What

22   are you asking?

23      **Q.**   When he walked up.  You told us you saw him

24   walking up from the direction of the parking lot area.

25      **A.**   Correct.

1     Q.   And if he handed a book bag off later, he must

2     have had it with him.  Right?

3     A.   Yes.

4     Q.   But you didn't see the book bag at that time?

5     A.   I saw it in his hand.

6     Q.   You told us you didn't see it until he extended

7     it.  I am talking about before --

8          MR. WASSERMAN:  Asked and answered.

9          THE COURT:  Overruled.

10         THE WITNESS:  I am asking which point you are

11    talking about.  Are you asking when he came from -- when he

12    first appeared or when I observed him make the hand to hand

13    exchange?

14    **BY MR. MARSTON:**

15    Q.   I appreciate you clarifying.  That is exactly what

16    I should have been doing.

17         You saw it extended in his hand to make an

18    exchange before that time as he is walking up, you don't see

19    a book bag then because you first saw it when he extended

20    it.

21    A.   That's correct.  That's correct.

22    Q.   Got you.  Okay.  And he extended it with which

23    hand?

24    A.   To my recollection the right hand.

25    Q.   What side of the fence was he on then?  The grassy

1    side or the walkway side?

2        **A.**    The grassy side.

3        **Q.**    So he -- Mr. Williams -- extends the book bag over

4    the fence to Mr. Douglas?

5        **A.**    Yes.

6        **Q.**    Okay.  When did he hop the fence?

7        **A.**    I don't know.  At that point I was watching the

8    lookout still trying to maintain my undercover capacity.

9        **Q.**    Do you know if he did hop the fence?

10       **A.**    I am assuming he did because he did eventually end

11   up into the walkway.

12       **Q.**    But we can't assume here.  I'm sorry.

13       **A.**    That's correct.

14       **Q.**    Okay.  So you don't know?

15       **A.**    I don't know.

16       **Q.**    Okay.  Later on you see him walking away --

17   Mr. Williams walking away from this exchange?

18       **A.**    Later on.  Correct.  Yes.

19       **Q.**    All right.  Was he walking down the walkway then?

20       **A.**    Yes.

21       **Q.**    Okay.  During this time you had your eyes, you

22   mention, on a group on the right-hand side, your right-hand

23   side, the rec center side.  Was your attention ever diverted

24   over to them around the time of this backpack exchange?

25       **A.**    No.

1    Q.   So you sat there watching Mr. Williams and

2   Mr. Douglas and someone else throughout that time, and

3   including up to the point of them walking away.  You are

4   watching them the whole time; is that what are you saying?

5    A.   Which one?

6    Q.   Start with Mr. Williams walking up, extending a

7   bag over the fence.

8    A.   Right.

9    Q.   And then you don't see Mr. Williams jump the fence

10   but you know later on he walked off; is that right?

11    A.   Correct.

12    Q.   From the time he walked up, to the time he walked

13   off, you are saying you were watching that whole time

14   Mr. Williams and Mr. Douglas?

15    A.   Yes.

16    Q.   And you had a clear line of sight?

17    A.   Yes.

18    Q.   No obstructions?

19    A.   Right.

20    Q.   20/20 vision?

21    A.   Yes.

22    Q.   But you have no idea how he got from the grassy

23   area to the walkway?

24    A.   I am not saying I don't have an idea, I just don't

25   remember.

1    Q.    That's a poor question on my part.  You didn't see

2    how he got there.

3          MR. WASSERMAN:  Your Honor, asked and answered.

4          THE COURT:  I will allow again.

5    **BY MR. MARSTON:**

6    Q.    Because I ask a question poorly, which I apologize

7    for.  You didn't see him -- so we were talking about the

8    time frame from him walking up, exchange, he walks off, he

9    starts -- Mr. Williams starts in the grassy area, later on

10   he is in the walkway and there is a fence between those two

11   areas.  Right?

12   A.    Yes.

13   Q.    You didn't see how he got over the fence or if he

14   did?

15   A.    I will say this:  I don't remember because that

16   part wasn't important to me.  I just don't remember that

17   part.

18   Q.    Got you.  So while you are there, there are some

19   things that aren't important to you.

20   A.    That's probably a poor choice of words; however, I

21   was more focused on the individual in possession of the book

22   bag.  I try to make my observations as accurate as possible,

23   but I can't give a complete play-by-play of what everyone is

24   doing at this particular time because I am trying to do a

25   bunch of other things, which is maintain my undercover

1    capacity as well.

2         Q.   I know.  It's not an easy job, obviously.  For

3    sure.  I apologize for these questions.  It's part of my

4    job.

5         A.   I am trying to be accurate.

6         Q.   I hear you.

7              Now, since your focus, I think you had said when

8    Mr. Wasserman was asking you questions, your focus was on

9    the blue coat person.  Right?

10        A.   Correct.

11        Q.   Mr. Douglas?

12        A.   Yes, sir.

13        Q.   And that contributed to you not exactly seeing

14   everything that Mr. Williams was doing it sounds like; is

15   that right?  Is that fair?

16        A.   Which part?

17        Q.   Your focus --

18        A.   Before or after?

19        Q.   Well, after there is an exchange now you've seen a

20   backpack you feel your focus should be there?

21        A.   Absolutely.  Yes, sir.

22        Q.   Let me ask you this:  Your focus is on this

23   backpack.  How did Mr. Douglas put it on?

24        A.   He took his jacket off, his blue coat.  I keep

25   saying jacket.  He took his blue coat off, put the book bag

1    on his person with the shoulder straps and then subsequently

2    put the jacket over it, over the book bag, while that book

3    bag was still on his person.

4        Q.   What did he do with his jacket while he was

5    putting on the backpack?

6        A.   I don't remember.  He took it off.  I can't say he

7    threw it to the ground.  I can't say he had somebody hold it

8    for him.  All I know is he took the jacket off and put the

9    book bag on and put it on -- and put the jacket over top of

10    it.

11        Q.   And your focus is here, but you don't know -- I

12    mean, you would agree with me, though, that putting on a

13    backpack requires both arms to be free.  You can't do it

14    with a jacket partially off.  It would be hard to hold on to

15    a jacket while putting it on.  Right?

16        A.   Right.

17        Q.   Even though your focus is there, you didn't see

18    what he did with the jacket?

19        A.   I could tell you at the time, but right now as I

20    tell you three months later, I just can't say.

21        Q.   Okay.  In terms of the backpack, how quickly did

22    Mr. Douglas put the backpack on?  Was it immediate?

23        A.   Yes, immediately.  After receiving the book bag,

24    he took his jacket off.  He didn't have his jacket on -- he

25    had his jacket on at the time.  He took the jacket off.  So

1    what I was trying to say is he didn't already have his

2    jacket off upon receiving the book bag.  He had the jacket

3    on after receiving the book bag, took the jacket off, then

4    put the book bag on and covered up the book bag with the

5    jacket.

6         Q.    Okay.  And nobody opened the backpack during this

7    time?

8         A.    No.

9         Q.    And nobody took anything out of it?

10        A.    No.

11        Q.    Nobody put anything into it?

12        A.    No.

13        Q.    That makes sense.  There wouldn't have been time

14   to do that.  Right?

15        A.    Correct.

16        Q.    Now, so the -- all right.  So I am trying to

17   understand the cash, the currency in this situation.  And

18   you had a view of what you believed to be an exchange of

19   currency from Douglas to Williams; is that right?

20        A.    Yes.

21        Q.    And where were they standing at that time?

22        A.    Still in the same positions.  After receiving the

23   book bag, placed the book bag on, put his jacket over, and

24   did the hand gesture, as if Williams was receiving the

25   currency.  I could not say that it was U.S. currency, but I

1    did see it was some sort of hand exchange like I mentioned.

2         Q.    Was the fence between them still?

3         A.    Yes.

4         Q.    Okay.  Where does Mr. Douglas get this currency

5    from?

6         A.    I cannot tell you that.

7         Q.    What did Mr. Williams do with the currency upon

8    receiving it?

9         A.    I do not remember.

10        Q.    Was it folded, the currency?

11        A.    All I saw was just a small object that I believed

12   to be U.S. currency.

13        Q.    I mean, you did a writeup in this case.  Right?

14        A.    Correct.

15        Q.    A written report?

16        A.    Yes.

17        Q.    And today you are expressing uncertainty about

18   whether it was currency.  The report expresses no

19   uncertainty.  Would you say that's correct?

20        A.    My report reflects the sequence of events that I

21   observed.  I am just basing my observation from that day.

22        Q.    I mean, we can get it as an exhibit.  I don't know

23   if we need to.  Does this sound right?  You said after the

24   exchange S1 gave S2 an unknown amount of U.S. currency.

25              MR. WASSERMAN:  Your Honor, what is he reading

1    from?

2             (Defendant Williams' Exhibit No. 1 was marked for

3    identification.)

4             MR. MARSTON:  Government's (sic) Exhibit 1 -- I'm

5    sorry.  May I approach the witness?

6             THE COURT:  You may.

7    **BY MR. MARSTON:**

8    **Q.**   Defendant's Exhibit 1.  Do you recognize that?

9    **A.**   Yes.

10   **Q.**   What is it?

11   **A.**   This is my observation notes.

12   **Q.**   Is that how you prepared it?

13   **A.**   Yes.

14   **Q.**   It hasn't been changed by anybody?

15   **A.**   No.

16            MR. MARSTON:  Your Honor, ask to admit Defendant's

17   Exhibit No. 1.

18            THE COURT:  Mr. Wasserman.

19            MR. WASSERMAN:  I'm sorry.  No objection.

20            THE COURT:  Defendant's Exhibit No. 1 is admitted.

21            MR. MARSTON:  Thank you, Your Honor.

22            MR. OHM:  No objection but can it be Defendant

23   Williams' Exhibit No. 1?

24            THE COURT:  Defendant Williams' Exhibit No. 1 is

25   admitted.

1          (Defendant Williams' Exhibit No. 1 was admitted.)

2          MR. MARSTON:  Thank you.

3     **BY MR. MARSTON:**

4          **Q.**   Officer Jackson, do you see the discussion of U.S.

5     currency in Defendant Williams' Exhibit 1?

6          **A.**   Yes, sir.

7          **Q.**   I mean, it says that is what happened.  Right?

8          **A.**   Yes.

9          **Q.**   But you don't know that is what happened.

10         **A.**   That's correct.

11         **Q.**   In terms of the U.S. currency, if it even was,

12    could you have -- do you have a memory of whether it was one

13    bill or multiple?

14         **A.**   I cannot tell you that.

15         **Q.**   How far away were you in the car from where this

16    exchange occurred in the walkway leading to 15th Street?

17         **A.**   Um, you want me to try to estimate feet or yards?

18         **Q.**   You used yards earlier, maybe stick with the

19    yards.

20         **A.**   Right.  I would say maybe about 15 yards.

21         **Q.**   Fifteen yards?  You never measured it?

22         **A.**   No.

23         **Q.**   And it was, essentially, too far to see for sure

24    that it was currency?

25         **A.**   Yes.

1      **Q.**   Tell us about the other person you said who was

2      there -- well, let's break this up, because I think you

3      said, at first when you looked over and saw Mr. Douglas,

4      before Mr. Williams was there.  Okay?

5      **A.**   Yes.

6      **Q.**   There were other people out there with

7      Mr. Douglas?

8      **A.**   Yes.

9      **Q.**   Okay.  And what did they -- I mean, these are

10     other black males?

11     **A.**   Yes.

12     **Q.**   Okay.  Also with jeans on?

13     **A.**   I cannot tell you a description of what they had

14     on at that time.  Not right now.  At the time I could have.

15     As of right now, I cannot remember.

16     **Q.**   In one of the Government exhibits, it was from

17     Officer Poupart's camera, you saw Mr. Douglas with the blue

18     puffy coat, saw Mr. Williams standing there.  You told us

19     that.  There was another individual in that image as well.

20     **A.**   Yes.

21     **Q.**   And the person is a black male?

22     **A.**   Black male wearing a black coat with fur on the

23     hood.

24     **Q.**   Dark jacket?  Jeans?

25     **A.**   Yes.

1    Q.   Okay.  Okay.  Which direction -- I mean, how close

2    were these other individuals -- so before the exchange, how

3    close were -- before Mr. Williams is there, how close were

4    these other individuals to Mr. Jackson?

5         I completely blew that.  You are Mr. Jackson.

6    A.   Yes, sir.

7    Q.   So before Mr. Williams arrives, before the

8    exchange, when it is just Mr. Douglas out there, and there

9    are other individuals there, you said as well, how close

10   were those other individuals to Mr. Douglas?

11   A.   The best I could describe is just near him.  I

12   can't give you an approximate feet.  I just can't tell you

13   that, but I can tell you they were near Mr. Douglas at the

14   time.  I am trying to be as accurate as possible.

15   Q.   I appreciate that.  Did it look like they were

16   talking to each other?

17   A.   Yes.

18   Q.   I am going to go to what is called a show up, like

19   when you went to view the suspects --

20   A.   Yes.

21   Q.   -- and make an identification.

22   A.   Yes.

23   Q.   This is Defendant Williams' Exhibit No. 2.

24        (Defendant Williams' Exhibit No. 2 was marked for

25   identification.)

1          MR. MARSTON:  I think I will just put it up here.

2          (Put on overhead projector.)

3    **BY MR. MARSTON:**

4      **Q.**   So this is the same vicinity we have been talking

5    about, the 2300 block, 15th Street.  Does that look right?

6      **A.**   Yes.

7      **Q.**   Okay.  Now, you had mentioned that when you did

8    the identification you were still in your vehicle?

9      **A.**   Yes.

10     **Q.**   You were at the mouth of the parking lot you said.

11   Do you remember that?

12     **A.**   Yes.

13     **Q.**   I am going to point over here to -- so the bottom

14   left of Defendant Williams' 2 is 15th Street -- actually, is

15   this a fair and accurate depiction of this vicinity?

16     **A.**   Yes.

17         MR. MARSTON:  Can I have Defendant Williams'

18   Exhibit 2 admitted into evidence?

19         MR. WASSERMAN:  No objection.

20         THE COURT:  So admitted.

21         (Defendant Willisams' Exhibit No. 2 was admitted.)

22   **BY MR. MARSTON:**

23     **Q.**   We see the walkway jutting from the bottom

24   left-hand corner to the center of the picture.  Right?

25     **A.**   Yes.

1      **Q.**   Here we see the triangle-shaped parking lot.

2      Right?

3      **A.**   Yes.

4      **Q.**   With a triangle-shaped median?

5      **A.**   Yes.

6      **Q.**   And the entrance to the parking lot is all of the

7      way up here in the upper right corner.  Right?  What is this

8      street?  Montana?

9      **A.**   Montana Avenue, yes.

10     **Q.**   And there is only one way into the parking lot; is

11     that right?

12     **A.**   Yes.

13     **Q.**   And I am pointing to it at the upper-right corner.

14     Right?

15     **A.**   Yes.

16     **Q.**   I will just write E on there for entrance; is that

17     all right?

18     **A.**   Yes.

19     **Q.**   You say you were at the mouth of the parking lot

20     for identification.  Is that where you were roughly, where

21     the E is?

22     **A.**   Yes, sir.

23     **Q.**   And the suspects were being held right in the

24     center of this picture, on these sidewalks right here; is

25     that right?

1    **A.**   Yes.

2    **Q.**   Okay.  So was Douglas over here?  I am pointing to

3    a spot just rear and to the right of a white car parked in

4    the middle of the picture.

5    **A.**   Yes.  However, this picture does not depict the

6    cars at the time.

7    **Q.**   That's a good point.  This is not a picture from

8    that day.  Correct?

9    **A.**   From that day.  Right.

10   **Q.**   Very good.  But so Douglas was here where I am

11   pointing -- it's hard to see.  Do you want me to come up

12   there?

13   **A.**   No, you are fine.

14       MR. WASSERMAN:  You can zoom in a little bit on

15   that too.

16       MR. MARSTON:  Oh, there we go.  Thank you.

17   **BY MR. MARSTON:**

18   **Q.**   Roughly here?

19   **A.**   Yes.

20   **Q.**   Is it okay if I put a D there for Douglas?

21   **A.**   Let me make sure.

22   **Q.**   Yeah.

23   **A.**   That's good.  That's good.

24   **Q.**   Okay.  Okay.  Where is Mr. Williams?

25   **A.**   At the time I saw him, roughly around right in

1  this area.  Move your pen to the left around in that area.

2      **Q.**   Around here?

3      **A.**   Go back to the left.  I am estimating but around

4  that area.

5      **Q.**   Do you mind if I put a W there?

6      **A.**   This is an overview of the row house, so it's kind

7  of shady in that area.

8      **Q.**   Got you.  I guess we can kind of see it.

9          So here is where you make the positive

10  identification.  I mean, if you look on this picture,

11  bottom-left corner is roughly, you know, where you were

12  parked, where I am pointing now.  Right?

13     **A.**   Are you asking me was I parked there doing

14  observation?

15     **Q.**   I'm sorry.  During the observation post, you are

16  out here on the street.  Right here.  Right?

17     **A.**   Yes.

18     **Q.**   I am just going to put a circle there, roughly.

19  This does not write on there.

20          MR. WASSERMAN:  Want a different marker?

21          MR. MARSTON:  Yeah.  Thank you.

22          THE WITNESS:  Sir, I would put it more like where

23  -- not that far back but more towards the rear of the van.

24  **BY MR. MARSTON:**

25     **Q.**   I agree.  The speed bump makes the triangles.  So

1    it's right about here?

2         **A.**   Yes.

3         **Q.**   Okay.  And the exchange, you said, was in the

4    walkway.  Am I pointing to that vicinity now?

5         **A.**   Come down to the left.  That's fine.

6         **Q.**   I will put an X there.  X for the exchange?

7         **A.**   Yeah.

8         **Q.**   So look here is the E.  I will circle the E.  You

9    remember that.  Right?  That was for where you did the --

10   where you were for the identification.

11        **A.**   Yes.

12        **Q.**   And so you are even further away from the people?

13        **A.**   Yes.

14        **Q.**   Okay.  And I mean, look, we saw on the video,

15   there's cars.  These aren't the cars from that day.  There

16   are a number of cars parked on the bottom right side of the

17   triangle-shaped parking lot.  Right?

18        **A.**   Right.

19        **Q.**   When you are there that day?

20        **A.**   Yes.

21        **Q.**   Then there are police who arrive and park in the

22   middle of this bottom right part of the triangle where I am

23   pointing now.  Right?

24        **A.**   Correct.

25        **Q.**   Somehow you look from the mouth of this parking

1    lot all of the way down past all of those things and people

2    and you are able to make an identification?

3        **A.**   Yeah.

4        **Q.**   The identification that you made was based on

5    clothing primarily?

6        **A.**   Clothing and hair and what I observed.

7        **Q.**   Okay.  You wouldn't have been able to see faces

8    from that distance.  Right?

9        **A.**   Not from that distance.  Correct.

10       **Q.**   Okay.  Now you told us -- this is a very important

11   part of the case.

12       **A.**   Say it again.

13       **Q.**   This is a very important part of your job.  Right?

14       **A.**   Yes.

15       **Q.**   Observing is critical to conducting an observation

16   post.

17       **A.**   Yes.

18       **Q.**   Okay.  And the first time you voice a lookout with

19   regard to, you know, let's call it blue and orange.  Blue

20   for Mr. Douglas.  Orange for Mr. Williams.  The first

21   lookout with regard to Mr. Williams was for -- we just heard

22   it was a black male with a gray coat?

23       **A.**   Correct and bushy hair.

24       **Q.**   Well, the first time you said black male with gray

25   coat.

1          **A.**    Correct.  Followed up by bushy, bushy-ish hair.

2          **Q.**    Then sometime later on the recordings, I think it

3      is merely 50 seconds later, black male -- this was just with

4      regard to Mr. Williams, not the blue coat.  You are always

5      consistent on the blue coat.  Correct?

6          **A.**    Right.

7          **Q.**    So then regarding Mr. Williams, black male --

8      second time, about 50 seconds -- not quite 50 seconds later

9      black male with gray coat, with puffy hair?

10         **A.**    Correct.

11         **Q.**    His hair is real messy?

12         **A.**    Correct.

13         **Q.**    We haven't heard anything about an orange hood at

14     this point?

15         **A.**    The second time.

16         **Q.**    Yeah, first time or second time you never said

17     anything about an orange hood.

18         **A.**    Which --

19         **Q.**    We can go through it again.  The first time you

20     spoke.  We heard it on the radio with regard to

21     Mr. Williams, black male with a gray coat.

22         **A.**    Correct me if I'm wrong, I believe the second

23     sequence was, move in -- it was the sequence where I did say

24     the blue coat was with the gray jacket with the orange hood.

25         **Q.**    Mr. Douglas is not my client and you mentioned

1    blue coat, kind of from the beginning, for Mr. Douglas?

2         **A.**    Correct.

3         **Q.**    Your focus was on him?

4         **A.**    Correct.

5         **Q.**    And so I am really just focusing on Mr. Williams.

6         **A.**    Okay.

7         **Q.**    So for the first time when you mention the second

8    person, you could say the giver of the bag --

9         **A.**    Correct.

10        **Q.**    All right.  Black male with gray coat; is that

11   your lookout?

12        **A.**    Correct.

13        **Q.**    All right.  Don't mention an orange hood?

14        **A.**    Correct.

15        **Q.**    Second time, black male with gray coat with puffy

16   hair.  His hair is real messy.

17        **A.**    Correct.

18        **Q.**    And it's like, you know, 50 seconds later.  It has

19   to be after this whole exchange occurred.  Right?  You said

20   it took 30, 45 seconds, whatever it was, for the whole thing

21   to occur?

22        **A.**    For the exchange or the stop?

23        **Q.**    For the exchange.

24        **A.**    For the exchange.  Correct.

25        **Q.**    So the exchange is over at that point?

1      **A.**   Correct.

2      **Q.**   You are still not mentioning an orange hood.

3      **A.**   Correct.

4      **Q.**   At that point Mr. Williams has walked away.

5   Right?  You said he walked away --

6      **A.**   Yes.

7      **Q.**   -- and later came back.  Kind of walking around?

8      **A.**   Correct.

9      **Q.**   All right.  And so then over almost a minute and a

10  half later, now you say Mr. Williams walks back up the

11  walkway.  Now you can see him again.  Right?

12     **A.**   Did I say that?  I saw him --

13     **Q.**   I thought you told us when Mr. Wasserman was

14  asking questions, there is the exchange.

15     **A.**   Correct.

16     **Q.**   Mr. Williams walks up.

17     **A.**   Correct.

18     **Q.**   And Mr. Williams walks back into your line of

19  sight.

20     **A.**   Correct.  I gave the lookout.  Am I giving the

21  lookout?

22     **Q.**   Yeah.  So there is the exchange, which you call

23  out.  Then a minute and a half later, on the recording at

24  least, you know, you mention for Mr. Williams, black male

25  with grayish coat with orange hood; that's the first time

1    you say orange hood?

2        **A.**    Correct.

3        **Q.**    Now, is Mr. Williams in your line of sight at that

4    point?

5        **A.**    Yes.

6        **Q.**    So while he's there you don't mention anything

7    about an orange hood the first time?

8        **A.**    The first time.  Correct.

9            THE COURT:  Mr. Marston, how much longer do you

10   have?  I just want to be cognizant of how long the court

11   reporter's been going.

12           MR. MARSTON:  If we took a break, I might be able

13   to narrow it down to another 10 to 15 minutes.

14           THE COURT:  Why don't we do that.  We have been

15   going almost two hours already.  Why don't we take a short

16   recess until 1:10 p.m.

17           MR. MARSTON:  Very good.

18           THE COURT:  Be back in 20 minutes.

19           MR. MARTSON:  Thank you.

20           (Recess.)

21           CLERK:  We are now back on the record.

22   **BY MR. MARSTON:**

23       **Q.**    Officer Jackson, a limited number of additional

24   questions.  Okay.  Hopefully it won't be too much longer.

25           In your various lookouts that related to,

1    ultimately, Mr. Williams in this case, you did not mention

2    age; is that right?

3        **A.**   Did you say age?

4        **Q.**   Right.

5        **A.**   Correct.  No, I did not.

6        **Q.**   You did not mention height; is that right?

7        **A.**   No, I did not.

8        **Q.**   You did not mention weight?

9        **A.**   No, I did not.

10       **Q.**   You did not mention build?

11       **A.**   Correct.  No, I did not.

12       **Q.**   All right.  And those are pretty standard things,

13   I mean, wouldn't you agree, to include in a lookout, if

14   able?

15       **A.**   If able, yes.

16       **Q.**   Okay.  They are on all of the police forms.  Age,

17   height, weight.  Among clothing and other things.  Right?

18       **A.**   Correct.

19       **Q.**   All right.

20           You said you've done over 500 operations in 20

21   years; is that right?

22       **A.**   Yes.

23       **Q.**   How many arrests has that resulted in?  Do you

24   know?

25       **A.**   From my observations or just being part of

1   operations?

2        **Q.**   Well, so out of the 500 operations, how many of

3   those are you in observation post?

4        **A.**   I would say 500.

5        **Q.**   Okay.  And out of those 500 where you are in

6   observation post, how many of those resulted in an arrest?

7        **A.**   You want me to try to give -- I would say close to

8   500.

9        **Q.**   Okay.  It's just about every time it sounds like;

10  is that right?

11       **A.**   Just about.  There are times when I call out

12  observations and there's -- my observations were not proven

13  to be illegal.

14       **Q.**   Like in this case if they open up the bag and

15  there's nothing in it, it wouldn't have amounted to

16  anything.

17       **A.**   Correct.  There have been instances -- giving just

18  an example -- instances where I seen a hand-to-hand exchange

19  and it turned out to be a signaling or something like that.

20       **Q.**   Got you.  Okay.

21            And essentially, all of those, you know,

22  approximately 500 arrests where you were in observation

23  post, involve a show-up identification similar to here.

24  Correct?

25       **A.**   Right.

1  **Q.**   Have you ever been involved in a show up where you

2  were in the observation post and said, Nope, that's not him?

3  **A.**   Yes.

4  **Q.**   Okay.  How often does that happen?

5  **A.**   You mean a number or just --

6  **Q.**   Yeah.  Whatever you can do?

7  **A.**   That's a long time.  I would say more than 10.

8  **Q.**   More than 10?

9  **A.**   Yes.

10  **Q.**   But not a lot more than 10?

11  **A.**   It could be a lot more but that's -- at minimum.

12  **Q.**   The minimum of 10?

13  **A.**   It's hard to really say.

14  **Q.**   Okay.  So out of 500 it could be 490 times you got

15  the guy.

16  **A.**   It could be.

17  **Q.**   Okay.

18  **A.**   I don't like to mess around with numbers because I

19  am trying to be as accurate as possible.

20  **Q.**   Okay.  I mean, the operation is designed to arrest

21  people who are engaged in illegal conduct.  Right?

22  **A.**   Yes.

23  **Q.**   And it would be -- the operation would not succeed

24  if somebody engaged in some conduct you thought was illegal

25  and the person didn't get arrested?

1      **A.**   Repeat that.

2      **Q.**   It would be a failure of the operation if you

3   observed what you thought was illegal conduct and those

4   people were not arrested.

5      **A.**   I wouldn't say failure.

6      **Q.**   Is it a success?

7      **A.**   If the person -- I can't understand what you are

8   asking me.

9      **Q.**   You know what, I am through.  I don't have any

10  further questions.  Thank you.

11             THE COURT:  Mr. Ohm.

12             MR. OHM:  Good afternoon, Your Honor.

13                    **CROSS EXAMINATION**

14  **BY MR. OHM:**

15     **Q.**   You said that you were out there on observation

16  post operation.  Correct?

17     **A.**   Correct.

18     **Q.**   You weren't there targeting Mr. Douglas.  Right?

19     **A.**   Correct.

20     **Q.**   The operation wasn't targeting Mr. Douglas?

21     **A.**   Correct.

22     **Q.**   It wasn't targeting Mr. Williams.  Right?

23     **A.**   Correct.

24     **Q.**   In fact, it wasn't targeting anyone individually?

25     **A.**   Right.

1      **Q.**   You were just out there looking to see if there

2      were any hand-to-hand transactions that the police would

3      further want to investigate?

4      **A.**   Yes.

5      **Q.**   There were no complaints by neighbors calling 911

6      saying man with the gun, man selling drugs or nothing like

7      that?

8      **A.**   Correct.

9      **Q.**   This is more of a proactive thing that the

10     narcotics unit does.

11     **A.**   Correct.  Yes.

12     **Q.**   You testified that you are part of the narcotics

13     unit.  Right?

14     **A.**   Yes.

15     **Q.**   Which is a subdivision of the narcotics and

16     special investigation division?

17     **A.**   Yes, sir.

18     **Q.**   Okay.  So you are generally -- your mission is to

19     get drugs off the street; is that fair?

20     **A.**   Yes.

21     **Q.**   And that's what you were doing when you were -- on

22     April 22nd, you were doing an anti-narcotics operation.

23     Right?

24     **A.**   Yes, essentially.  I can't base it on narcotics

25     alone because we are always -- the number one priority is

1    illegal firearms, which we do, people get injured and death

2    and stuff.

3        Q.   Right.  So if you saw a robbery in front of your

4    eyes, you don't say, I am a narcotics officer.

5        A.   I am not trying to limit our observations to just

6    drugs.

7        Q.   There is a drug recovery unit.  Right?

8        A.   That's right.

9        Q.   That's a separate part of the department?

10       A.   Yes.

11       Q.   Their focus is on drugs?

12       A.   Yes.

13       Q.   You are part of the drug unit.  Right?

14       A.   Yes.

15       Q.   And your focus is on drugs?

16       A.   Yes.

17       Q.   And on this day, this operation was a pretty

18   extensive operation.  Right?

19       A.   Yes.

20       Q.   It would be fair to say that there were a lot of

21   officers involved in the operation?

22       A.   Yes.

23       Q.   Okay.  How many officers were involved?

24       A.   Do you mean undercover officers or undercover

25   officers and arresting members?

1          **Q.**   Let's start with undercover officers.

2          **A.**   Undercover officers, I can best remember maybe

3    four to five.  It could have been four.  Those are the only

4    ones I can think of offhand.

5          **Q.**   And how many uniformed officers?

6          **A.**   I can think of maybe 10 to 15 uniform.  I am just

7    giving an estimate.  I am not 100% sure.

8          **Q.**   Okay.  And so just to be clear, when a person --

9    when an undercover says, Move in, the entire arrest team

10   goes and moves in.  Right?

11         **A.**   In this particular situation or are you just

12   asking about --

13         **Q.**   Well, let's start generally.  You don't have --

14         **A.**   I'm sorry.  I am not trying to be confusing.  I

15   just want to be as accurate as possible.

16         **Q.**   Great.

17         **A.**   I don't have officers assigned to me.  It is

18   generally undercover officers in the neighborhood.  Based

19   off of their observations they will say, I need arrest team

20   members to move in.

21         **Q.**   Okay.  And that's what happened here.  Basically,

22   the whole arrest team moved in once you gave the call to

23   move in?

24         **A.**   Yes.

25         **Q.**   Now, when you gave the call to move in, you didn't

1    know what was inside of the bag.

2         A.   That's correct.

3         Q.   You didn't know if it was contraband.

4         A.   No, I did not know.

5         Q.   You didn't know if it wasn't contraband.

6         A.   That's correct.

7         Q.   And your suspicion was based upon a hand-to-hand

8    transaction for what you thought might be money.  Right?

9         A.   Correct.

10        Q.   And you testified today that you are really not

11   sure.  You just know it was a white piece of paper.

12        A.   I didn't say white piece of paper.  I just said

13   white colored object.

14        Q.   So what you saw was a white-colored object.  You

15   didn't know what it was.

16        A.   Correct.  I cannot testify and tell you, yes, for

17   sure, that was U.S. currency.

18        Q.   You remember it was a white-colored object.

19   Right.

20        A.   Say again?  Are you saying white or light?  I am

21   saying light not white.  I'm sorry about that.

22        Q.   Do you remember seeing a light-colored object?

23        A.   Yes.

24        Q.   And sitting here today remembering the

25   light-colored object you could say definitively that you are

1    not sure what that light-colored object was?

2         **A.**   Correct.  I cannot tell you that I am 100% sure it

3    was U.S. currency.

4         **Q.**   Well, I don't want to say -- the two choices are

5    100% or 0%.  It sounds like you are saying that you really

6    don't know what it was.

7         **A.**   That's correct.  I just can't say.

8         **Q.**   Okay.  So you are not 80% sure?

9         **A.**   I can't say.

10        **Q.**   You just can't say one way or the other.

11        **A.**   I can't say; that's correct.

12        **Q.**   Now, when you're sitting there in your police car

13   making these observations, all of these other arrest team

14   individuals, they are waiting for you to make -- tell them

15   whether they should make a move or not.  Right?

16        **A.**   Yes.

17        **Q.**   And you are -- one of the most important things is

18   to make sure you are getting a good look at what is going

19   on.  Right?

20        **A.**   Yes.

21        **Q.**   So you are not on the side of the street on 1500

22   that -- of what you are observing, you are across the

23   street; is that fair?

24        **A.**   Right.

25        **Q.**   You are parallel parked?

1      **A.**   Yes.

2      **Q.**   Is it fair to say that across the street there are

3   other cars that are parallel parked?

4      **A.**   Yes.

5      **Q.**   And it looked like from Government's Exhibit 2

6   that at least part of your vision would be blocked by some

7   of the cars; is that fair?

8      **A.**   Which exhibit?

9           MR. OHM:   Your Honor, I am showing the witness

10   Government's Exhibit 2, which was previously admitted.

11   There is a zoom button somewhere.

12           CLERK:   On the screen, the little button.

13           MR. WASSERMAN:   Is that our exhibit or something

14   that --

15           MR. OHM:   It's my copy of the defendant's exhibit.

16           THE COURT:   Why don't we use, so the record is

17   clean, the exhibit that was, in fact, admitted.

18           MR. OHM:   In terms of touching, Your Honor.

19           THE COURT:   Oh, that's fair.   Do you have any

20   reason to believe that the photograph is in any way

21   different than the Government's?

22           MR. WASSERMAN:   No, Your Honor.   It is in the

23   plastic sleeve because it is distorted.

24           THE COURT:   Remove it from the --

25           MR. WASSERMAN:   It appears to be the same shot.

1          THE COURT:  Mr. Marston?

2          MR. MARSTON:  I just would note, I think

3   Government's Exhibit 2 as it was admitted has a marking on

4   it with a green marker, which to the extent that makes a

5   difference, but I think it was just a circled car.

6          THE COURT:  It was a circled car on the right-hand

7   side.  I think because of concerns about different people

8   touching exhibits, we will just go ahead with this version,

9   Mr. Ohm.  Thank you, Mr. Marston.

10         MR. WASSERMAN:  Should we mark it as Defendant

11  Douglas' Exhibit 1?

12         THE COURT:  Sure.

13         MR. OHM:  I will mark this as Defendant's Exhibit

14  D, Douglas, 1 which is also Government's Exhibit 2.

15  **BY MR. OHM:**

16     **Q.**   Do you see that, Officer?

17     **A.**   Yes, sir.

18     **Q.**   As Mr. Marston was saying, there is a black sedan

19  on the other side of the street that you marked with a green

20  marker earlier.  Right?

21     **A.**   Correct.

22     **Q.**   And that is where my pen is now; is that right?

23     **A.**   Yes, sir.

24     **Q.**   I will mark a circle around it.  And that's where

25  you are.  Right?

1      **A.**    Yes.

2      **Q.**    You are positioned in the driver's side of that

3   vehicle?

4      **A.**    Yes, sir.

5      **Q.**    The front, driver's side?

6      **A.**    Yes, front, driver's side, yes.

7      **Q.**    Now, you, in terms of where the walkway is, the

8   walkway is a little bit to the left of the center of the

9   exhibit.  Right?

10      **A.**    Yes.

11      **Q.**    Between your line of sight and where the walkway

12   is, there is at least one SUV, a white SUV.  Do you see

13   that?

14      **A.**    Yes, sir.

15      **Q.**    Is it fair to say that that, under certain

16   circumstances, that that might block your vision?

17      **A.**    That's correct, yes, sir.

18      **Q.**    And you also see the big tree in the middle.

19   Right?

20      **A.**    Correct.

21      **Q.**    And that's to the right of the exhibit right -- if

22   you are looking at it, in front of the SUV.  Right?

23      **A.**    Yes, sir.

24      **Q.**    It's sort of in your line of vision too.

25      **A.**    Correct.

1      **Q.**   And the activity you are looking at is on this

2  wall.  Right?

3      **A.**   Correct.

4      **Q.**   I think you previously said that it was around

5  where the building begins or ends; is that fair?

6      **A.**   Yes.

7      **Q.**   Okay.  So I am going to mark that here also.

8      **A.**   Are you saying the exchange?  Which part?

9      **Q.**   Yeah.  The people coming together.

10      **A.**   I wouldn't say right there.

11      **Q.**   I'm sorry.  Where would you say?

12      **A.**   Let's go about -- down, come down, no, about right

13  where that shadow is.

14      **Q.**   Right here?

15      **A.**   Yeah.  About here.

16      **Q.**   I will draw an X where my original marking is and

17  I will say the exchange is at the circle where the shadow

18  is.  Is that a fair depiction of where it was?

19      **A.**   Let me make sure.  I am not trying to be

20  difficult, I am trying to be as accurate as possible.

21          I would say that's fair.

22      **Q.**   Okay.  You are looking at this part from your car,

23  the black car where the first circle is.  Right?

24      **A.**   Yes.

25      **Q.**   And I think you were testifying earlier that

1    you're essentially -- for Mr. Douglas, you are seeing his

2    back?

3         **A.**   Yes.

4         **Q.**   And sort of his right side; is that right?

5         **A.**   Correct.

6         **Q.**   Okay.  So is it fair to say that you could not see

7    his face at that point?

8         **A.**   That's correct.

9         **Q.**   I think you also testified when you identified,

10   when you did the drive-by identification, that you weren't

11   identifying a face.  You were identifying clothes.

12        **A.**   Yes.

13        **Q.**   Because you never really got a good look at the

14   faces.  Correct?

15        **A.**   I got a good look at the face, but I didn't base

16   my identification process on the face alone.  I based it on

17   the article of clothing.

18        **Q.**   Well, it's a little bit different than what you

19   said a little bit ago.

20        **A.**   Okay.

21        **Q.**   You said you identified them based on the clothes.

22   Right?

23        **A.**   Correct.

24        **Q.**   Not the face.  Right?

25        **A.**   No, you were asking -- I could have been confused,

1  but I am not saying that I didn't see his face.  I did see

2  his face.  I just didn't base my identification process on

3  that alone.

4      **Q.**  Sure.

5      **A.**  I based my identification process on the clothing.

6  I did see his face.  I just didn't base the identification

7  process on that.

8      **Q.**  Let me just be clear.  You testified that you

9  noticed a man in blue because he was standing there in the

10 walkway.  Right?

11     **A.**  Correct.

12     **Q.**  He wasn't really doing anything, and he was

13 standing with his back towards you.  Right?

14     **A.**  At which point?  During the exchange or just

15 during my observations?

16     **Q.**  During your observations.

17     **A.**  No, he wasn't standing with his back towards me

18 the whole entire time.  To the best of my recollection,

19 probably just walking back and forth, but that is the best I

20 can describe it.

21     **Q.**  So when you say "best of your recollection" and

22 "probably" it makes it seem like you are putting pieces

23 together.  It's important to know what you actually remember

24 seeing versus what you are sort of inferring.

25          MR. WASSERMAN:  Your Honor, I would object.

1    Leading, Your Honor.

2             THE COURT:  Sustained.

3    **BY MR. OHM:**

4        **Q.**   Do you remember seeing him walking back and forth?

5        **A.**   Yes.

6        **Q.**   Could you describe that for us, because I don't

7    remember you saying that.

8        **A.**   I am talking about prior to the exchange, and

9    that's just walking back and forth; that's the best I can

10   describe it.

11       **Q.**   Okay.  Is it fair to say, though, that you weren't

12   focused on the man in blue at that point?

13       **A.**   That is correct.  That's why it may come off like

14   I am being uncertain, but I wasn't completely focused on the

15   man in blue at the time.  But to the best of my

16   recollection, I do remember some walking back and forth, but

17   that is about it.

18       **Q.**   So you now remember you saw a face during that

19   time when you were sitting in the black car and seeing a man

20   walk back and forth?

21       **A.**   A face?

22       **Q.**   A face.

23       **A.**   Yeah.  Yes.  Yes.

24       **Q.**   Okay.  But on direct examination you were saying

25   that when you did the actual identification part, you were

1  over by the mouth of the parking lot and your identification

2  was just based on clothing?

3      **A.**  Correct.  Right.

4      **Q.**  Okay.

5          When you made the identification, the person you

6  identified was surrounded by police officers; is that fair?

7      **A.**  Can you move your notes on the projector?

8      **Q.**  You will get a preview of my questions.

9      **A.**  I don't want a cheat code.

10     **Q.**  I forgot my question.  So you had -- officers were

11 surrounding the person in blue at the time of the

12 identification.  Right?

13     **A.**  Yes.

14     **Q.**  Was the person handcuffed?

15     **A.**  Yes.

16     **Q.**  Was he still wearing the blue jacket?

17     **A.**  Yes.

18     **Q.**  Were there also police cars there?

19     **A.**  Yes.

20     **Q.**  How many officers would you say were there?

21     **A.**  Off hand, like I said, maybe four to five.

22     **Q.**  Okay.  And while they were arresting him, you were

23 listening.  Right?  You were on the radio with the arrest

24 team.  Right?

25     **A.**  Yes.

1      **Q.**   You could hear them arresting him, essentially.

2    Right?

3      **A.**   Yes.

4      **Q.**   Okay.

5      **A.**   I'm sorry.  I am not trying to be difficult.  I

6    could hear that they had stopped him.  At that point he

7    wasn't arrested.  Is that what you were asking.  Or was he

8    under arrest?

9      **Q.**   Did you hear them moving in on the person you

10   described?

11     **A.**   Yes.  Correct.  He wasn't under arrest at that

12   point.

13     **Q.**   That's a legal conclusion; is that fair?

14     **A.**   Yes.

15           THE COURT:  You did use that term yourself.

16           MR. OHM:  That's true.  That's also fair.

17           THE WITNESS:  And I'm trying to be clear, Mr. Ohm.

18   **BY MR. OHM:**

19     **Q.**   At the time he was in handcuffs, let's put it that

20   way.

21     **A.**   Okay.

22     **Q.**   From the time you put out the lookout and the time

23   the arresting team went to put him in handcuffs, you were in

24   communication with them.  Right?

25     **A.**   Correct.

1    **Q.**   You were also in communication from the time that

2    they had him in handcuffs to the time they brought him to

3    the parking lot.  Right?

4    **A.**   Correct.

5    **Q.**   All right.

6         So you knew you were looking at the person that

7    the officers had stopped after you gave your direction?

8    **A.**   Can you repeat that question?

9    **Q.**   You knew the person that was being presented to

10   you, the person in blue, was the person that the officers

11   had stopped after you gave the direction to move in?

12   **A.**   No.  And the only reason why I am trying to

13   clarify is essentially he went out of my sight and I did not

14   see him being stopped.  I kept continually asking, Do you

15   have him stopped?

16   **Q.**   Okay.

17   **A.**   I don't know if that clarifies anything.  I did

18   continually ask, Do you have the blue coat stopped?  Because

19   I didn't see him being stopped.  It wasn't until I came

20   around, that's when I saw him stopped.

21   **Q.**   Okay.  When you asked that question, they said,

22   Yes.  Right?

23   **A.**   To my recollection, yes.

24   **Q.**   So you didn't see --

25   **A.**   I did not see the stop.

1      **Q.**   You did get confirmation from them that they were

2      stopping the person you directed them to stop?

3      **A.**   Correct.  Yes.

4      **Q.**   Okay.  Now in terms of the things that you

5      observed from your driver's seat, were you able to describe

6      the bag?

7      **A.**   All I remember was a dark-colored bag; that was

8      it.

9      **Q.**   From where you were sitting, you couldn't see the

10     colors of the bag other than the fact it was dark?

11     **A.**   Yeah.  At the time I could see what color it was

12     but right now as I am telling you I cannot remember what

13     color it was.

14     **Q.**   Okay.  And then I think that you had -- how would

15     you describe, if you could, the action and motions of the

16     individual putting the bag on?

17     **A.**   Sure.  After receiving that book bag, he quickly

18     took off his jacket; I can't remember what he did with the

19     jacket.  He put the book bag on his shoulders as he wore a

20     book bag regularly and put his jacket over top of that.

21     **Q.**   Okay.  So when you say "quickly", are you saying

22     that as soon as he got the bag he took off his jacket or are

23     you describing some action where the actual taking off of

24     his jacket?

25     **A.**   Repeat that question.

1        Q.    Okay.  You used the adverb quickly for taking off

2    the jacket.

3        A.    Right.  I am only referring that to his action the

4    way it appeared while he was taking -- it looked like -- he

5    wasn't taking it off slowly.  It was hurrying it up and

6    taking it off and putting the book bag on.  When I say

7    quickly, I am describing that action.

8        Q.    So you're saying that the whole thing was sort of

9    -- he did it as quick as possible?

10        A.    Not Incredible Hulk, tearing clothes off, but the

11    motion I am trying to best describe -- and I'm sorry if I am

12    being confusing but I can tell you, I remember him taking

13    his jacket off in a quick motion and putting the book bag on

14    in a quick motion; that's the best I can describe it.

15        Q.    The quick part is taking the jacket off?

16        A.    Yes.

17        Q.    Not the putting it back on?

18        A.    I would say that would be a quick part too.

19        Q.    And putting the jacket back on?

20        A.    Hurrying up taking the jacket off and hurrying up

21    putting the jacket on.

22        Q.    So you have a very clear memory of this?

23        A.    Yes.

24        Q.    So where was the jacket?

25        A.    I don't know.  That's what I am trying to tell

1     you.  I don't know where the jacket was.  I just remember

2     him taking the jacket off, putting the book bag on, and

3     putting the jacket back on.  I don't know if it was in his

4     hands or between his legs.  I don't remember.

5          Q.   Now, you testified about your general practice as

6     undercover.  You are looking for things that seem like they

7     are secretive or whatever.

8          A.   Correct.

9          Q.   That might include if I went and talked to

10    Mr. Marston and said something to him, that might be

11    something you would consider secretive?

12         A.   Correct.

13         Q.   One of the things that you look for is the

14    transaction of hand-to-hand and the parties just dispersed

15    or separate.  Right?

16         A.   At which point?

17         Q.   For example, in the hand-to-hand drug transaction,

18    and you've been doing it for 20 years so you've seen a long

19    history of hand-to-hands.

20         A.   Yes.

21         Q.   Somebody could come, do a hand-to-hand, receive

22    something.  The buyer leaves.  The seller stays.  That's

23    pretty typical?

24         A.   Right.

25         Q.   The buyer and seller are not just going to hang

1    out.

2         **A.**    Right.

3         **Q.**    And in your -- in this situation it sounds like

4    what you are saying is, the transaction that you observed,

5    you are assuming that it was a sale.  Right?

6         **A.**    It appeared.

7         **Q.**    It's an assumption.  Right?

8         **A.**    Right.

9         **Q.**    You don't know if there was money.

10        **A.**    That's correct.

11        **Q.**    And you didn't hear anything between them.  Right?

12        **A.**    That's correct.

13        **Q.**    Oftentimes a buyer will look and inspect a

14   product.  Right?

15        **A.**    Correct.

16        **Q.**    You didn't see any inspecting of a product.

17   Right?

18        **A.**    No, I did not.

19        **Q.**    You didn't see anything like that.  Right?

20        **A.**    No.

21        **Q.**    You didn't see the person in blue do anything to

22   indicate that they were getting something or that they were

23   purchasing something and they wanted to know what it was.

24   Right?

25        **A.**    Are you indicating as far as him looking into the

1    bag after the receipt?

2         **Q.**    No looking into the bag.  Right?

3         **A.**    Say again.

4         **Q.**    There was no looking into the bag?

5         **A.**    Correct.

6         **Q.**    There was no feeling of the bag?

7         **A.**    Correct.

8         **Q.**    And there was no other interactions between these

9    two people other than the handing over of the bag and some

10   sort of handshake.

11        **A.**    Correct.

12        **Q.**    And that handshake you think had included some

13   sort of light-colored material in the exchange.

14        **A.**    Correct.

15        **Q.**    You said "object" today.  I just want to be clear.

16   You are not saying you could tell it was paper.

17        **A.**    That's correct.

18        **Q.**    You mentioned the words "probable cause" on

19   direct.  Right?

20        **A.**    Correct.

21        **Q.**    And probable cause is probable cause to arrest

22   somebody.  Right?

23             MR. WASSERMAN:  Objection.

24             THE COURT:  What is the question?

25             MR. OHM:  When you say it is probable cause to

1    arrest somebody.

2              THE COURT:  What is the reason for this question?

3              MR. OHM:  I want to go to the importance of money

4    in the assessment that the officers would have.

5              THE COURT:  I'll allow the question, Mr. Ohm.

6    **BY MR. OHM:**

7         **Q.**  Probable cause to arrest is what you are referring

8    to.  Right?

9         **A.**  Yes.

10        **Q.**  When you have an exchange of money, that is

11   exactly what you are looking for.  Right?

12        **A.**  Say again.

13        **Q.**  When you are observing an exchange of an object

14   for money, that is what you are looking for.  Right?

15        **A.**  Correct.

16        **Q.**  And especially if they are acting in other ways

17   like going to a stash location, that would indicate to you

18   that it was contraband.  Right?

19        **A.**  Correct.

20        **Q.**  If I gave Mr. Marston a bag and I shook his hand,

21   that wouldn't be illegal?

22        **A.**  Wouldn't be what?

23        **Q.**  That wouldn't be illegal.  Right?

24             MR. WASSERMAN:  Objection.  Relevance.

25             THE COURT:  Sustained.

1    BY MR. OHM:

2         Q.    Okay.  So you had testified both on direct on Mr.

3    Marston's questions that you believed that the individual in

4    gray jumped the fence.  Right?

5         A.    He could have.  I didn't see that part.

6         Q.    Okay.  So you don't know one way or another?

7         A.    I cannot testify to you that he hopped the fence.

8         Q.    Okay.  Because you weren't focusing on him at that

9    point in time or because he wasn't in your line of sight?

10        A.    Which defendant?

11        Q.    The grey.

12        A.    That's correct.  I wasn't focusing on that part.

13   I was trying to get my lookout out and get the arrest team

14   members to get them stopped.

15        Q.    Was he in your line of sight?

16        A.    Which part?

17        Q.    The part -- so you saw him on the other side of

18   the fence at one point?

19        A.    Right.  In my sight.

20        Q.    Later on you say you saw him on the other side of

21   the fence?

22        A.    Yes.  At some point he was in my line of sight in

23   the walkway.

24        Q.    Did you lose sight of him though between those two

25   times or is it just that you can't remember whether you saw

1     him jump the fence?

2          **A.**   I just cannot remember.

3          **Q.**   So you didn't lose sight?

4          **A.**   I can't say that I lost sight.  I am not trying to

5     be difficult.  I just can't remember that part.

6          **Q.**   Sure.  But you are watching this transaction,

7     Right, and as a drug undercover, you are looking at both the

8     buyer and the seller all of the time.  Right?

9          **A.**   Correct.

10         **Q.**   You are not just focusing on one individual.

11    Right?

12         **A.**   Correct.

13         **Q.**   And so you see the buyer and you are saying you

14    are focused on him and the guy in the gray is the seller in

15    your perspective, then are you continuing to watch both the

16    blue and the gray, the buyer and the seller?

17         **A.**   Trying to, yes.

18         **Q.**   When you say that you don't know if he jumped the

19    fence or not, are you saying that you lost sight of the guy

20    in gray or are you saying you just don't remember?

21         **A.**   I am telling you, I just don't remember.

22         **Q.**   Okay.  You don't know if you lost sight of him or

23    not?

24              MR. WASSERMAN:  Objection.  Asked and answered.

25              THE COURT:  Yes.  Sustained.

1    BY MR. OHM:

2        Q.    Then you watch -- at one point do you decide to

3    leave to drive around to Montana?

4        A.    I think when I saw sufficient arresting members in

5    the block, I just drove off because I wanted to make sure

6    that they had Mr. Douglas stopped.  At some point they did

7    indicate that they had him stopped, and I wanted to come

8    around just to make sure of that.

9        Q.    Okay.  And did you see Mr. Douglas get stopped?

10       A.    Getting stopped or was he already stopped?

11       Q.    Did you see him stopped?

12       A.    I saw him stopped.

13       Q.    But you didn't see him getting stopped?

14       A.    I did not see him getting stopped.

15       Q.    And you said you didn't see Mr. Williams getting

16   stopped?

17       A.    That's correct.

18       Q.    But you saw the officers move in upon your

19   command?

20       A.    Correct.

21       Q.    And after that point, when you saw enough officers

22   move in, that's when you decided to go?

23       A.    I am not trying to be difficult.  It's just the

24   officers moving in was not my factor to leave.

25       Q.    I thought you just said you wanted to make sure

1    that Mr. Douglas was stopped and so you waited for all of --

2    enough officers to move in and that's when you left.

3         **A.**   Correct.  I just left.

4         **Q.**   Okay.  So it seemed like the main factor in your

5    decision to leave was after you were making sure that there

6    were enough officers where you were confident that Mr.

7    Douglas was stopped.

8         **A.**   Ask that again.

9         **Q.**   It sounds like you were waiting to leave until

10   after you were sure there were enough officers moving in so

11   you could be confident that Mr. Douglas would be stopped?

12        **A.**   Correct.

13        **Q.**   Okay.

14            So you didn't leave though until a bunch of

15   officers came in is what I am trying to say?

16        **A.**   Correct.

17        **Q.**   Okay.  I wanted to -- if we could go to --

18            MR. OHM:  I will mark this as Defense Douglas' 2,

19   Government's Exhibit 5, the Andrew Stout camera that you

20   previously identified.

21            CLERK:  Mr. Ohm, is this on your laptop?

22   **BY MR. OHM:**

23        **Q.**   Okay.  So this is the footage you watched earlier

24   on direct examination, from Officer Stout.  Right?

25        **A.**   Correct.

1     **Q.**   Here you see the individuals in the walkway.

2     Right?

3     **A.**   Correct.

4     **Q.**   I am at 2:16 now.  Going back to 2:18.  Here you

5     see different members of the arrest team moving in.

6     **A.**   Correct.

7     **Q.**   So at 2:19 on the right hand of the exhibit you

8     see one officer.  Right?

9     **A.**   Yes.

10     **Q.**   And then you see a -- is that a police car, the

11     silver car --

12     **A.**   Yes.

13     **Q.**   -- at 2:19 in the middle of the exhibit and there

14     is a second officer there.  Correct?

15     **A.**   Right.

16     **Q.**   Here at 2:21 is a third officer.  Right?

17          THE COURT:  Let's be clear that when you are

18     talking about 2:19 and 2:21, you are talking about the time

19     in the file, not the time posted in the upper right-hand

20     corner.

21          MR. OHM:  Yes, Your Honor.  I apologize.  Is it

22     better for the record if I switch to the upper right-hand

23     corner?

24          THE COURT:  That's probably the clearest way to

25     proceed.

1          MR. OHM:  Okay.

2    **BY MR. OHM:**

3          Q.   I am at 19:02:42 is the time in the upper

4    right-hand corner.

5               (Played video.)

6               Okay.  So at 19:02:49 you see the two officers and

7    the one unmarked police car.  Right?

8          A.   Yes, sir.

9          Q.   Are there any other police cars here?

10         A.   So far I just see one.

11         Q.   Okay.  At 19:02:51 is when another officer

12   arrives.  Correct?

13         A.   That's correct.

14         Q.   And Officer Stout is in uniform also.  Is that

15   fair?

16         A.   Yes.

17         Q.   Is that one of the officers that we see in

18   19:03:03?  Is that one we already saw or a different one?

19         A.   I believe it is one we already saw.

20         Q.   Is this Mr. Williams on the left-hand side of the

21   exhibit at 19:03:03?

22         A.   Yes.

23         Q.   He is in full view of the officers.  Correct?

24         A.   Of the officers, yes.

25              (Played video.)

114

1          **Q.**   If you look in the background, did you see the

2     squad car drive by in 19:03:03?

3          **A.**   Yes.

4          **Q.**   You see your car behind it.  Right?

5          **A.**   Right.  Right next to it.

6          **Q.**   It's fair to say that Mr. Williams was in the

7     presence of officers at the time that you left.

8          **A.**   I couldn't see that far.  I couldn't see those

9     officers walking past Mr. Williams.

10          **Q.**   Okay.  Well, it's fair to say that the officers

11     walked by Mr. Williams while you were still there.

12          **A.**   Yes.

13          **Q.**   Okay.  And after the exchange, how much longer did

14     you see the two individuals?

15          **A.**   Um, maybe -- after the exchange.  Right?

16          **Q.**   Yeah.

17          **A.**   No more than a minute, maybe 20 to 30 seconds.

18          **Q.**   And in those 20 to 30 seconds, they didn't

19     separate.  Right?

20          **A.**   At the time I saw them.  Correct.

21          **Q.**   They stayed together.

22          **A.**   Yes, at the time I saw them.

23          **Q.**   Which is different than you often see with a

24     buyer/seller situation.  Right?

25          **A.**   Correct.

1    Q.   I just wanted to clarify one point.  Did the

2    exchange, the hand-to-hand transfer of the light-colored

3    object, did that happen before or after the backpack was

4    given?

5    A.   After.

6    Q.   Okay.  And did it happen before or after the

7    backpack was put on?

8    A.   It was before the backpack was put on.

9    Q.   Okay.  So you are saying that the backpack is

10   handed over, the jacket is taken off and then the money is

11   exchanged and then the backpack is put on?

12   A.   No.

13   Q.   Why don't you break it down.

14   A.   The backpack is given, the exchange, and then the

15   taking off of the jacket and putting it back on.

16   Q.   So the backpack is given, the money is given and

17   then the exchange?

18   A.   Yes.

19   Q.   Okay.  And was it almost like right after is when

20   the backpack was given and the money -- or not the money,

21   when the light-colored object was given?

22   A.   Correct.

23   Q.   Is it simultaneous or is it --

24   A.   Which part was simultaneous?

25   Q.   The backpack and then the hand-to-hand where the

1    light-colored object was given?

2        **A.**   It was quick like that so simultaneously, yeah.

3    The backpack was given, hand-to-hand and then the jacket --

4        **Q.**   The next instant the hand-to-hand?

5        **A.**   Yes.

6        **Q.**   And this is the part where the man in blue is --

7    his back is facing you.  Right?

8        **A.**   That's correct.

9        **Q.**   And I think you had said that the man in gray was

10   sort of -- well, I will just ask you.  Where was the man in

11   gray?

12       **A.**   The man in gray, I could see the left portion of

13   his body.  I could see more dominant -- I could see.  Keep

14   going.  Right there -- that portion of the body.

15       **Q.**   So a little bit of the front but not the whole

16   right side?

17       **A.**   Yeah.

18       **Q.**   You had testified that the fifth district has the

19   most drug use; is that what you said?

20       **A.**   No, sir.

21       **Q.**   What did you say?

22       **A.**   I was asked if I had observed and I am just trying

23   to think if drug sales took place more than usual in first

24   district, second district, third district and fourth

25   district.  And I said I observed more drug sales taking

1    place in the fifth district versus those other four

2    districts.

3        **Q.**   I see.  How often -- in the last five years or so,

4    how often did you work in the first district?

5        **A.**   The first district?

6        **Q.**   Yeah.

7        **A.**   Do you want a rough number?

8        **Q.**   Sure.

9        **A.**   I would say maybe close to 100.

10        **Q.**   And what about the second district?

11        **A.**   The second district I can think of offhand no more

12    than five.

13        **Q.**   So less than five times?

14        **A.**   Let me double check.  Let me think.  I am basing

15    this off of some investigations and drug complaints that we

16    had.  No more than 10.

17        **Q.**   What about the third district?

18        **A.**   The third district we have been there quite

19    frequently as well.  I would say maybe about 100 times.

20        **Q.**   What about the fourth district?

21        **A.**   The fourth district probably the same, close to

22    100.

23        **Q.**   What about the fifth district?

24        **A.**   The fifth?

25        **Q.**   Yeah.

1    **A.**   Um, more than those districts I just described.

2    It's hard to give you an accurate number.

3    **Q.**   A couple hundred?

4    **A.**   Yeah, a couple hundred.

5          MR. WASSERMAN:  I'm sorry.  I didn't catch the

6    question.

7          MR. OHM:  A couple hundred?

8          MR. WASSERMAN:  What was the question before that?

9          MR. OHM:  How many times from the fifth district?

10         MR. WASSERMAN:  Okay.

11   **BY MR. OHM:**

12   **Q.**   To be clear because I wasn't sure you are saying

13   your understanding of where drugs are sold the most is based

14   upon your observations and experience as an undercover

15   officer.  Right?

16   **A.**   And drug complaints.

17   **Q.**   Drug complaints.

18   **A.**   Yes.

19   **Q.**   Okay.  Okay.

20         You had testified that at the time of the exchange

21   that there may have been other individuals who were around

22   the person in the blue and the person in orange?

23   **A.**   Correct.

24   **Q.**   How many?

25   **A.**   I can remember maybe two walking.

1    Q.   So there were two other people right there?

2    A.   Possibly.  I can't actually say that it was two

3    but possibly.

4    Q.   When you say you can't say it was two, do you mean

5    it could be more or it could be less or it could be zero?

6    A.   It's definitely not zero.  It could be more or

7    less.  I just can't give you an exact number.

8    Q.   Okay.  And what was the gender of those other

9    people?

10   A.   Males.

11   Q.   They were males?

12   A.   At the time, yes.  I didn't mean to cut you off.

13   Are you asking at the time of the exchange or between the

14   time I was there for 10 or 15 minutes.

15   Q.   At the time of the exchange.

16   A.   At the time of the exchange, I would say maybe one

17   or two and those are males.

18   Q.   And could you tell us what -- the first person

19   that you remember, what did that person look like?

20   A.   I don't remember.

21   Q.   What was the race of that person?

22   A.   Black male.

23   Q.   Any idea what their clothing was?

24   A.   I do not.

25   Q.   Tall?  Short?

1      **A.**    I can't tell.

2      **Q.**    Heavy or skinny?

3      **A.**    I cannot testify to that.

4      **Q.**    Okay.  With the same -- so there's a second male

5    that you may or may not have seen?

6      **A.**    Yes.  And I'm only basing it off of what I saw

7    earlier from the individual with the black coat and fur on

8    it.  I can't even tell you -- that refreshed my recollection

9    at the time of seeing the video.  So I can't tell you --

10   what I am trying to say is I can't --

11     **Q.**    Okay.  In terms of your refreshed recollection

12   about the person with the black coat and fur, what did you

13   see that person doing?

14     **A.**    I cannot tell you that.  I can only reflect my

15   recollection that I saw that individual.  I cannot remember

16   specific details.

17     **Q.**    Okay.  But there was something that was triggered

18   in your memory that made you think that person was part of

19   the group?

20     **A.**    He could have been out there, yes.

21     **Q.**    Okay.  How many people were out there?  Were there

22   a lot?

23     **A.**    In the walkway or just in --

24     **Q.**    The whole complex.

25     **A.**    There were --

121

1          MR. WASSERMAN:  Objection.  Relevance.  The whole

2     complex?

3          MR. OHM:  That part he can see.

4          THE COURT:  Rephrase the question.

5     **BY MR. OHM:**

6     **Q.**   How many people did you see out there?

7     **A.**   I can only testify to the group of individuals

8     that were to the right of me, which was right by the

9     recreational center, and the ones I just previously brought

10    up, maybe two to three individuals, one or two individuals.

11    So this group on the right side of me by the recreational

12    center, I would say maybe six to eight.

13    **Q.**   Okay.  And did you see all of those individuals

14    interacting with each other?

15    **A.**   They were just standing around each other and just

16    interacting amongst each other.

17    **Q.**   And are you saying with certainty that nobody else

18    interacted with the person in gray?

19    **A.**   Which?

20    **Q.**   Did you see anyone else interact with the person

21    in gray, come to arms length with the person in gray?

22    **A.**   During the exchange or just in general?

23    **Q.**   In general.

24    **A.**   I can't say for certain.

25    **Q.**   Okay.  How about during the exchange?

1      **A.**    Ask the question again.

2      **Q.**    During the exchange, did you see anybody else

3   within arm's length of the person in gray?

4      **A.**    No.  I'm sorry.

5      **Q.**    During the exchange did you any person within

6   arm's length of the person in blue?

7      **A.**    No.  The only person I saw was the individual in

8   gray and the individual in blue within arm's length of each

9   other.

10      **Q.**    Where was the third person?

11      **A.**    I cannot tell you that.

12      **Q.**    You just know a person was there?

13      **A.**    I just know a person was there.

14      **Q.**    Okay.  Oh, why didn't you have binoculars?

15      **A.**    For one, I was in the undercover vehicle, which

16   does not have tinted windows.  I was within some feet from a

17   group of individuals where we were watching not only those

18   but individuals -- so I cannot -- I am trying to blend in as

19   an undercover officer.  So I cannot keep putting up

20   binoculars.  It would be very obvious that I am undercover.

21      **Q.**    Do you typically not use binoculars?

22      **A.**    I typically don't.

23      **Q.**    Okay.  And then -- oh, there were some questions

24   about training.  I just want to clarify some things.  You

25   said you had training in the academy, on-the-job training,

123

1    and I think you said you had something twice a year?

2         A.   Yes, PDT, which I cannot think what the acronym

3    is.  Training done at the academy.  It is a refresher

4    course.  We go over certain subjects, refresh our training

5    on certain things like firearms.

6         Q.   Is it something that all of the officers do?

7         A.   Yes.

8         Q.   Okay.  So in terms of specialized training as an

9    undercover narcotics officer, what kind of training do you

10   have?

11        A.   On a yearly basis, nothing as far as on a yearly

12   basis for drug op.  The only other thing is probably just

13   search warrant training.

14        Q.   So when is the last time you had undercover

15   narcotics training?

16        A.   Um, I would say maybe 10 years ago.

17        Q.   Okay.

18             MR. OHM:  Your Honor, that is all I have.

19             THE COURT:  Mr. Wasserman, would you wish to do

20   redirect?

21             MR. WASSERMAN:  We do, Your Honor.

22                       **REDIRECT EXAMINATION**

23   BY MR. WASSERMAN:

24        Q.   Good afternoon, Officer Jackson.

25        A.   Good afternoon.

1      **Q.**   You were asked about the hand-to-hand exchange

2      that you observed.  And specifically related to the object

3      that Mr. Douglas handed Mr. Williams, what did you believe

4      that to be at the time?

5      **A.**   U.S. currency.

6      **Q.**   And in your training and experience, is that the

7      only thing of value that might ever be transferred between

8      two people that might be for contraband?  Is there ever

9      transfer of drugs for firearms, in your experience?

10     **A.**   Not in my experience.  I am not saying that it

11     can't happen but in my experience, U.S. currency will be

12     more often used.

13     **Q.**   I'm sorry.  What?

14     **A.**   In my experience, U.S. currency will be more often

15     used.

16     **Q.**   And based upon your observations, is that what you

17     believe you were seeing?

18     **A.**   Yes.

19     **Q.**   Okay.  With respect to your observations of the

20     actual exchange of the backpack, you were shown a map --

21     excuse me, a photograph that showed where your vehicle was

22     in relation to other vehicles.  Do you recall seeing that?

23     **A.**   Yes.

24     **Q.**   All right.  Was there anything -- any of those

25     things, cars, trees, bushes, that obstructed your view of

1    the exchange between Mr. Williams and Mr. Douglas?

2         **A.**   No.

3         **Q.**   You were -- I want to ask you a little bit about

4    the radio run and just to make sure that we are clear on the

5    course of your description.  So if I can, and just to be

6    clear, Mr. Marston said a certain amount of time passed when

7    you first gave the lookout and when you mentioned the orange

8    hood.  Do you recall that?

9         **A.**   Yes.

10        **Q.**   All right.  So if I can go ahead and play

11   Government's Exhibit No. 3, at the 6 minute mark, it is

12   6:29.

13             THE COURT:  Before you play that, does this audio

14   file have a time stamp associated with the time of day?

15             MR. WASSERMAN:  No, it doesn't.  Since it's a -- I

16   don't know if we can call it a tack channel, it doesn't have

17   a dispatch, sometimes it will give a timing stamp or marker

18   on the transmissions.

19             THE COURT:  Okay.

20             MR. WASSERMAN:  If you can play from the

21   six-minute marker.

22             (Played video.)

23   **BY MR. WASSERMAN:**

24        **Q.**   Officer Jackson, was that your initial lookout?

25        **A.**   Yes.

126

1      Q.   So primarily focused on the individual in the blue

2  coat?

3      A.   Yes.

4      Q.   And why were you particularly focused on the

5  individual in the blue coat at that point?

6      A.   Because I knew he was in possession of the book

7  bag.

8      Q.   All right.  And what did you -- is that -- is the

9  book bag what you suspected may have contained contraband?

10     A.   Yes.

11     Q.   I am going to go ahead and ask you to play from

12  6:29 to 7:08 of Exhibit 3.

13          (Played audio.)

14          Officer Jackson, was that the second part of your

15  lookout?

16     A.   Yes.

17     Q.   The next transmission you made that had a lookout?

18     A.   Yes.

19     Q.   All right.  And in that lookout, did you

20  supplement your description of what was later identified as

21  Mr. Williams with puffy hair or puffy or messy hair?

22     A.   Yes.

23     Q.   And since we started about the six-minute mark and

24  that transmission ended about 7:08, is it about a minute or

25  so from the first -- from the time you first gave -- started

1    to give the first lookout?

2          **A.**    Yes.

3          **Q.**    Now, I am going to ask to play from 7:28 of the

4    recording to 7:39, Exhibit 3.

5                (Played audio.)

6                So is this the third transmission you had that

7    included the lookout for the two individuals?

8          **A.**    Yes.

9          **Q.**    And in this particular transmission, is this the

10   first point in which you mentioned the orange hood as it

11   related to Mr. Williams?

12         **A.**    Correct.

13         **Q.**    All right.  That was approximately about a minute

14   and a half after you started the initial lookout.

15         **A.**    Correct.

16         **Q.**    Is that right?

17         **A.**    Yes.

18         **Q.**    All right.  So for timing, based upon you are

19   listening to the recording, was it about a minute and a

20   half, a minute and a half that it took you to add the

21   additional descriptive information as it related to Mr.

22   Williams?

23         **A.**    Correct.

24         **Q.**    You talked a little bit about or have been asked

25   about some of the other people that you saw in the immediate

1    vicinity of the walkway.  Did any of the individuals that

2    you saw in the area match the description or have a similar

3    description as to Mr. Douglas or Mr. Williams?

4         **A.**   No.

5         **Q.**   With respect to -- I want to ask you a little bit

6    about some of the questions that Mr. Ohm asked you.  You

7    indicated that there might have been four or five undercover

8    officers working that day in this operation.  Do you recall

9    that?

10        **A.**   Yes.

11        **Q.**   All right.  And is everybody working in the same

12   area or were those other undercovers located in other parts

13   of 5D, if you know?

14        **A.**   I am basing this off of some transmission that

15   took place, but we were all in the same area, but not

16   directly with each other.  I would say a couple undercover

17   officers were some blocks away and pretty much scattered

18   amongst this neighborhood.

19        **Q.**   And you indicated there may have been about 10 to

20   15 uniformed officers that were assigned to the arrest team?

21        **A.**   Correct.

22        **Q.**   All right.  And were those people, those uniformed

23   officers sort of assigned to respond to anything that might

24   have been called out as far as the lookout from any one of

25   the undercover officers, the four or five that were working

1    that day?

2         **A.**   Yes, sir.

3         **Q.**   So they weren't -- the 10 to 15 officers were not

4    specifically assigned to you.

5         **A.**   Correct.

6         **Q.**   With respect to your observations of the exchange,

7    you talked about your experience and your understanding of

8    the frequency of criminal activity not only in 5D but in

9    that particular location of the walkway and the rec center.

10   Do you recall that?

11        **A.**   Yes.

12        **Q.**   Does that experience, and your understanding of

13   that area, factor into your assessment of whether what you

14   are observing, what you observed with respect to Mr. Douglas

15   and Mr. Williams was suspicious?

16        **A.**   Can you repeat that?

17        **Q.**   I'm sorry.  It was not a well-worded question.

18   Your understanding of that area as an area with more

19   frequent criminal activity, I think you said drugs,

20   robberies, did that factor into your assessment that what

21   you were observing between these two people was suspicious?

22        **A.**   Yes.

23        **Q.**   You were also asked about your show-up ID, as

24   Mr. Marston termed it, and when you did the identification

25   procedure in relation to where both defendants were located.

1    Just to clarify, were you able to clearly see both

2    individuals without anything obstructing your view?

3         **A.**   Yes, I did.

4         **Q.**   Had something been obstructing your view, would

5    you have moved into a position in order to be able to see

6    them clearly?

7         **A.**   Yes.  Not only that, I would indicate to arrest

8    team, radio to bring them further towards this way or that

9    direction, like I have done in the past.

10        **Q.**   All right.  And I think you've indicated there are

11   times where the arrest team has stopped somebody that turned

12   out to not be the person that you observed?

13        **A.**   Correct.

14        **Q.**   So do you have no problem telling the arrest team

15   they have the wrong guy?

16        **A.**   No problem at all.

17        **Q.**   And, again, just so we are clear, was there

18   anybody else that you observed in that area that sort of

19   matched the description or had similar description in terms

20   of clothing and appearance as Mr. Williams and Mr. Douglas?

21        **A.**   No.

22        **Q.**   I just have one other question.  You indicated

23   that after you saw this exchange between Mr. Douglas and Mr.

24   Williams, they sort of both walked off at some point towards

25   the parking lot.  Do you recall saying that?

1          **A.**   Yes, sir.

2          **Q.**   Did you have any idea at that time whether they

3     were going to be remaining together or separate?

4          **A.**   I did not have any idea.  All I know is they just

5     walked out of my sight towards that parking lot.

6               MR. WASSERMAN:  That's all I have.

7               THE COURT:  Thank you.

8               Officer Jackson, I don't have any questions for

9     you.  Thank you for your time today.

10              THE WITNESS:  Leave the microphone here?

11              THE COURT:  I think so, yes.  You are excused.

12              Are you ready to call your next witness?

13              MR. WASSERMAN:  Yes.  The Government calls Officer

14    Poupart.

15              THE COURT:  Officer, hold on for one second.

16              MR. WASSERMAN:  I was going to give him a wipe.

17              THE COURT:  If you want to wipe that down.

18              CLERK:  Please raise your right hand.  Do you

19    solemnly swear that the testimony you shall give the Court

20    today will be the truth, the whole truth, and nothing but

21    the truth?

22              THE WITNESS:  I do.

23              CLERK:  Please be seated.

24              THE COURT:  Officer Poupart, you are obviously

25    wearing a mask.  You have the option to put on a face shield

1    if you want to take off the mask and have the face shield.

2    What the prior witness found was that that face shield

3    fogged up to some extent.  So while you can speak more

4    easily with it, you may not be able to see as well.  It's

5    your choice.  We put that microphone over there to make it

6    easier to hear a witness with a mask on.  If you want to

7    start that way and see how it goes, that's fine with us or

8    if you prefer to do a face shield, we have some available.

9              THE WITNESS:  I will start like this.  Thank you.

10             THE COURT:  Okay.  We will try that.

11                      **<u>DIRECT EXAMINATION</u>**

12   **BY MR. WASSERMAN:**

13       **Q.**   Good afternoon.  Can you introduce yourself to the

14   Court and spell your first and last name for the court

15   reporter, please?

16       **A.**   My name is Officer Maxwell Poupart, M-a-x-w-e-l-l,

17   P-o-u-p-a-r-t.

18       **Q.**   Where are you currently employed?

19       **A.**   The Metropolitan Police Department.

20       **Q.**   What is your position with the MPD?

21       **A.**   Officer.

22       **Q.**   How long have you worked with MPD as a police

23   officer?

24       **A.**   Close to five years.

25       **Q.**   What is your current assignment?

1    **A.**   I am an officer of the third district.

2    **Q.**   Any specific role in 3D?

3    **A.**   I am on the crimes suppression team.

4    **Q.**   What do you do with the crime suppression team?

5    **A.**   It's a special missions unit.  We focus on violent

6    crime in the district, firearms, occasionally prostitution.

7    **Q.**   Where were you assigned on April 22nd of 2020?

8    **A.**   NSID, the narcotics enforcement unit.

9    **Q.**   When were you first assigned to NSID?

10   **A.**   I don't know the exact date.  It was the end of

11   January or the beginning of February of this year.

12   **Q.**   And how long were you in NSID -- well, before you

13   went to 3D?

14   **A.**   Approximately five months.  I went back to 3D in

15   June of this year.

16   **Q.**   Okay.  Was that a temporary detail you were doing

17   in NSID?

18   **A.**   Yes.

19   **Q.**   Okay.  And prior to your assignment with NSID, I

20   guess in late January, where were you assigned?

21   **A.**   Prior to NSID I was assigned third district in the

22   same position I am in now.

23   **Q.**   Okay.  What were your duties?  What was your

24   assignment when you were with NSID?

25   **A.**   i was assigned to the narcotics enforcement unit.

134

1      We would handle drug complaints that came in from citizens,

2      residents, as well as narcotics-related operations, buy/bust

3      operations.

4           Q.   And, specifically, your role in those

5      investigations?

6           A.   I was a member of the arrest team.

7           Q.   All right.  As part of your training and

8      experience as a police officer, have you received any

9      firearms training?

10          A.   Yes.

11          Q.   And have you been involved in investigations where

12     firearms were seized?

13          A.   Yes.

14          Q.   And prior to April 22nd of 2020, have you been

15     involved in investigations where either you seized a firearm

16     or officers you were with seized firearms?

17          A.   Yes.

18          Q.   How many times do you think you participated in

19     investigations where firearms were seized?

20          A.   I don't know the exact number.  Approximately 20,

21     maybe more.

22          Q.   Based upon your training and experience, are you

23     familiar with the size, shape, weight and other

24     characteristics of most handguns?

25          A.   Yes.

1       **Q.**   Based upon your training and experience, are you

2  able to recognize what a handgun feels like without

3  necessarily being able to see it?

4       **A.**   Yes.

5       **Q.**   I want to direct your attention to the afternoon

6  of April 22nd of 2020, were you on duty that afternoon?

7       **A.**   Yes.

8       **Q.**   And do you recall what your assignment was that

9  day?

10       **A.**   Arrest unit.

11       **Q.**   Was that with NSID?

12       **A.**   Yes.

13       **Q.**   And do you know what -- why you all were out there

14  that day?  Was there a particular operation or --

15       **A.**   We were conducting operations in that district.

16       **Q.**   I'm sorry?

17       **A.**   We were conducting operations in the fifth

18  district.

19       **Q.**   All right.  And was there anything in particular

20  that the operations focused on?  Narcotics?  Firearms?

21       **A.**   We were -- I believe we were focused on narcotics

22  complaints in the area.

23       **Q.**   Okay.  How were you dressed that day?

24       **A.**   Full police uniform.

25       **Q.**   And were you on foot or in a vehicle?

1      **A.**    I was in a vehicle.

2      **Q.**    Was that vehicle marked or unmarked?

3      **A.**    Unmarked.

4      **Q.**    Were you with any other officers that day?

5      **A.**    Yes.

6      **Q.**    Who was that?

7      **A.**    Officer Taylor.

8      **Q.**    All right.  Any other officer other than Officer

9   Taylor?

10     **A.**    No.

11     **Q.**    Were you involved in an investigation on that date

12  that resulted in the seizure of a firearm in the area of the

13  2300 block of 15th Street in northeast Washington, DC?

14     **A.**    Yes.

15     **Q.**    Prior to April 22nd of 2020, were you familiar

16  with the area of the 2300 block of 15th Street?

17     **A.**    I haven't particularly worked over there since I

18  was assigned to the 3rd district.

19     **Q.**    Okay.  Did you have experience -- have you worked

20  there before or are you not famniliar with that area?

21     **A.**    Well, my unit has executed search warrants in

22  other parts of the city other than the third district.  We

23  have been in other districts.  But not to my recollection

24  being in that block.

25     **Q.**    All right.  Did there come a point on April 22nd

1    of 2020 when you received a radio transmission to respond to

2    that block?

3         **A.**   Yes.

4         **Q.**   And do you recall generally what the radio

5    transmission requested?

6         **A.**   It was another officer from observation post

7    requesting for units to move in and make a stop.

8         **Q.**   Of anybody in particular?

9         **A.**   Yeah, two described individuals.

10        **Q.**   All right.  And prior to your testimony today,

11   have you had an opportunity to review the radio transmission

12   from that particular incident?

13        **A.**   Yes.

14        **Q.**   All right.  I want to play you Government's

15   Exhibit No. 3 from 6 minute mark to about 6:29.

16             (Played audio.)

17             Do you recognize the voice on that radio

18   transmission?

19        **A.**   Yes.

20        **Q.**   Who is that?

21        **A.**   That is Officer Jackson.

22        **Q.**   And do you know what Officer Jackson was doing

23   that day in terms of his assignment?

24        **A.**   Yes, he was an undercover officer.

25        **Q.**   Was that the radio transmission that you responded

1    to that day?

2         **A.**    Yes.

3         **Q.**    To your knowledge, were you and Officer Taylor the

4    first officers on the scene?

5         **A.**    Yes.

6         **Q.**    And have you had, prior to today, an opportunity

7    to review your body worn camera footage from that day?

8         **A.**    Yes.

9         **Q.**    All right.  I am going to play you Government's

10   No. 4 from 19:02:25 time stamp to about 19:02:50.

11             (Played audio.)

12             All right.  Officer Poupart, did you recognize

13   that portion of the video?

14        **A.**    Yes.

15        **Q.**    All right.  Can you tell us why you approached the

16   individual in the blue jacket?

17        **A.**    That was the description given by the undercover

18   officer.

19        **Q.**    And do you see the individual in the blue jacket

20   that you interacted with anywhere in the courtroom today?

21        **A.**    Yes.

22        **Q.**    All right.  Can you please identify that

23   individual by describing where he is sitting and an article

24   of clothing he is wearing?

25        **A.**    Sitting to my left in orange.

1          THE COURT:  And, again, because we are wearing

2    masks, I would ask the defendant to take off his mask if you

3    can confirm --

4          MR. WASSERMAN:  Is that the person you interacted

5    with there in the blue coat that is on Government's Exhibit

6    4?

7          THE WITNESS:  Yeah.

8          MR. WASSERMAN:  Your Honor, I ask the record

9    reflect of the in-court identification of Mr. Douglas.

10         THE COURT:  The record so reflects.

11   **BY MR. WASSERMAN:**

12      **Q.**   Okay.  During your interaction with Mr. Douglas,

13   did either you or your partner draw your weapons at any

14   point during that interaction?

15      **A.**   No.

16      **Q.**   Were you or your partner yelling at or threatening

17   Mr. Douglas at any point during that interaction?

18      **A.**   No.

19      **Q.**   I am going to show you what has been admitted into

20   evidence as Government's Exhibit 4-A.  Do you recognize that

21   still shot, Exhibit 4-A?

22      **A.**   Yes.

23      **Q.**   Is that from your body worn camera?

24      **A.**   Yeah.

25      **Q.**   Other than Mr. Douglas, can you see anyone

140

1       standing near Mr. Douglas?

2            **A.**    Yes.

3            **Q.**    Do you recognize either one of those individuals?

4            **A.**    Yes.

5            **Q.**    Which one do you recognize?

6            **A.**    The individual on the right.

7            **Q.**    All right.  Who is that?

8            **A.**    Mr. Williams.

9            **Q.**    As you approached Mr. Douglas, did you know

10      whether or not at the time these two other individuals, the

11      one you referred to as Mr. Williams and the other individual

12      in the black coat to Mr. Williams' left, did you know

13      whether or not these other two individuals had any

14      involvement in the transaction observed by the OP?  The

15      observation post.

16           **A.**    I essentially focused on Mr. Douglas.

17           **Q.**    Why did you lead Mr. Douglas away from these two

18      other individuals?

19           **A.**    In my experience it is safer for everyone on the

20      scene to pull the stop away from a group of people.

21           **Q.**    All right.  And why would safety be of concern to

22      you under these circumstances?

23           **A.**    Well, officer safety is always paramount but at

24      the time my partner and I arrived, we were the only officers

25      on scene.  There are two of us and three other individuals

141

1    standing there and it is a housing complex with the

2    possibility of more people coming outside.

3        **Q.**   Why did you place Mr. Douglas in handcuffs after

4    you brought him aside?

5        **A.**   Officer safety.

6        **Q.**   When you say "officer safety" were you aware of

7    what, based on the lookout, the observation post officer had

8    observed?

9        **A.**   Yes.

10       **Q.**   Can you estimate approximately how much time

11   elapsed between the time you first heard the lookout and

12   when you encountered Mr. Douglas?

13       **A.**   Maybe a minute and a half, around that.

14       **Q.**   All right.  I am going to play you Government's

15   Exhibit No. 4 from 19:02:50 to 19:03:10.  I want to ask you

16   one additional question first.  Based upon -- have you been

17   involved in narcotics investigations previously?

18       **A.**   Yes.

19       **Q.**   And how common in your training and experience is

20   it for individuals engaged in narcotics trafficking to

21   possess firearms?

22       **A.**   It's common.

23       **Q.**   Common.  And at the time that you placed Mr.

24   Douglas in handcuffs, you indicated that you were concerned

25   about officer safety.  What specifically were you concerned

1    about other than -- I think you mentioned a couple other

2    individuals there.

3        A.    In narcotics investigations, it is common for one

4    or many subjects in the area to be armed.  So if someone has

5    been identified as part of an alleged illegal transaction,

6    we stop the individual for officer's safety.  We put them in

7    handcuffs because we don't know at that moment what their

8    capability is of harming us or someone else.

9        Q.    All right.  Is it fair to say that you didn't know

10   whether Mr. Douglas was armed or not at the time that you

11   approached him?

12       A.    Correct.

13       Q.    All right.  Go ahead and play Exhibit 4.

14             (Played audio.)

15             Can you describe for us in looking at Exhibit 4,

16   that clip, what you were doing?

17       A.    I had noticed a bulge under the defendant's

18   jacket, which was a backpack that was seen put on under his

19   jacket, so I frisked him.

20       Q.    And is that why you were sort of feeling the rear

21   area of Mr. Douglas' jacket?

22       A.    Correct.

23       Q.    Were you able to detect whether there was anything

24   in the area of the jacket that you were, you know, feeling

25   or --

1      **A.**    Yeah.

2      **Q.**    What, if anything, were you able to detect as a

3    result of the external frisk?

4      **A.**    I thought I recognized what was a firearm.

5      **Q.**    Can you describe what specifically you felt that

6    made you recognize what you believed was a firearm?

7      **A.**    Both the shape, weight of the object, the length

8    and the grip, or some people call it the handle, of the

9    firearm sticking up.

10     **Q.**    Okay.  So just to break that down a little bit,

11   was the item that you were feeling in Exhibit 4, was it a

12   hard object or a soft object?

13     **A.**    Yes, it was a hard object.

14     **Q.**    And you mentioned that you recongnized what you

15   thought was the butt or handle of the firearm; is that

16   right?

17     **A.**    Correct.

18     **Q.**    What direction, if you can -- from Exhibit 4, how

19   did it feel to you that that item was positioned in the bag?

20     **A.**    It was positioned so that the grip was sticking

21   upwards towards the sky to the left-hand side of the bag.

22     **Q.**    All right.  So I am going to step over to the TV

23   screen.  Tell me if I am correct.  Did you feel the butt of

24   the gun, the handle of the gun, going up in this direction?

25     **A.**    Correct.

1      **Q.**   And I am pointing up towards the top of the screen

2      of the TV.  And then what other portion of what you believed

3      was a firearm did you say you recognized other than the

4      butt?

5      **A.**   The slide.

6      **Q.**   Which direction was that going?

7      **A.**   Horizontal.

8      **Q.**   Which way would the slide and barrel be facing?

9      **A.**   The barrel would be facing towards the right where

10     that officer is pictured.

11     **Q.**   All right.  So it would be towards Mr. Douglas'

12     right arm?

13     **A.**   Yes.

14     **Q.**   Horizontally?

15     **A.**   Right.

16     **Q.**   Okay.  In your recognition of that item, was that

17     based upon -- it is a gun -- is that based upon your

18     familiarity with handguns and your training and experience?

19     **A.**   Yes.

20     **Q.**   All right.  I am going to ask to play, with the

21     sound hopefully up a little bit, from 19:03 of Government's

22     Exhibit 4 to 19:03:16.

23              (Played audio.)

24              All right.  Did you hear in the last part of that

25     clip you saying, "Is that your glasses case?"

1      **A.**    I believe I asked what was that and the defendant

2      said "glasses case" and I repeated that.

3      **Q.**    So you asked him what that was and he said,

4      "glasses case" and you repeated, "Is that your glasses

5      case?"

6      **A.**    Right.

7      **Q.**    And while you were conducting that frisk, did you

8      -- (cell phone ringing.)

9              MR. WASSERMAN:  I'm sorry, Your Honor.  I thought

10     I turned that off.

11     **BY MR. WASSERMAN:**

12     **Q.**    Officer Poupart, were you able to feel anything

13     else other than the gun during the pat down?

14     **A.**    Yes.

15     **Q.**    And did you know what that was, before he told you

16     it was a glasses case?

17     **A.**    No, I didn't know what it was.

18     **Q.**    All right.  Were you able to distinguish during

19     your pat down between whether there were two separate items

20     or, you know, whether it was just one big item?

21     **A.**    It felt like there was an additional item in with

22     the firearm.

23     **Q.**    I am going to show you Government's Exhibit 4-B.

24     Do you recognize that photograph?

25     **A.**    Yes.

1      Q.   Was that just a still shot from your body worn

2   camera?

3      A.   Yes.

4      Q.   And is that a fair and accurate depiction of at

5   least part of the external frisk you conducted on that date,

6   April 22nd?

7      A.   Yeah.

8          MR. WASSERMAN:  Your Honor, I move Government's

9   Exhibit No. 4 into evidence.

10          MR. MARSTON:  No objection.

11          MR. OHM:  No objection.

12          THE COURT:  Government's Exhibit 4-B is admitted.

13          (Government's Exhibit No. 4-B was admitted.)

14          (Government's Exhibit Nos. 6-A and 6-B were marked

15   for identification.)

16   **BY MR. WASSERMAN:**

17      Q.   Can you describe what you are feeling in that

18   particular still shot?

19      A.   In that shot I am feeling the firearm.

20      Q.   All right.  I want to show you Government's

21   Exhibits 6-A and 6-B.

22          MR. WASSERMAN:  Your Honor, can I approach?

23          THE COURT:  Please.

24   **BY MR. WASSERMAN:**

25      Q.   If you can just take 6-A out of the bag.

1          **A.**   (Complied.)

2          **Q.**   What does 6-A consist of?

3          **A.**   The firearm.

4          **Q.**   Is that also a magazine there?

5          **A.**   Yes, firearm and magazine.

6          **Q.**   Do you recognize Government's Exhibit 6-A?

7          **A.**   Yes.

8          **Q.**   What is it?

9          **A.**   It's the firearm removed from the backpack.

10         **Q.**   And the firearm that was removed on April 22nd,

11    was that firearm, 6-A, loaded?  Was the magazine loaded with

12    ammunition?

13         **A.**   Yes.

14         **Q.**   And was it loaded into the gun, into the butt of

15    the gun?

16         **A.**   Yes.

17         **Q.**   So other than that the magazine is now removed and

18    the ammo is separate, is it substantially the same

19    condition?

20         **A.**   Yes.

21              MR. WASSERMAN:  Your Honor, I move Government's

22    Exhibit 6-A into evidence.

23              MR. MARSTON:  No objection.

24              MR. OHM:  No objection.

25              THE COURT:  So admitted.

1                   (Government's Exhibit No. 6-A was admitted.)

2       **BY MR. WASSERMAN:**

3            **Q.**   Looking at Government's Exhibit 6-B in the bag, do

4       you recognize the items in that bag?

5            **A.**   Yes.

6            **Q.**   What is that?

7            **A.**   The ammunition that would have been in the

8       firearm.

9            **Q.**   Again, other than it being outside of the magazine

10      and the firearm, is it substantially the same condition?

11           **A.**   Yes.

12                  MR. WASSERMAN:  Your Honor, I move Government's

13      Exhibit 6-B into evidence.

14                  MR. MARSTON:  No objection.

15                  MR. OHM:  No objection.

16                  THE COURT:  Government's Exhibit 6-B is admitted.

17                  (Government's Exhibit No. 6-B was admitted.)

18      **BY MR. WASSERMAN:**

19           **Q.**   Recognizing that the magazine is not inside of the

20      butt of the firearm, can you actually hold up Government's

21      Exhibit 6-A and just kind of show us what parts of the

22      firearm you felt that you recognized during the external

23      frisk and how it was positioned in the bag?

24                  THE COURT:  Please stand up.

25                  THE WITNESS:  It was against his back, here, this

1      position, left arm, right arm, positioned in the bag with

2      the slide forward at the time but it was positioned like

3      this in the bag.  Feeling it in a manner similar to this, I

4      was feeling the grip as well as the lower portion.

5  **BY MR. WASSERMAN:**

6      **Q.**   I'm sorry, lower portion what?

7      **A.**   Lower portion of the slide and the grip.

8      **Q.**   You are holding the firearm in your hand with the

9      butt of the gun facing up and your thumb sort of towards the

10     butt of the gun and your forefinger there on the slide and

11     the barrel of the gun sort of facing towards your left side

12     of your body.  Is that accurate, Officer, just the way you

13     are holding it now?

14     **A.**   Sure.

15     **Q.**   Okay.

16         THE COURT:  It is pointing towards the right side

17     of his body.  I think most importantly, he has described how

18     the gun was positioned, we believe, against the defendant's

19     back in relation to the defendant's body.  Correct, Officer?

20         THE WITNESS:  That's correct, Your Honor.

21         MR. WASSERMAN:  Thank you.

22  **BY MR. WASSERMAN:**

23     **Q.**   With respect to the other item that you felt, do

24     you have a sense for where it was positioned?  Was it in

25     front of the gun or closer to the defendant's back?

1        **A.**    In front of the gun.

2        **Q.**    All right.  And was it -- do you know whether it

3    -- was that object, you know, was it horizontal or was it up

4    vertical, if you know, to the other object that you felt?

5        **A.**    It felt like it was laying horizontal.

6        **Q.**    Okay.  Thank you.  Have a seat.

7             I want to play for you now, Government's Exhibit 4

8    from 19:03:16 to about 19:04.

9             (Played audio.)

10            Officer Poupart, just so we are clear, in terms of

11   when you first recognize that item as a firearm, when did

12   you first recognize it?  Was it during that initial frisk?

13       **A.**    Yes.

14       **Q.**    All right.  So in the clip that we just played,

15   did you ask the defendant if he minded if you searched the

16   bag?

17       **A.**    Yes.

18       **Q.**    And what was his response?

19       **A.**    He did not consent, in other words.

20       **Q.**    Okay.  And what did you say, you know, if

21   anything?  Did you hear what he said after he said, You

22   can't search it or you can't look in it?  He said something

23   to the effect that it was just glasses or glasses case.

24   Were you able to hear what your response was?

25       **A.**    I said, I don't know that that is a glasses case.

1     **Q.**   Why did you ask the defendant for consent to

2   search at this point if you had already recognized the item

3   as a firearm?

4     **A.**   I like to give people the opportunity to be

5   honest.

6     **Q.**   I'm sorry?

7     **A.**   I like to give people the opportunity to be

8   honest.

9     **Q.**   Okay.  So did your asking him for consent to

10   search have anything to do with whether you -- you know,

11   your degree of certainty about what you thought?

12     **A.**   No.

13     **Q.**   Why did you say, I don't know if that is your

14   glasses case?

15     **A.**   Typically, we don't like to use the word gun on

16   the scene unless it is an emergency situation.  We don't use

17   that and it's just not something I would say to someone.

18     **Q.**   I mean, why would you be concerned about saying,

19   Hey, that's not your glasses case, it's a gun?

20     **A.**   It's going to make that person much more likely to

21   flee, fight, endanger the scene.

22     **Q.**   All right.  Going to Government's Exhibit 4, I

23   want to play, if we can, from 19:04:57 to 19:05.

24          (Played audio.)

25          All right.  In that clip, from Exhibit 4, were you

1    able to hear what you said?

2        **A.**    Yes.  I said the guy with the blue jacket, is he

3    good for a search?

4        **Q.**    Why were you asking about whether he was good for

5    a search at that point?

6        **A.**    It's my way of checking with everyone else that

7    the scene is safe and secure.  I did not have eyes on the

8    other subject that was involved.  I didn't know if he was

9    stopped, secured or detained.  I don't want to conduct a

10   search for a firearm in a bag if the other suspect that was

11   involved is not stopped or secured.  Definitely could have

12   someone running.

13       **Q.**    Did your request for permission to -- permission

14   to search, for lack of a better way of phrasing, have

15   anything to do with your level of certainty of what you had

16   initially felt in that external frisk?

17       **A.**    No.

18       **Q.**    I want to play from 19:05:06 to 19:05:13.

19              (Played audio.)

20              In that clip, what was the result of the search?

21   You opened up the backpack at that point; is that correct?

22       **A.**    Yes.

23       **Q.**    What did you observe, if anything?

24       **A.**    I observed a firearm in the backpack.

25       **Q.**    Did you hear yourself say "1-800"?

1    **A.**   Yes.

2    **Q.**   What does that mean?

3    **A.**   It is our code word for presence of a firearm.

4         (Government's Exhibit No. 7 was marked for

5    identification.)

6    **BY MR. WASSERMAN:**

7    **Q.**   I want to show you Government's Exhibit No. 7 for

8    identification.  Do you recognize that photograph?

9    **A.**   Yes.

10   **Q.**   And what is that photograph?

11   **A.**   It's a photograph of the firearm inside of the

12   backpack.

13   **Q.**   Is that the same firearm that is Exhibit 6-A on

14   your table there?

15   **A.**   Yes.

16   **Q.**   Is it a fair and accurate depiction of how the

17   firearm appeared inside of the backpack on April 22nd at the

18   time that it was recovered?

19   **A.**   Yes.

20        MR. WASSERMAN:  Your Honor, I would move for

21   Government's Exhibit No. 7 into evidence.

22        MR. MARSTON:  No objection.

23        MR. OHM:  No objection.

24        THE COURT:  Government's Exhibit No. 7 is

25   admitted.

1          (Government's Exhibit No. 7 was admitted.)

2     **BY MR. WASSERMAN:**

3          **Q.**   Do you recall whether ultimately there was a

4     glasses case recovered or found inside of that backpack?

5          **A.**   Yes, I believe there was.

6          **Q.**   All right.  And were you the one that actually did

7     the removal, once it was -- well, was the backpack taken off

8     Mr. Douglas after you initially looked in and found it?

9          **A.**   Yes.

10          **Q.**   Did somebody else actually conduct the search and

11     removal of the firearm?

12          **A.**   Yes.

13          **Q.**   All right.  That wasn't you?

14          **A.**   Correct.

15          **Q.**   All right.  And did you see specifically where

16     that glasses case was located at the time it was removed?

17          **A.**   I think it was against the firearm, but I can't

18     specifically recall at the moment.

19          **Q.**   You are not sure at the moment?

20          **A.**   No.

21          **Q.**   All right.  After you observed the gun inside Mr.

22     Douglas' backpack, you said "1-800".  What was done with Mr.

23     Douglas at that point?

24          **A.**   At that point he was placed under arrest.

25          **Q.**   And his backpack was also seized?

1     **A.**   Yes.

2     **Q.**   All right.

3          (Government's Exhibit No. 9 was marked for

4     identification.)

5     **BY MR. WASSERMAN:**

6     **Q.**   I am going to show you what has been marked for

7     identification as Government's Exhibit No. 9.  Do you

8     recognize that exhibit?

9     **A.**   Yes.

10    **Q.**   What is it?

11    **A.**   The backpack that was taken off of Mr. Douglas.

12    **Q.**   Does it appear to be in substantially the same

13    condition as when you found it on Mr. Douglas on April 22nd?

14    **A.**   Yes.

15         MR. WASSERMAN:  Your Honor, I move Government's

16    Exhibit No. 9 into evidence.

17         MR. MARSTON:  No objection.

18         MR. OHM:  No objection.

19         THE COURT:  So admitted.

20         (Government's Exhibit No. 9 was admitted.)

21         MR. WASSERMAN:  Your Honor, that is all I have.

22         THE COURT:  Thank you.  Mr. Ohm, I assume?

23                       <u>**CROSS EXAMINATION**</u>

24    **BY MR. OHM:**

25    **Q.**   Good afternoon, Officer.

1      **A.**    Good afternoon.

2      **Q.**    When you approached Mr. Douglas, he didn't try to

3   flee, did he?

4      **A.**    No.

5      **Q.**    And you said, Come over here for a minute.  Right?

6      **A.**    Correct.

7      **Q.**    And he complied with your direction?

8      **A.**    He did.

9      **Q.**    You told him he was being stopped as part of an

10   investigation?

11      **A.**    Right.

12      **Q.**    And he walked with you.  Right?

13      **A.**    Yes.

14      **Q.**    Then you took out your handcuffs.  Right?

15      **A.**    Yes.

16      **Q.**    He basically put his hands behind his back.  You

17   didn't have to tell him to do that?

18      **A.**    I think we guided his hands behind his back.  I

19   don't specifically recall.

20      **Q.**    You didn't say, Put your hands behind your back?

21      **A.**    He wasn't forced into handcuffs.

22      **Q.**    I'm sorry.  He complied with you and did not

23   resist at all in terms of being handcuffed.  Right?

24      **A.**    Sure.

25      **Q.**    And at that point there was no indication that he

1    wasn't being compliant.  Right?

2         A.   No, not at that time.

3         Q.   And really at any time.

4         A.   No, he was complying.

5         Q.   Now, you testified -- I just want to make sure I

6    have this right.  Mr. Wasserman asked you why you placed him

7    in handcuffs.  Right?

8         A.   Yes.

9         Q.   You said it was common for officers' safety to put

10   people in handcuffs?

11        A.   Yes.

12        Q.   When would you put somebody in handcuffs?

13        A.   Well, I mean, that depends.  It is situational.

14        Q.   Okay.  So it sounded like you were saying that

15   generally speaking, when you are doing the drug operations,

16   when you are told to move in, then you place people in

17   handcuffs.  Is that fair?

18        A.   Yes.

19        Q.   You do that almost all of the time?

20        A.   Pretty much.

21        Q.   It doesn't matter if somebody is trying to flee.

22   Right?

23        A.   [Inaudible] -- A person in handcuffs you typically

24   don't move in when the individuals are handcuffed.

25        Q.   I'm having a tough time hearing you.

1      **A.**   I'm sorry.  Typically it is the arrest team and

2   sometimes they are handcuffed.

3      **Q.**   Now, at this time when you are approaching Mr.

4   Douglas, you don't know Mr. Douglas.  Right?

5      **A.**   Correct.

6      **Q.**   You haven't heard of Mr. Douglas as being someone

7   who is armed and dangerous?

8      **A.**   No, I don't personally know him.

9      **Q.**   Okay.  And you know that there was a suspicion of

10   contraband in the bag, but you don't know what that

11   contraband is.  Right?

12      **A.**   Correct.

13      **Q.**   And no one -- I think you had said something about

14   complaints about drug activity.  There were no complaints

15   about gun sales or gun operations in that neighborhood.

16   Right?

17      **A.**   Not that I know of.

18      **Q.**   And you were definitely conducting observations

19   both for potential marijuana sales, cocaine sales and that?

20      **A.**   Narcotics in general.

21      **Q.**   And no one had called in and said there is a man

22   with a gun out there that day.  Right?

23      **A.**   No, not that I know of.

24      **Q.**   Now, as you approach Mr. Douglas, you could see

25   both of his hands.  Right?

1       **A.**    Yes.

2       **Q.**    They were actually sort of swinging like he was

3    kind of hanging out, like this.  Right?  (Indicated)

4            MR. OHM:  If the record could reflect I am

5    swinging my hands back and forth.

6            THE WITNESS:  I guess.

7    **BY MR. OHM:**

8       **Q.**    There was no movement of his hands towards any

9    other part of the body?

10      **A.**    Not that I recall.

11      **Q.**    The information that you had was that the

12   potential contraband was underneath the jacket in a book

13   bag.  Right?

14      **A.**    Correct.

15      **Q.**    When Officer Jackson reported a book bag, he

16   didn't say it was open.  Right?

17      **A.**    Right.

18      **Q.**    He didn't say, Be careful.  What is in that book

19   bag, it is easy to access what is in it.  Nothing like that?

20      **A.**    No.

21      **Q.**    All right.  And when you first made contact with

22   him, for Mr. Douglas to get into that bag, he would have had

23   to have taken off his jacket, taken off the backpack,

24   unzipped the book bag and get whatever is inside; is that

25   fair?

1    **A.**   That would be the easiest way.

2    **Q.**   Well, was there any other way?

3    **A.**   I don't know if he is flexible enough to reach

4    around.  It's unlikely.

5    **Q.**   You can at least agree it is not like accessing

6    the waistband.  It is pretty hard to get what is in that

7    backpack.  Correct?

8    **A.**   Correct.

9    **Q.**   You were part of the arrest team for this

10   operation?

11   **A.**   Correct.

12   **Q.**   How many individuals were part of the arrest team?

13   **A.**   I don't recall how many that day.  Maybe -- do you

14   want me to proximate?

15   **Q.**   Sure.

16   **A.**   Maybe eight.

17   **Q.**   Okay.  And when Officer Jackson puts in the call

18   for arrests, the whole arrest team comes out.  Right?

19   **A.**   Yeah.

20   **Q.**   It's not like there's an Officer Jackson team

21   where only two people come out?

22   **A.**   Once in a while the team gets separated or some of

23   them are still on something else.  But in this case, I

24   believe the whole arrest team --

25   **Q.**   So approximately eight people came out and that

1    was the understanding that you had when you were moving in

2    for arrest.

3        **A.**    Eventually.  Like I previously stated, my partner

4    and I were the first on scene.

5        **Q.**    Right.  And you knew that other people were also

6    listening to the same radio communications that Officer

7    Jackson was making.  Right?

8        **A.**    Correct.

9        **Q.**    You knew that they were supposed to join you in

10   coming out?

11       **A.**    Yes.

12       **Q.**    You didn't think that they were going to sit back

13   in their cars while you and Officer Taylor were dealing with

14   it?

15       **A.**    I hope not.

16       **Q.**    You also knew they were close by.  Right?

17       **A.**    I don't know their locations when they are waiting

18   for a call, but I assumed they were relatively close.

19       **Q.**    When you say "relatively close," you mean within a

20   block or two, not like 15.  Right?

21       **A.**    Yeah, within a few blocks.

22       **Q.**    Now showing your body worn camera, I want to make

23   sure we have a decent sense --

24            MR. OHM:  I will mark this, Your Honor, as --

25            THE COURT:  So you are marking what is

162

1      Government's Exhibit 4, body worn camera footage, as

2      Defendant Douglas' Exhibit 3?

3              MR. OHM:  Yes, Your Honor.

4              THE COURT:  Okay.

5              (Defendant Douglas' Exhibit No. 3 was marked for

6      identification.)

7      **BY MR. OHM:**

8          **Q.**   I am right now at 19:02:52, the timeframe in the

9      upper right-hand corner.  This is when you and Officer

10     Taylor make initial contact with Mr. Douglas.  Right?

11         **A.**   Yes.

12         **Q.**   Okay.  And for clarity, I am going to scroll back

13     a little bit so we know -- we will go to :33, that is when

14     you put your hands on Mr. Douglas.  Right?

15         **A.**   Yes.

16         **Q.**   All right.  And then 19:02:43 is when you hear the

17     handcuffs going on.  Right?

18         **A.**   Yes.

19         **Q.**   It's fair to say that he is not free to leave.

20     Right?

21         **A.**   No, he is detained.

22         **Q.**   And it's also fair to say when you first put your

23     hands on him, he is also not free to leave.  Right?

24         **A.**   Correct.

25         **Q.**   Okay.  So now it is 19:02:55 and other officers

1    are converging on the scene.  Right?

2        **A.**   Yes.

3        **Q.**   You know that these officers are responding to

4    Officer Jackson's call to move in.  Right?

5        **A.**   Yes.

6        **Q.**   Although they first appear on your video at

7    19:02:55, they are obviously walking up before.  They don't

8    just magically appear there.  Right?

9        **A.**   I would think so, yeah.

10       **Q.**   These are the folks you knew would come and

11   support you shortly after you were making contact with Mr.

12   Douglas?

13           MR. WASSERMAN:  Objection.  It calls for

14   speculation.

15           THE COURT:  Rephrase it.

16   **BY MR. OHM:**

17       **Q.**   These are the folks that are part of the arrest

18   team whose job it is to support you also.  Right?

19       **A.**   Correct.

20       **Q.**   And I know that you said that you thought that

21   maybe there were about eight people out there.  I want to

22   see if the body worn camera shows that there might be a few

23   more.  I will go to 19:03:35.  At this point you can sort of

24   see a couple officers in the background.

25       **A.**   Yeah.

164

1    **Q.**   And in the background here you can also see there

2    are other officers who are posted in the parking lot area.

3    Right?

4    **A.**   Yes.

5    **Q.**   There are also marked cars on the scene.  Right?

6    **A.**   There was a marked car there.

7    **Q.**   Now, at no time during your interaction with Mr.

8    Douglas did he threaten to harm any officer or anybody else?

9    **A.**   Not that I recall.

10   **Q.**   In fact, Mr. Douglas never indicated that he had a

11   weapon.  Right?

12   **A.**   No.

13   **Q.**   And the other individuals that were standing

14   there, there was no time where any of those individuals made

15   any comments towards you.  Correct?

16   **A.**   Not to me.

17   **Q.**   Well, during the time where you are walking up to

18   Mr. Douglas, did any of those individuals ever say anything

19   to you, that is even remotely threatening?

20   **A.**   No.

21   **Q.**   Did any of them talk to you at all?

22   **A.**   That I don't recall.  I don't know.

23   **Q.**   And the same with Officer Taylor.  Did any of

24   those individuals say anything to Officer Taylor that was

25   threatening?

1       **A.**   Not that I know of.

2       **Q.**   Did you notice or see any of them making any

3  gestures towards waistbands or towards anything else?

4       **A.**   Not that I recall, no.

5       **Q.**   So your assessment of them being threatening to

6  you was sort of the general assessment that they are in a

7  neighborhood conducting a street encounter and stopping an

8  individual.

9       **A.**   Can you repeat that?

10       **Q.**   Those other two individuals that were there, when

11  you assessed them as a possible threat to you, that is only

12  because you are in a neighborhood, in a general street

13  encounter; that's the basis of your assessment?

14       **A.**   At the time my partner and I were the only ones on

15  the scene.  There were two other gentlemen besides Defendant

16  Douglas.  I don't know who they are, if they are armed and

17  what their intentions are; that's my basis.

18       **Q.**   But in terms of specifics about those two

19  individuals or this situation, was there anything else that

20  you knew about what was going on that made you concerned

21  about the two individuals?

22       **A.**   Other than what I just listed?

23       **Q.**   Right.  Just the general fact that they were

24  there.

25       THE COURT:  Let's pause for one second.  We may be

1    losing a charge.

2                CLERK:   (Replaced microphone batteries.)

3    **BY MR. OHM:**

4        **Q.**   I assume you will ask me to repeat my question.

5        **A.**   Sorry.  Yeah.

6        **Q.**   Other than the presence of these two individuals

7    and the fact that it was a street encounter, was there

8    anything about them specifically that made you concerned

9    about your safety?

10       **A.**   Not specifically other than the things that I

11   previously listed.

12       **Q.**   That you didn't know if they were armed?

13       **A.**   Right.  The possibility that they could be armed,

14   what their intentions are or are not.  The possibility of

15   flight and things like that.  Other than that, no.

16       **Q.**   Okay.  Well, them fleeing is not a concern to you?

17       **A.**   I was referencing Mr. Douglas.

18       **Q.**   Mr. Douglas himself did not show any indication of

19   fleeing.  Right?

20       **A.**   Most people don't until they do.

21       **Q.**   Did you ask any of them if they were armed?

22       **A.**   No.

23       **Q.**   Did you ask them to step back 20 yards?

24       **A.**   No, that's why I moved Mr. Douglas away from them

25   so I wouldn't have to.

1    **Q.**   Okay.  And just to be 100% clear, you didn't see

2    them actually do anything, reach for anything on their

3    person?

4    **A.**   No.

5    **Q.**   And you had no reason to suspect that they were --

6    actually suspect they were armed other than the fact that

7    you did not know that they weren't.

8    **A.**   Right.

9    **Q.**   When you and Officer Taylor approached, you were

10   fully uniformed you said?

11   **A.**   Correct.

12   **Q.**   Your firearm was on your hip?

13   **A.**   Correct.

14   **Q.**   Was visable?

15   **A.**   Yes.

16   **Q.**   Officer Taylor's firearm was also visible?

17   **A.**   Yes.

18   **Q.**   I know you were talking about the glasses case

19   versus the firearm.  I just wanted to ask you when you were

20   feeling which.  I am going to go back to Defendant's 3,

21   which is Government's 4?

22           THE COURT:  I believe it is Defendant Douglas' 3.

23           (Played video.)

24   **BY MR. OHM:**

25   **Q.**   So we are at 19:03:01.  Is it fair to say that is

1    the first time you touched Mr. Douglas' back?

2         **A.**   Yes.

3         **Q.**   What are you feeling right there?

4         **A.**   At that point I noticed a protrusion in his

5    jacket, the backpack.  At that point it looks like I am

6    feeling -- it's the beginning of a frisk.  It looks like I

7    am feeling part of the sunglass case and my thumb either is

8    or is about to be pressed up against the grip of the

9    firearm.

10        **Q.**   Okay.  So what are you trying to do when you are

11   feeling like this?

12        **A.**   I am trying to articulate what's there.

13        **Q.**   You are trying to figure out what it is?

14        **A.**   Yeah.  Right.

15        **Q.**   Now you are feeling at 19:03:03 another part of

16   the jacket sort of more towards, I guess, middle to right of

17   middle?

18        **A.**   Yes.

19        **Q.**   And what are you feeling there?

20        **A.**   The the end of the object.

21        **Q.**   Okay.  Which object?

22        **A.**   It looks like probably the glasses case, maybe.

23        **Q.**   Okay.  Do you not know at the time?

24        **A.**   I don't specifically remember.  I can't say

25   exactly what my finger was on that second.  I know what

1      objects were there.

2           **Q.**   You had said when we were at 19:03:01, you said

3      you could feel a gun.  When you are holding the left part of

4      the jacket and you now concluded -- are you concluding in

5      hindsight it was a sunglass case or did you know it was a

6      sunglass case when you first felt it?

7           **A.**   I couldn't definitively say it was a sunglass case

8      until I saw it.

9           **Q.**   But you didn't suspect it was a gun?

10          **A.**   Not the sunglass case.

11          **Q.**   So you felt an object.  You said this is some

12     random object that is not a gun in your mind?

13          **A.**   Right.

14          **Q.**   Okay.  And then I think you said right here at

15     19:03:01 your finger could feel the slide of the gun; is

16     that right?

17          **A.**   Right.

18          **Q.**   At that point in time did you identify it as a

19     gun?

20          **A.**   In reaching around, essentially around the

21     sunglass case, my thumb is up now on the grip of the

22     firearm.

23          **Q.**   Okay.  Could you tell it was a firearm?

24          **A.**   From my first guess?

25          **Q.**   At this point in time?

1      **A.**   Yeah, I would say.

2      **Q.**   So you are feeling the sunglasses but your thumb

3   is feeling, what you were saying now was the gun and you

4   knew it was the gun at this moment, at 19:03:01.

5      **A.**   Can you go back a split second where it stops and

6   starts?

7      **Q.**   Starting at 19:02:56.  Okay.  So you immediately

8   feel it is a gun on your thumb?

9      **A.**   At this point, no.

10     **Q.**   Right before that in -- I went back like you asked

11  me to.  Can you tell me to stop when you first feel the gun

12  and know that it's a gun?

13     **A.**   Sure.

14     **Q.**   All right.

15          (Continued playing the video.)

16     **A.**   There.

17     **Q.**   So 19:03:05 is when you first believe you are

18  feeling a gun?

19     **A.**   Correct.

20     **Q.**   Okay.  So when you are talking about the thumb

21  before, is that something that in hindsight you now think

22  was a gun, but you didn't know at the time?

23     **A.**   When I am feeling that handle with my thumb, I

24  recognized it to be the handle of the firearm.

25     **Q.**   Okay.  So at 19:03:01 you know you are feeling the

1    gun.

2                (Playing video again.)

3                So right there you know your thumb is touching a

4    gun.

5        A.    I told you it was after that.  Keep going.

6        Q.    Up until this point you don't know that you are

7    dealing with a gun?

8        A.    I am suspecting that it's a gun and I am

9    furthering that as I am continuing to frisk his bag.

10       Q.    So at 19:03:10 you are suspecting it is a gun; is

11   that fair?

12       A.    Sure.  At this point it looks like I am feeling it

13   pretty well.  Yeah, I will say it was a firearm.

14       Q.    Before that, 19:03:10, you feel like you are

15   feeling the sunglasses.

16       A.    Yeah.  I mean at one point I would say I was

17   feeling the sunglass case.  It is difficult to go back in

18   time in split-second stills to go back and say what your

19   mind was thinking or feeling.  I am doing the best for you,

20   here.  At this point I think it is safe to say, yes, I

21   believe I was feeling a firearm.

22       Q.    Okay.  Is it fair to say at this point this is the

23   first time where you feel like you are feeling a firearm or

24   suspecting you feel like you are feeling a firearm?

25       A.    Yes.

1      Q.    When you mention your thumb feeling something

2   earlier, you are talking about this 19:03:10 time frame?

3      A.    Yes.

4            (Playing video.)

5      Q.    Now, when Mr. Douglas says, It's a glasses case,

6   at that point in time you also agree there is at least a

7   glasses case in there?

8      A.    Yeah, or a similar-shaped object.

9      Q.    What you are trying to figure out is if there is

10  something else in there.

11     A.    Right.  If there is something else in there.

12     Q.    It is good you are squeezing to figure out.

13     A.    Right.

14     Q.    You feel like you successfully did that or at

15  least starting at 19:03:10.

16     A.    Yeah.

17           THE COURT:  Mr. Ohm, I think we need to take

18  another break for the court reporter.  Before we do that,

19  though, how much longer do you think you have?

20           MR. OHM:  Probably about 15 to 20 minutes.

21           THE COURT:  Let's take a brief recess.  Before we

22  do, though, are there going to be any other witnesses?

23           MR. WASSERMAN:  Not from the Government.

24           MR. OHM:  I have Officer Taylor.  At this point I

25  don't think so but I probably --

1          THE COURT:  You can reserve but you think it's

2    unlikely.  Here is why I ask:  If we do -- if we resume 15

3    minutes from now and were to go to 4:15 approximately, with

4    the continuation of cross -- I am assuming you don't have

5    anything, Mr. Marston?

6          MR. MARSTON:  No questions.

7          THE COURT:  Redirect from the Government we will

8    be at 4:15 or so.  I think that what I may do is just call

9    the hearing for the day.  We will have had all of the

10   evidence introduced and then I may ask you all separately,

11   perhaps tomorrow or at a time when we can agree on, to argue

12   the motions based on what the record would reflect.

13         That's what I am thinking.  I am not so sure about

14   that yet, but let's at a minimum, for the court reporter's

15   sake and for those working here, let's come back at 3:48.

16   We can finish with this witness, let the officer go, and

17   talk about next steps.

18         MR. OHM:  Your Honor, would the court admonish the

19   witness not to discuss his testimony?

20         THE COURT:  Yes.  Please do not discuss your

21   testimony with anyone.

22         THE WITNESS:  Very good, Your Honor.

23         CLERK:  All rise.  Court is in recess.

24         (Break.)

25         CLERK:  Court is now in session.  Please be seated

1    and come to order.

2              We are now back on the record.

3              MR. OHM:  May I proceed?

4              THE COURT:  Please.

5              MR. OHM:  Thank you.

6    **BY MR. OHM:**

7        **Q.**   Good afternoon.  We stopped around 19:03:11 which

8    is when you first feel you are identifying it as a gun.

9    Okay?

10             (Playing video.)

11             Okay.  See how at 19:03:15 you switch over to a

12   different part?

13       **A.**   Yes.

14       **Q.**   Is that the gun or the sunglasses case?

15       **A.**   I believe it is both.

16       **Q.**   You believe you are feeling both at that point?

17       **A.**   Yes.

18       **Q.**   You hear yourself say, Is this the glasses case?

19       **A.**   Yes.  He mentioned a glasses case and I said, Is

20   this a glasses case?

21       **Q.**   Is that at 19:03:17?  Is that what are you feeling

22   when you say, Is this the glasses case?

23       **A.**   Yeah.

24       **Q.**   Was that -- do you hear the statement, The book

25   bag is underneath the sweat shirt, at 19:03:38?

1    **A.**    Yes.

2    **Q.**    Who was it that said that?

3    **A.**    I did.

4    **Q.**    Was that in response to anything or was it just

5    something you just said?

6    **A.**    I don't recall.

7    **Q.**    Okay.  Does it sound familiar that somebody said,

8    Negative on the book bag?

9    **A.**    I don't remember.

10    **Q.**    Okay.  Now, whose decision was it to take off his

11    jacket?

12    **A.**    Mine.

13    **Q.**    And what was the purpose of that?

14    **A.**    To get to the book bag.

15    **Q.**    Okay.

16    **A.**    Because I felt what I recognized to be a firearm

17    inside of it.

18    **Q.**    Pardon me?

19    **A.**    Because I felt what I recognized to be a firearm

20    in the book bag.

21    **Q.**    Okay.  So is your purpose -- is it fair to say the

22    purpose of taking off the jacket -- you are no longer in the

23    external frisk section, you are beginning the search; is

24    that fair?

25    **A.**    The search hasn't started yet.  I am feeling the

1      jacket for the book bag.

2              **Q.**    What is the purpose of exposing the book bag?

3              **A.**    Essentially, I haven't seen the book bag yet.

4              **Q.**    Okay.  So at this point you have your eyes on the

5      book bag.  Right?  We are now at 19:03:38.  Do you see

6      yourself -- it looks like you are pulling down the zipper a

7      little bit more?

8              **A.**    I'm sorry?

9              **Q.**    What are you doing with your left hand at

10     19:03:38?

11             **A.**    My left hand is touching the strap of the book

12     bag.

13             **Q.**    Okay.  And what are you trying to do with it?

14             **A.**    I was just articulating.

15             **Q.**    I'm sorry?

16             **A.**    Articulating.  I don't recall exactly what I was

17     doing with it.

18             **Q.**    All right.  Okay.  And now you see yourself

19     putting your hand on the backpack.  Right?

20             **A.**    Correct.

21             **Q.**    And this is when you say something to the effect,

22     Do you mind if I search?

23             **A.**    Correct.

24             **Q.**    And he says, No?

25             **A.**    Correct.

1      Q.   Now, you testified on direct examination -- what

2  was the reason why you said, Do you mind if I search?

3      A.   I was giving him the opportunity to be honest with

4  me.

5      Q.   That's the only reason?

6           MR. WASSERMAN:  I can't really hear Mr. Ohm.  He's

7  not near the microphone.

8           MR. OHM:  My computer is over here.  I'm sorry.

9           CLERK:  (Provided Mr. Ohm with a lapel mic.)

10          MR. OHM:  Can you hear me?  Can you hear me?

11  **BY MR. OHM:**

12      Q.   Okay.  So I think you said -- you just said that

13  the reason you asked him, Do you mind if I search, had

14  nothing to do with trying to get consent to search.  Is that

15  fair?

16      A.   Well, I mean, I am asking -- as I said, it's a

17  courtesy, in my eyes.

18      Q.   Are you trained on that?

19      A.   What do you mean?

20      Q.   Are you trained on giving a courtesy or giving a

21  person the opportunity to tell the truth?

22      A.   Not specifically.  I like to give people the

23  opportunity to tell the truth.

24      Q.   Okay.  And what happens if they tell the truth

25  versus if they don't?

1          MR. WASSERMAN:  Objection.

2          MR. OHM:  He can tell the answer of the witness.

3          THE COURT:  I will allow it.

4          THE WITNESS:  I will still do my job either way,

5     just giving them the opportunity to tell the truth.

6     **BY MR. OHM:**

7     **Q.**   Okay.  So other than giving someone an opportunity

8     to be honest, you had no other reason to ask to search his

9     bag?

10    **A.**   No.

11    **Q.**   Okay.  And you are familiar with consent within

12    the Fourth Amendment and the police officer's job.  Right?

13    **A.**   Right.

14    **Q.**   But that didn't enter into your mind?

15    **A.**   No.  At this point, I already articulated enough

16    to search the bag.

17    **Q.**   Okay.  Now, Mr. Douglas said immediately, No.

18    Right?

19    **A.**   Correct.

20    **Q.**   So at that point you are free to search.  Right?

21    **A.**   Correct.

22          (Playing video.)

23          I think it was at 19:03:58 where you hear him

24    saying -- you can hear yourself saying, I don't know if that

25    is possible.

1      **A.**   Correct.

2      **Q.**   It was said in response to Mr. Douglas saying you

3  can't search.  Right?

4      **A.**   Yeah, I think so.

5      **Q.**   Okay.  So now it's 19:04, you still haven't

6  searched yet.

7      **A.**   Right.

8          (Playing video.)

9      **Q.**   Now it is 19:40:09 and you still haven't searched.

10  Right?

11      **A.**   Yes.

12      **Q.**   It is 12 seconds since he declined the opportunity

13  to tell the truth.  Right?

14      **A.**   I wasn't watching the clock.  If you say 12

15  seconds.

16      **Q.**   So far it is 12 seconds.

17      **A.**   Okay.

18      **Q.**   Now it is 19:04:19.  Why haven't you searched him?

19      **A.**   I don't know if the other individual is stopped,

20  if the scene is secure.

21      **Q.**   Did you ask?

22      **A.**   When you hear my radio key up and go Mmmm it means

23  someone else was talking so I couldn't.

24      **Q.**   Okay.  So right now it sounds like everything is

25  clear.  Right?

180

1      **A.**   No.  I think they are still talking on the radio.

2      **Q.**   I just want to make sure I understand what you are

3   saying.  Since 19:03:58 or so that's where Mr. Douglas says

4   you can't search, the entire time you are just waiting to

5   confirm whether the other suspect has been apprehended?

6      **A.**   Yes.  Waiting to confirm the scene is secure so I

7   can search him.

8      **Q.**   That's the only thing you are waiting for?

9      **A.**   Yes.

10     **Q.**   Okay.  And at this point you are surrounded by

11  around 10 officers.  Is that fair?

12     **A.**   I didn't count but there are several officers.

13     **Q.**   So when you say the scene isn't secure, what is

14  going on in your mind?  What are you thinking?

15     **A.**   I don't know if the other subject has been

16  stopped, detained, secured.  Because you could have a

17  scenario where I pull a firearm out of his backpack and he

18  sees it and takes off running.  Then we have officers going

19  after that subject.

20     **Q.**   Fair.  But you don't have to pull the firearm out

21  of the bag.  Right?

22     **A.**   No.

23     **Q.**   In fact, you never pull the firearm out of the

24  backpack.  Right?

25     **A.**   Right.

1          Q.   You just look in to see if there is a firearm in

2     your search?

3          A.   [NODDED HEAD]

4          Q.   So that wouldn't -- that scenario you just laid

5     out wouldn't happen.  Right?

6          A.   Well, the firearm is going to come off of his

7     person.  It is going to come out of the bag.  I personally

8     didn't do it, but it's going to come off him.  I would like

9     to make sure that the other party involved is secure before

10    we take it off of him.

11         Q.   Is that something you are trained on?

12         A.   Yes, considering officer safety, scene safey,

13    scene security, I would say, yes.

14         Q.   So specifically, you are worried about if you open

15    the bag like you did --

16              MR. WASSERMAN:  Objection.  Asked and answered.

17              THE COURT:  Finish the question and I will answer

18    the objection.

19              MR. OHM:  You open the bag.  You peek in to see

20    whether there is a firearm in there or not.  Your decision

21    is not to do that, not to do that peeking because of why?

22    What are you worried about?

23              THE COURT:  The objection is overruled.  You can

24    answer the question.

25              THE WITNESS:  Because the other individual that is

1    involved was per the -- the individual exchanged originally

2    with the defendant.  So the guy went from him to the

3    defendant so assumingly, the first subject had possession,

4    is aware of what is in the bag.  Now he is watching us peer

5    into this bag.  So now he knows that we know there is a

6    firearm in this bag.  Whether or not we pulled it out, he is

7    watching us look into it.  If he's scared, you can bet he

8    will run, fight, flee.

9    **BY MR. OHM:**

10        **Q.**   Wouldn't those things also apply if he sees an

11   individual handcuffed?

12        **A.**   I think it is more likely that that would apply if

13   he sees us looking in the backpack verifying there is a

14   firearm in it versus having someone stopped and handcuffed.

15        **Q.**   So when you decide to put somebody in handcuffs,

16   you are not thinking about how it might trigger another

17   individual.  It is only when you are peeking into the bag?

18        **A.**   It's not my -- can you ask that again?

19        **Q.**   That's all right.  When you say, Am I okay to

20   search, who are you asking?

21        **A.**   The rest of the units that have eyes on the

22   location that I don't.  Anyone else with the other subject.

23        **Q.**   Is that when you said, you asked, Is the other

24   individual apprehended?

25        **A.**   I said -- I'm sorry?

183

1      Q.   Do you ask on your radio if the other individuals

2 are apprehended.  If the other individual was apprehended.

3      A.   Are you asking if I asked that?

4      Q.   Yeah.

5      A.   No, I don't.

6      Q.   Okay.  That is what you are waiting for according

7 to your testimony?

8      A.   What I said is, Is he good for a search?  I want

9 to know if they say yes, they are saying the scene is

10 secure, go ahead and search it.

11      Q.   So your assumption is if you say he is good for a

12 search, they understand that that means that the scene is

13 secure and the other person is under arrest?

14      A.   No.  I didn't say anything about being under

15 arrest.

16      Q.   Or Stopped.  I'm sorry.

17      A.   Secured.

18      Q.   Okay.  Is that like a predetermined code word?

19      A.   No.  But we all interact with each other

20 regularly.  We know how to understand each other on the

21 scene.

22      Q.   Like, for example, when you said 1-800 means gun;

23 that's a code word?

24      A.   Yes.

25      Q.   So you all sat around and decided that that is

1    what 1-800 --

2         THE COURT:  Mr. Ohm, let's not get close to the

3    line of badgering the witness.

4    **BY MR. OHM:**

5         Q.   All right.  So in any other of your

6    communications, either by radio or with the other officers

7    not by radio, you never asked anybody, Hey, can you make

8    sure you let me know when the other guy is apprehended.

9    Right?

10        A.   I don't think I said that.

11        Q.   And you never told any of the other officers you

12   felt the gun.  Right?

13        A.   Not that I recall.

14        Q.   You didn't tell your partner that you felt the gun

15   either.  Right?

16        A.   No.  I don't think I verbalized that, no.

17        Q.   Did you tell in any other way, in a non-verbal

18   way?

19        A.   I think she was watching me feel the bag. I can't

20   speak to what she was thinking at that moment.  I didn't

21   give her an answer or anything.

22        Q.   Just to be clear, after the jacket is taken off,

23   you never do the experimental frisk again.  Right?

24        A.   No, I don't think so.

25        MR. OHM:  I think that is all I have, Your Honor.

1          (Sidebar discussion off the record.)

2          MR. WASSERMAN:  Briefly, Your Honor.

3                    **REDIRECT EXAMINATION**

4     **BY MR. WASSERMAN:**

5          **Q.**    Officer Poupart, good afternoon.

6          **A.**    Good afternoon.

7          **Q.**    You testified in reference to your initial stop

8     with Officer Taylor of the Defendant Mr. Douglas.  Is it

9     fair to say you didn't know what was in the bag at the time

10    that you approached him?

11         **A.**    Correct.

12         **Q.**    All right.  And you testified previously that

13    there was about a minute and a half from the time you heard

14    the lookout until the time that you arrived on the scene.

15    Do you recall saying that?

16         **A.**    Yes.

17         **Q.**    And at the time that you arrived on the scene,

18    were you aware that there was also a second subject that was

19    involved in this exchange?

20         **A.**    Yes.

21         **Q.**    Okay.  Were you able to see what, if anything Mr.

22    Douglas had done with the book bag from the time that he

23    received it from Mr. Williams to the time that you first

24    laid eyes on him over by the parking lot?

25         **A.**    No.

1      **Q.**   So do you know whether or not he had reached into

2      the book bag and pulled anything out in that period of time?

3      **A.**   I don't know.

4      **Q.**   All right.  Were you aware of whether he could

5      have had a weapon anywhere else on his person at the time

6      that you approached him?

7      **A.**   I did not, no.

8      **Q.**   About how long do you think it takes for somebody

9      to draw a gun or weapon and use it?

10     **A.**   Half a second to a second.

11     **Q.**   All right.  When you arrived on the scene, you

12     testified it was you and Officer Taylor who were first on

13     the scene.  Do you recall that?

14     **A.**   Yes.

15     **Q.**   And Mr. Ohm showed you some of the video from your

16     body worn camera that showed within about 50 seconds or so

17     other officers arrived on the scene.  Do you recall seeing

18     that part of defense Exhibit No. 3?

19          MR. OHM:  Objection to the characterization, Your

20     Honor.  The record will speak for itself.  The Government's

21     estimate of timing.

22          THE COURT:  I'll allow the question.

23     **BY MR. WASSERMAN:**

24     **Q.**   Certainly within a minute or less other officers

25     were there; is that your recollection of that video?

1          **A.**   Yeah.

2          **Q.**   And do you know whether they were actually looking

3    for the other subject that was part of that lookout, those

4    officers?

5          **A.**   Yes, they were looking for the other subject.

6          **Q.**   Who was handling Mr. Douglas?

7          **A.**   Myself and my partner.

8          **Q.**   And just to be sure, with respect to -- I showed

9    you Government's Exhibit No. 4, I think it was, your body

10   worn camera.  When you approached, do you recall seeing Mr.

11   Douglas in the blue jacket, Mr. Williams and another third

12   individual?

13         **A.**   Yes.

14         **Q.**   Were you aware at that time whether or not either

15   one of those two individuals may have been the second

16   subject that had been part of Officer Jackson's lookout?

17         **A.**   I was not aware.

18         **Q.**   Were you concerned they might be?

19         **A.**   Yes, it is possible.

20         **Q.**   Did that factor into part of your calculation in

21   placing Mr. Douglas in handcuffs?

22              MR. OHM:  Objection.

23              THE COURT:  Overruled.

24              MR. WASSERMAN:  Did the fact that those two

25   individuals were there and may or may not have been part of

1     this transaction, factor into your decision to handcuff Mr.

2     Douglas?

3                    MR. OHM:  Objection.  Leading.

4                    THE COURT:  Overruled.  You can answer.

5                    THE WITNESS:  Yeah.

6     **BY MR. WASSERMAN:**

7          **Q.**   Mr. Ohm asked you a little bit about the pat down,

8     that you frisked or whatever you want to call it, that you

9     conducted.  When you did the pat down or the frisk, did you

10    -- were you able to, you know, detect that there was more

11    than one item in there when you did the frisk?

12         **A.**   Yes.

13         **Q.**   And given that there was more than one item that

14    you could feel in there, was there a point at which you --

15                   MR. OHM:  Objection.  Leading.

16                   THE COURT:  Mr. Ohm, I will let him finish the

17    question.

18    **BY MR. WASSERMAN:**

19         **Q.**   Was there a point in which you were able to

20    distinguish between the two items during the frisk?  In

21    other words, based on what you were feeling?

22         **A.**   Yes.

23         **Q.**   One distinct item and another distinct item?

24         **A.**   Yes.

25         **Q.**   All right.  And within that period of time on

1    the -- on your body worn camera footage, while you were

2    patting down or frisking the exterior of the jacket, were

3    you able to determine that one of those items was a gun?

4        **A.**   Yes.

5            MR. WASSERNMAN:  The Court's indulgence.

6    **BY MR. WASSERMAN:**

7        **Q.**   One other question.  Mr. Ohm asked you a question

8    about situations where you would not place somebody in

9    handcuffs.

10           If you conducted a stop of somebody for

11   jaywalking, would you put them in handcuffs?

12       **A.**   For jaywalking, probably not.

13       **Q.**   What about a routine traffic stop for a blinker or

14   speeding?

15       **A.**   Probably not.

16       **Q.**   Okay.  Without any other facts or situational

17   facts that might cause you to be concerned for your safety;

18   is that a fair statement?

19       **A.**   Yes.

20           MR. WASSERMAN:  That's all I have.

21           THE COURT:  Thank you, Officer.  Thank you for

22   your time.  You are excused.  Thank you for your testimony

23   today.

24           THE WITNESS:  Thank you, Your Honor.

25           THE COURT:  The Government has no additional

1    evidence at this point.

2              THE COURT:  Mr. Ohm?

3              MR. OHM:  Your Honor, Mr. Douglas would like to

4    call Officer Taylor.

5              THE COURT:  Officer Taylor, can you hold on one

6    second.  In case you want to wipe down the witness stand.

7    We will wipe it down for you.

8              THE WITNESS:  Thank you.

9              CLERK:  Please raise your right hand.  Do you

10   solemnly swear to tell the truth, the whole truth and

11   nothing but the truth so help you God?

12             THE COURT:  Officer Taylor, thank you for wearing

13   a mask.  I think it is fair to say we found wearing a mask

14   is more effective than wearing a face shield.  If you would

15   prefer to wear a face shield while you testify, that is a

16   possibility as well.  During our hearing today we concluded

17   that so long as you speak into the microphone and are not

18   too fast, we can understand you just fine with the face mask

19   on, if that's okay with you.

20             THE WITNESS:  Sounds good.

21             THE COURT:  Thank you.

22                      **DIRECT EXAMINATION**

23   **BY MR. OHM:**

24        **Q.**   Good afternoon, Officer.

25        **A.**   Good afternoon.

1   **Q.**   Could you please state your name and spell it for

2   the court reporter?

3   **A.**   Brianna Taylor.  B-r-i-a-n-n-a, T-a-y-l-o-r.

4   **Q.**   How are you employed?

5   **A.**   The Metropolitan Police Department as an officer.

6   **Q.**   How long have you been with the MPD?

7   **A.**   Eight years in February.

8   **Q.**   And do you have a partner?

9   **A.**   Some days.  It just depends.

10  **Q.**   And on April 2nd, 2020, did you have a partner?

11  **A.**   Yes.

12  **Q.**   Who was that?

13  **A.**   Officer Poupart.

14  **Q.**   Have you worked together before?

15  **A.**   Yes.

16  **Q.**   Are you on the same team?

17  **A.**   Yes.  Were, yes.

18  **Q.**   So even when you didn't work as partners, you also

19  often worked together; is that fair?

20  **A.**   That's fair.

21  **Q.**   Okay.  I want to show you what I am marking as

22  defense 4.

23          THE COURT:  Defendant Douglas' 4.

24          MR. OHM:  Defendant Douglas' 4.  Thank you, Your

25  Honor.

1          (Defendant Douglas' Exhibit No. 4 was marked for

2    identification.)

3    **BY MR. OHM:**

4        **Q.**   Does this scene look familiar to you?

5        **A.**   Yes, it does.

6        **Q.**   Do you see the writing in the top-right corner of

7    the exhibit?

8        **A.**   Yes.

9        **Q.**   What is this?

10       **A.**   The body cam information.

11       **Q.**   If I play it right now, it is at 1:33, the first

12   minute of the body worn camera footage, what is that

13   usually?

14       **A.**   Whatever you are doing prior to after putting on

15   your body worn camera.

16       **Q.**   This is activated footage.  Is that fair?

17       **A.**   Yes.

18          (Played video.)

19       **Q.**   Do you recognize this?

20       **A.**   Can you play a little more?

21       **Q.**   Sure.  Whose body worn camera footage is this?

22       **A.**   It appears to be mine.

23       **Q.**   Who is the officer on the left?

24       **A.**   Officer Poupart.

25          MR. OHM:  Your Honor, I would move in Defendant

1    Douglas' 4.

2              MR. WASSERMAN:  No objection.

3              THE COURT:  So admitted.

4              (Defendant Douglas' Exhibit No. 4 was admitted.)

5    **BY MR. OHM:**

6         **Q.**   Okay.  Did you hear that?  I'm sorry.  How do you

7    pronounce his name?

8         **A.**   Poupart.

9         **Q.**   Did you hear Officer Poupart there?

10        **A.**   Yes.

11        **Q.**   What did he say?

12        **A.**   I believe he asked him, do you mind if he checked

13   the bag.

14        **Q.**   What do you think Officer Poupart means when he

15   says that?

16             MR. WASSERMAN:  Objection.

17             THE COURT:  Sustained.

18   **BY MR. OHM:**

19        **Q.**   Have you worked with Officer Poupart on street

20   encounters before?

21        **A.**   Yes.

22        **Q.**   Have you worked with Officer Poupart when he

23   searched an individual before?

24        **A.**   Yes.

25        **Q.**   Okay.  Does Officer Poupart routinely ask if he

1    has permission to search?

2         **A.**   I believe.

3         **Q.**   It isn't routine?

4         **A.**   I don't think anything is routine in terms of --

5         **Q.**   Has Officer Poupart ever expressed to you that he

6    likes to give people an opportunity?

7         **A.**   We never discussed it before.

8         **Q.**   Okay.  And in terms of you being partnered up,

9    would you say that that's happened more than -- how many

10   times do you think that that's happened?

11        **A.**   Um, I am not sure.  We have been partners for six

12   months detailed --

13        **Q.**   So multiple times a week?

14        **A.**   Twice.

15        **Q.**   For the last six months?

16        **A.**   Yes.

17             (Playing video.)

18        **Q.**   Did you hear Mr. Douglas say, You can't check it.

19   It's just glasses?

20        **A.**   Can you play it back, please?

21        **Q.**   Sure.  You heard him say, No, you can't check it.

22   Right?

23        **A.**   Yes.

24        **Q.**   Now, at this point Officer Poupart hasn't opened

25   it up yet.  Why is that?

1      **A.**   I am not sure.  I am not sure why he did not open

2   the backpack.

3      **Q.**   Okay.  Did he express to you what he was waiting

4   for?

5      **A.**   No, he did not.

6      **Q.**   And just so -- we are at 19:04:24.  Do you see

7   four fellow officers in the background there?

8      **A.**   Yes.

9      **Q.**   How many people were on the arrest team that day?

10      **A.**   I am not sure.

11      **Q.**   More than 10?

12      **A.**   I am not sure.

13      **Q.**   At least five and the two of you though.  Right?

14      **A.**   That's what I see.  That would be fair.

15      **Q.**   Just so we can see, there are five on the right

16   side of the exhibit.  We are at 19:04:30.  And two towards

17   the middle of the exhibit, as well as the two of you.

18   Right?

19      **A.**   Yeah.

20      **Q.**   Would it be fair to say that these officers are

21   all sort of facing the three of you and not really doing

22   anything else other than sort of supporting you guys?

23      **A.**   Which officers?

24      **Q.**   The officers in the background.

25          MR. WASSERMAN:  Your Honor, I am just going to

196

1    object to leading the witness.

2               THE COURT:  Overruled.  You can answer the

3    question.

4    **BY MR. OHM:**

5         **Q.**   Starting at 19:04:35.  I will play for a few

6    seconds.  If you could keep an eye on the other officers.  I

7    am stopping at 19:04:41.  Is it fair to say that those

8    officers are in support of you and Officer Poupart?

9         **A.**   That would be fair to say.

10               (Playing video.)

11        **Q.**   At that point did you hear Officer Poupart say,

12   Are we good for a search?

13        **A.**   I didn't hear that.

14        **Q.**   Let's go back.  Did you hear that?

15        **A.**   I heard the word search.

16        **Q.**   You heard Officer Poupart.  Right?

17        **A.**   Yes.

18        **Q.**   Do you know what that meant?

19        **A.**   Search.  To do a search.

20        **Q.**   I will show you Officer Poupart --

21               MR. OHM:  This is marked as defense 3, Your

22   Honor.

23               (Playing video.)

24               I'm sorry.  Did you hear it there?

25               (Playing video.)

1          THE COURT:  Mr. Ohm, I think you are confusing the

2    time on the file with the time of the actual time.  You need

3    to go back.

4          MR. OHM:  Okay.  Thank you, Your Honor.

5    **BY MR. OHM:**

6      **Q.**   Okay.  Defense Exhibit 3 at 19:04:58, did you hear

7    Officer Poupart?

8      **A.**   Yes.

9      **Q.**   Did you hear him say, are we good for a search?

10     **A.**   Yes.

11     **Q.**   Have you worked with Officer Poupart before?  What

12   did you think of that to mean?

13     **A.**   What did I think in terms of?

14     **Q.**   What did you take it to mean in terms of his

15   question, Are we good for a search?  What does that mean?

16         MR. WASSERMAN:  I am going to object to the

17   relevance of that question.

18         THE COURT:  Overruled.

19         THE WITNESS:  To my knowledge, is the individual

20   good to be searched.

21   **BY MR. OHM:**

22     **Q.**   Okay.  He was asking if the individual was good to

23   be searched?

24     **A.**   Yes.

25     **Q.**   Okay.  Was there any other meaning behind that

1    question that you know of?

2         **A.**    Not to my knowledge.

3         **Q.**    Okay.  Just very briefly.  Would you say at the

4    time that you apprehended Mr. Douglas, was he entirely

5    cooperative?

6         **A.**    The entire account or?

7         **Q.**    As you approached him and as you encountered him,

8    did he ever try to flee, argue or threaten?

9         **A.**    When we stopped him?  No, he did not.

10        **Q.**    Did you see any other individuals there?

11        **A.**    No.

12        **Q.**    When you stopped Mr. Douglas, initially were there

13   other individuals there acting in a threatening manner

14   towards you?

15        **A.**    Honestly, I can't recall.  There were residents I

16   am assuming coming out, but nobody was in an aggressive

17   manner.  There were quite a few officers on the scene.

18        **Q.**    So you didn't have anyone threaten you or pull a

19   gun on you or anything like that?

20        **A.**    No.

21        **Q.**    Okay.  I mean, if you saw somebody you suspected

22   had a gun, officers actually apprehend them.  Right?

23        **A.**    Yes.

24             MR. OHM:  No further questions, Your Honor.

25             THE COURT:  Mr. Wasserman.

1          MR. WASSERMAN:  Briefly, Your Honor.

2                    **CROSS EXAMINATION**

3    **BY MR. WASSERMAN:**

4          **Q.**   Good afternoon, Officer Taylor.

5          **A.**   Good afternoon.

6          **Q.**   Do you remember when you first started working at

7    NSID?

8          **A.**   I believe it was February, 2020.

9          **Q.**   February.  Was it sort of a detail?

10         **A.**   Yes.

11         **Q.**   And when did you -- where were you assigned

12   before?

13         **A.**   The sixth district.

14         **Q.**   How long have you been with MPD?

15         **A.**   It will be eight years in February.

16         **Q.**   Have you been at 6D the whole time?

17         **A.**   Aside from other details, yes.

18         **Q.**   Okay.  And what is your position in patrol?

19   Crimes?  Correction?

20         **A.**   I am patrol.

21         **Q.**   Okay.  And when did you -- you started in NSID in

22   February of 2020.  When did you finish up with that detail?

23         **A.**   I believe it was August, mid-August.

24         **Q.**   Mid-August of this year?

25         **A.**   Yes.  I'm sorry.  2020.

1      **Q.**    So prior to your assignment with NSID, had you

2      worked with Officer Poupart before?

3      **A.**    No.

4      **Q.**    And was he your partner the whole time you were in

5      NSID or did you guys switch around?

6      **A.**    We kind of switched around.

7      **Q.**    All right.  So as far as actually -- when you say

8      "partner", does that mean you ride in the same car together

9      essentially?

10     **A.**    Essentially.

11     **Q.**    And responding to calls together?

12     **A.**    Yes.

13     **Q.**    Okay.  So during that six-month period, is it

14     correct to say that, you know, sometimes you worked with him

15     as your partner.  Sometimes you might have worked with him,

16     but he wasn't right there with you as your partner?

17     **A.**    Yes.

18     **Q.**    Okay.  Do you happen to recall -- let me,

19     actually, ask if we can play Government's Exhibit No. 4

20     starting at the 6-minute mark.

21          Before we do that, do you recall getting a lookout

22     over the radio to respond to the 2300 block of 15th Street

23     that day?

24     **A.**    Yes.  Yes.

25     **Q.**    All right.

1          MR. WASSERMAN:  Government's Exhibit 3 at the

2    6-minute mark.

3          (Played audio.)

4    **BY MR. WASSERMAN:**

5    **Q.**   Do you recall, was that the lookout that you and

6    Officer Poupart responded to that day?

7    **A.**   Yes.

8    **Q.**   In that lookout, it was for two individuals; is

9    that correct?

10   **A.**   Yes, yes.

11   **Q.**   All right.  And have you worked narcotics and

12   firearm cases before in terms of investigations?  Come

13   across people who have been selling drugs?

14   **A.**   Yes.

15   **Q.**   All right.  In your eight-year career; is that

16   correct?

17   **A.**   Yes.

18   **Q.**   Okay.  And in your training and experience, is it

19   common for people engaged in drug trafficking to carry

20   firearms or other weapons?

21   **A.**   Yes.

22   **Q.**   Is that a concern of yours as an eight-year police

23   officer when you approach somebody in the type of situation

24   where you approached Mr. Douglas?

25   **A.**   Yes.

1      **Q.**   And on the day of April 22nd, the day you and

2    Officer Poupart approached Mr. Douglas, is it correct that

3    you were aware that there was another individual that was

4    suspected of being involved in this exchange?

5      **A.**   Yes.

6      **Q.**   Did you know where that individual was at the time

7    that you approached Mr. Douglas?

8      **A.**   No.

9      **Q.**   And when you and Officer Poupart arrived on the

10   scene and approached Mr. Douglas, were you the first

11   officers on the scene?

12     **A.**   Yes.

13     **Q.**   Did you know where the other officers were when

14   you first made contact with Mr. Douglas?

15     **A.**   No.

16     **Q.**   Do you know how long it was going to take them to

17   arrive in that area?

18     **A.**   No.

19     **Q.**   If I could ask -- all right.  I am showing you

20   Government's Exhibit 4-A.  Officer Taylor, do you recall

21   that particular still shot?  Is that from Officer Poupart's

22   body worn camera footage?

23     **A.**   I am not sure.

24     **Q.**   You are are not sure.  Do you recognize the

25   individual in the blue coat?

1      **A.**   Yes.

2      **Q.**   Who is that?

3      **A.**   That is the individual that we did the search

4   with.

5      **Q.**   Okay.  Do you see anybody else in that photograph?

6      **A.**   Yes.

7      **Q.**   At the time that you stopped Mr. Douglas, do you

8   know who those other individuals were?

9      **A.**   No.

10          MR. WASSERMAN:  That's all I have, Your Honor.

11   Thank you.

12              THE COURT:  Thank you.

13              Mr. Ohm, any redirect?

14              MR. OHM:  No, Your Honor.

15              THE COURT:  Thank you, Officer.  You are excused.

16              THE WITNESS:  Thank you.

17              THE COURT:  So counsel, here is where I am.  I

18   don't want to hear argument on the motions.  We have the

19   evidence now.  I think it is closed.  Correct me if that's

20   not the case.

21              MR. OHM:  I don't remember if I moved in my

22   exhibits.  I know they are duplicate of the Government

23   exhibits.

24              CLERK:  You did not do 1 through 3.

25              THE COURT:  It looks like maybe not.  Why don't

1    you move in -- it looks like you need to move in Defendant

2    Douglas' Exhibits 1, 2 and 3.  I don't believe there were

3    objections, since they were Government exhibits so we will

4    admit them.

5              (Defendant Douglas' Exhibit Nos. 1-3 were

6    admitted.)

7              MR. WASSERMAN:  No, Your Honor.

8              THE COURT:  So we have the evidence.  I don't want

9    to hear argument today on the motions.

10             Here is what I think is the most efficient course.

11   We've heard something like five hours of testimony today.  I

12   think the best course is for parties to take the evidence

13   that we heard today and file supplemental briefs on the

14   motions.

15             So I am open to whatever proposal you have.  I am

16   thinking of something relatively concise.  They need not be

17   an exchange of briefs.  I want to keep this case moving.  I

18   am thinking about each party getting a supplemental brief of

19   X-number of pages to tell me the most relevant evidence that

20   we heard today as it relates to the arguments that have been

21   presented already.

22             The reason I think it is complicated because, of

23   course, the Government has a position on two of the motions

24   we heard evidence on today.  There are the defendants who

25   are on different positions.  I think the fair way to do it

1    is on the motions to suppress the identification testimony,

2    each party gets to file a 10-page supplemental brief,

3    basically, arguing whatever you want to argue on the

4    evidence today with citations to the record.

5            And then as to the motion to suppress, the

6    tangible evidence, on that one, Defendant Douglas and the

7    Government get 10-page briefs presenting whatever arguments

8    you want to make based on the evidence we heard today.  The

9    briefs will be filed simultaneously.  I don't think we need

10   to have -- I have already read the legal arguments.  I just

11   want to understand the synthesis of the evidence as it

12   relates to various positions.  I will have the Government go

13   first or vice versa.  That's how I want to proceed.  The

14   question for you is, When is an appropriate time for you to

15   file these briefs?

16           Obviously, you heard the evidence today, and

17   obviously you will need the transcript to cite it.  So

18   there's that question.  And I don't know what your schedules

19   are like.  With the goal in mind of resolving this quickly,

20   I want to give you the opportunity to put your best foot

21   forward.

22           That's how I would like to proceed.  The only

23   question being, When would you like to file these

24   supplemental briefs?  Obviously, the Government has two to

25   file.  Mr. Marston one.  So the question is probably to Mr.

1    Ohm and Mr. Wasserman, what do you want to file?

2    Mr. Marston, you can object if you don't like their

3    proposal.  Feel free to approach.

4              MR. WASSERMAN:  Your Honor, I guess the only issue

5    is when we would get the transcript.  We can order it daily

6    I suppose.  I don't know how long.  I have permission to do

7    that.  I don't think it is a problem.  Assuming I can get

8    the transcript.

9              May I confer with the court reporter?

10             THE COURT:  You may.

11             MR. WASSERMAN:  I know it is a pretty lengthy

12   transcript.  How long do you think you might be able to get

13   it completed?

14             COURT REPORTER:  Um, two days.

15             MR. WASSERMAN:  I just want to look at my

16   schedule, Your Honor.  Is two weeks --

17             THE COURT:  That's acceptable from my perspective.

18   I think something can be done before you get the transcript

19   just to make whatever argument, whatever the lawyers will

20   testify to.

21             MR. WASSERMAN:  November 5th or 6th?

22             THE COURT:  Let me hear from Mr. Ohm, whose client

23   is in the most time sensitive position.  Mr. Ohm?

24             MR. OHM:  Your Honor, I am leaning towards only

25   filing the Fourth Amendment one.

1          THE COURT:  I understand.

2          MR. OHM:  So I am -- a week -- a week from the two

3    days is fine with me.  I know everyone is busy.

4          THE COURT:  Why don't we do October 30th.  It's

5    not quite two weeks.  I know Mr. Wasserman, it's more than a

6    full week after the transcripts are available, and we have

7    the rest of this week to at least --

8          MR. WASSERMAN:  Your Honor, I apologize.  I've got

9    compassionate release motion I have to respond to by the

10   28th.  I've got to go to Grand Jury on another case on the

11   27th.  I just have a few balls in the air here that I am

12   trying to balance.

13         The more time I could get, I think, the more

14   realistic it would be for me.

15         THE COURT:  Let's do November 3rd.  Two weeks from

16   today and that's not quite two weeks from the transcript but

17   that's how we are going to proceed.

18         Mr. Ohm, feel free to respond if you like.  I

19   understand you may only file the Fourth Amendment.  Again,

20   each party can file.  The Government can file two briefs,

21   supplemental briefs, each of no more than 10 pages on the

22   two motions to suppress.  Mr. Ohm, Mr. Douglas, can file one

23   or two supplemental briefs on those motions, and Mr.

24   Williams can file one supplemental brief on the motion, the

25   motion to suppress that he has filed.  And those briefs are

1    due two weeks from today, which is November 3rd.  I will not

2    impose a time deadline.

3              Anything else we should discuss today, Counsel?

4              MR. WASSERMAN:  Is the Court going to decide the

5    -- [inaudible] -- will be on papers --

6              THE COURT:  Yes.  Well, I guess I should say, I

7    don't know yet.  What I want to do is I want to see -- to be

8    clear, I want to see the parties' respective positions on

9    these motions, especially the motion to suppress the

10   tangible motions.  I may decide to hear arguments on them

11   and possibly on the other motions.  I tend to think that

12   those can be resolved in the papers, but I really want to

13   see how you synthesize the questions here today, and it may

14   be that depending on how the suppression motions come out.

15             I think the better course is to decide after you

16   file those things whether I want to have argument at all if

17   -- and if so, on what issues?  And, of course, if we

18   schedule argument, I will make everybody aware of what I

19   intend.  Thank you for the question.

20             MR. WASSERMAN:  Very well, Your Honor.

21             MR. MARTSON:  Nothing from Mr. Williams.

22             THE COURT:  Thank you, Counsel.

23             CLERK:  All rise.

24             (Proceedings concluded at 4:37 p.m.)

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24                        C E R T I F I C A T E

25

1          I, Lorraine T. Herman, Official Court

2   Reporter, certify that the foregoing is a true and correct

3   transcript of the record of proceedings in the

4   above-entitled matter.

5

6          Please Note:  This hearing occurred during

7   the COVID-19 pandemic and is therefore subject to the

8   limitations of court reporting mask wearers.

9

10

11

12

13

14   __October 21, 2020___      ____/s/_____
              DATE                    Lorraine T. Herman

15

16

17

18

19

20

21

22

23

24

25