1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF COLUMBIA

3

     UNITED STATES OF AMERICA,
4                                           CR Action
                  Plaintiff,                No. 1:20-121
5
          vs.                               Washington, DC
6                                           March 17, 2021
     TAVONTE WILLIAMS AND
7    THEODORE B. DOUGLAS                     1:00 p.m.
                  Defendants.
8    _____/

9

10      TRANSCRIPT OF TELEPHONE STATUS CONFERENCE/GUILTY PLEA
             BEFORE THE HONORABLE CARL J. NICHOLS
                 UNITED STATES DISTRICT JUDGE
11
     APPEARANCES:
12
     For the Plaintiff:       STEVEN B. WASSERMAN
13                            U.S. ATTORNEY'S OFFICE FOR D.C.
                              555 Fourth Street, NW
14                            Washington, DC 20530
                              (202) 252-7719
15
     For T. Williams:        JOHN PETER MARSTON
16                            FOLEY HOAG, LLP
                              1717 K Street, NW
17                            Washington, DC 20006
                              (202) 785-6687
18
     For T. Douglas:         EUGENE OHM
19                            FEDERAL PUBLIC DEFENDER FOR D.C.
                              625 Indiana Avenue, NW, Suite 550
20                            Washington, DC 20004
                              (202) 208-7500
21

22

23   Reported By:       LORRAINE T. HERMAN, RPR, CRC
                         Official Court Reporter
24                       U.S. District & Bankruptcy Courts
                         333 Constitution Avenue, NW
25                       Room 6720
                         Washington, DC 20001

1          **P R O C E E D I N G S**

2              COURTROOM DEPUTY:  This is criminal case year

3    2021-121, United States of America versus Tavonte Williams,

4    Defendant number 1 and Theodore B. Douglas, Defendant number

5    2.  Pre-trial officer is John Copes.

6              Counsel, please introduce yourselves beginning

7    with the Government.

8              MR. WASSERMAN:  Good afternoon, Your Honor.  Steve

9    Wasserman for the United States.

10             THE COURT:  Mr. Wasserman, good afternoon.

11             MR. MARSTON:  Good afternoon, John Marston for

12   Mr. Williams.

13             THE COURT:  Mr. Marston, good afternoon.

14             MR. OHM:  Eugene Ohm on behalf of Mr. Douglas.  I

15   apologize for holding everybody up, Your Honor.

16             THE COURT:  No.  I totally understand, Mr. Ohm.

17   Thank you.

18             I note that Mr. Douglas is on by video, as is Mr.

19   Williams.  We are obviously here on the continued plea

20   hearing that we were conducting last time.  And I know that

21   we have some new papers that we will get to.

22             I do think it is probably appropriate just to

23   ensure, first, Mr. Ohm, that Mr. Douglas consents to proceed

24   again today by videoconference in light of the pandemic and

25   for the reasons discussed at our last hearing.

1             MR. OHM:  Mr. Douglas does consent, Your Honor.

2             THE COURT:  Thank you.

3             Ms. Lesley, could you then administer the oath to

4    Mr. Douglas, so he is under oath again today?

5             COURTROOM DEPUTY:  Yes, Your Honor.

6             Mr. Douglas, please raise your right hand.  Do you

7    solemnly swear that you will well and truly answer the

8    questions propounded to you so help you God?

9             THE DEFENDANT:  Yes.

10            THE COURT:  Mr. Douglas, are you sick or impaired

11   in any way that could prevent you from understanding what is

12   happening here today?

13            THE DEFENDANT:  No, Your Honor.

14            THE COURT:  Mr. Ohm, do you have any reason to

15   believe that Mr. Douglas will be unable to understand what

16   we discuss today?

17            MR. OHM:  No, Your Honor.

18            THE COURT:  It appears to me that Mr. Douglas is

19   responding appropriately to questions and appears to

20   understand them fully, and he continues to be competent and

21   capable of entering an informed plea.

22            Obviously, last time we covered some but not all

23   of the topics that we would normally cover in the plea

24   hearing.  Mr. Douglas, do you recall our discussion last

25   time about your rights to a trial and to appeal and the

1    related rights that you would be giving up if you plead

2    guilty here today?

3               THE DEFENDANT:  Yes, I do.

4               THE COURT:  You recall that.  And you continue to

5    believe that you would like to waive those rights and to

6    proceed to a guilty plea here today?

7               THE DEFENDANT:  Yes.

8               THE COURT:  And last time I held up and noted for

9    the record that we had the waiver of trial by jury.  I don't

10   think we need to do that again, but I assume you continue to

11   agree that that is your signature on the waiver of the right

12   to trial by jury and that you so waive.  Correct?

13              THE DEFENDANT:  Yes.

14              THE COURT:  And one thing I will note is, as I

15   believe Mr. Wasserman noted, I believe, during the last

16   hearing, while you are giving up a number of your rights to

17   appeal, the plea agreement expressly authorizes you to

18   appeal, should you wish, my decision on the motions that

19   were pending before me last fall.  Do you understand that,

20   Mr. Douglas?

21              THE DEFENDANT:  Yes, sir.

22              MR. WASSERMAN:  Your Honor, this is Steve

23   Wasserman.

24              Just to be clear, it specifically refers to

25   preservation of his right to appeal the Motion to Suppress

1    with a decision to deny the Motion to Suppress tangible

2    evidence.

3              THE COURT:  Thank you.  Yes.  Exactly.  Thank you

4    for the precision there.  That is exactly what I meant.

5              So with that, we are essentially where we left off

6    last time.  Here is what I would like to do.  I would like,

7    because there was a discussion on the record about the

8    Statement of the Offense and a discussion about what the

9    Government could put in that statement and what was in the

10   plea, I think it would probably be best if, Mr. Wasserman,

11   you and Mr. Ohm could state the resolution of that issue,

12   and then we will go ahead and have you, I think, just reread

13   or resummarize the Statement of the Offense so that we can

14   have the record clear that that is what Mr. Douglas is

15   agreeing to.

16             MR. WASSERMAN:  Yes, Your Honor.

17             So the change to the plea removed the enhancement

18   for an obliterated serial number, which was a four-level

19   enhancement to the guideline range.

20             I had viewed that with the officers and determined

21   that it was not appropriate to seek application of that

22   enhancement, so it was removed; that also resulted in

23   recalculation in Paragraph 4 of the plea agreement of the

24   guideline range, which is now 12 months to 18 months of

25   incarceration.

1              The only change that was made to the Statement of

2       Offense, and that is otherwise in all respects the same as

3       what I read last week, is I removed the sentence that

4       referred to the fact that the gun had an obliterated serial

5       number on it.  In all respects the Statement of Offense is

6       identical to what I had read at the last hearing.  So that's

7       the changes that were made to the plea and the Statement of

8       Offense.

9              THE COURT:  Thank you, Mr. Wasserman.  Mr. Ohm, do

10      you agree with all of that?

11             MR. OHM:  I do, Your Honor.

12             THE COURT:  Thank you.

13             I think rather than have you, Mr. Wasserman,

14      resummarize the Statement of Offense, the record reflects

15      that you removed the sentence about the obliteration of the

16      serial numbers.  I reviewed the Statement of Offense.  That

17      sentence is no longer in there.  And the revised Statement

18      of the Offense, which I am now holding up for the video

19      camera and including, I think the paragraph with the removed

20      sentence.  I am now holding up for the record the final

21      page, which I believe bears both Mr. Ohm's signature and

22      Mr. Douglas' signature.

23             Mr. Douglas, have you reviewed the revised

24      Statement of Offense and discussed it with Mr. Ohm?

25             THE DEFENDANT:  Yes, Your Honor.

1        THE COURT:  Is that your signature on the last

2   page acknowledging that you read the description of the

3   criminal conduct and fully understand it?

4        THE DEFENDANT:  Yes.

5        THE COURT:  And does the Statement of Offense now

6   truly and accurately describe what you did in this matter?

7        THE DEFENDANT:  Yes.

8        THE COURT:  Are there any corrections or changes

9   that you would make to the revised Statement of Offense?

10       THE DEFENDANT:  No.

11       THE COURT:  Did you, in fact, do what the

12  Government has said that it can prove at trial?

13       THE DEFENDANT:  Yes.

14       THE COURT:  Thank you.

15       Now, as to the plea agreement which Mr. Wasserman

16  has described the changes to, let me just do a little bit

17  more colloquy here.

18       Mr. Wasserman, is this the most lenient plea offer

19  made to Mr. Douglas in this matter?

20       MR. WASSERMAN:  Yes, Your Honor.

21       THE COURT:  Mr. Douglas, have you had enough time

22  to review this plea agreement and to discuss it with Mr.

23  Ohm?

24       THE DEFENDANT:  Yes, Your Honor.

25       THE COURT:  I am now going to hold up what I

1    believe is the revised plea agreement, which contains on the

2    first page date of March 10, and on the back page,

3    signatures of you, Mr. Douglas and Mr. Ohm, both dated March

4    11.  I think I said for the record March 10.  So March 10,

5    2021 on the front page and March 11, 2021 on the signatures.

6    Is this your signature, Mr. Douglas, accepting and agreeing

7    to the terms and conditions of the plea agreement?

8              THE DEFENDANT:  Yes, Your Honor.

9              THE COURT:  Mr. Ohm, there's obviously been some

10   discussion about the plea agreement including what Mr.

11   Wasserman has mentioned.  Can I ask you to briefly summarize

12   the key terms of the plea agreement.  You don't need to do,

13   I think, the basics around the waiver of appellate rights

14   and jury rights, but just to provide for the record a

15   summary of plea agreement from the Defendant's perspective.

16             MR. OHM:  Yes, Your Honor.

17             Mr. Douglas is pleading to Count 1 of the

18   indictment, which is a violation of 18 USC 922(g),

19   possession of a firearm by a prohibited person.  The

20   Government is agreeing to cap at the low end of the

21   guidelines, which we now estimate the range to be at 12 to

22   18 months.  There is a distribution case in Superior Court

23   that has been dismissed during the pendency of this case and

24   the Government agrees not to rebring that case, and those

25   are the terms of the agreement in essence.

1          THE COURT:  Thank you, Mr. Ohm.  Mr. Wasserman,

2    anything you think we need to add?

3          MR. OHM:  I should probably include that this is a

4    conditional plea where Mr. Douglas retains the right to

5    appeal the Fourth Amendment decision by the Court.

6          THE COURT:  Thank you.  Yes.  As we discussed

7    before.  Mr. Wasserman, anything you would add?

8          MR. WASSERMAN:  No, Your Honor.

9          THE COURT:  Thank you.

10   **BY THE COURT:**

11      **Q.**   Mr. Douglas, let me just ask you some questions

12   and describe to you what will happen, assuming your plea

13   happens today, we take your plea.  With respect to

14   sentencing, have you and Mr. Ohm discussed sentencing and

15   how the relevant statute and sentencing guidelines may apply

16   here?

17      **A.**   Yes.

18      **Q.**   Let me just briefly summarize some key portions of

19   that.  Obviously we will take some of this up at sentencing.

20   If I accept your guilty plea in this case, the statutory

21   penalties, the statutory penalties you face are as follows:

22   For the charge to which you are pleading, a maximum sentence

23   of 10 years of imprisonment, a maximum fine of $250,000 and

24   supervised release term of not more than 3 years.  You have

25   obligation to pay any applicable interest or penalties on

1   fines not timely paid.  Additionally, you face a special

2   assessment of $100, and upon conviction, you shall forfeit

3   the firearm and ammunition that were seized on April 22nd,

4   2020, and which are described in the plea agreement, which

5   includes a Sig Sauer P320 semiautomatic pistol, serial

6   number 58AU72741, the accompanying magazine and 13 rounds of

7   .40 caliber ammunition.

8           Mr. Douglas, do you understand what I just listed,

9   the prison term, supervised release term, fine, forfeiture

10  and special assessment are statutory penalties that apply in

11  your case?

12      **A.**   Yes.

13      **Q.**   Do you understand that the offense to which you

14  are pleading guilty is a felony offense, and that if your

15  plea is accepted and you are found guilty of that offense,

16  such a finding may deprive you of certain civil rights, such

17  as the right to vote, hold public office, right to serve on

18  a jury and the right to possess any kind of firearm?

19      **A.**   Yes.

20      **Q.**   Have you discussed the statutory penalties and

21  these possible consequences with Mr. Ohm?

22      **A.**   Yes.

23      **Q.**   Now, in deciding on a fair and appropriate

24  sentence, when we get to that stage, I will have to consider

25  statutory factors and sentencing guidelines which we have

discussed a little bit today, which are detailed guidelines
for judges to consider when determining a sentence in a
criminal case like this.  The guideline sentencing range is
for specific offenses.  And although I must consult the
guidelines, they are advisory not mandatory.  While you and
Mr. Ohm may have an idea based on your criminal history and
the nature of the offense here of what your sentencing range
may be, nothing will be certain until the Probation Officer
submits a pre-sentence report that will come to me and to
the attorneys.

Mr. Ohm will review it with you, and you will have
a chance to make changes in it or object to portions of it.
At the time of sentencing I will hear from both attorneys
and I will have to determine what your sentencing guidelines
range is.  Once I hear from both parties and determine that
range, I am still permitted to impose a sentence outside
that range, which means I could sentence you above or below
the range.  I can't, however, sentence you to more than the
maximum statutory period, which I explained earlier is 10
years imprisonment.

When I determine your sentence, I am required by
law to consider a series of factors including the nature and
circumstances of the offense and your history and
characteristics, the need for the sentence imposed to
reflect the seriousness of the offense, to promote respect

1    for the law and provide just punishment, to afford adequate

2    deterrence to criminal conduct, both to you and others, to

3    protect the public from further crimes by you, and to

4    provide you with needed educational or vocational training,

5    medical care or other correctional treatment in the most

6    effective manner.

7              I have to consider the kinds of sentences

8    available.  I have to consider the sentencing guidelines and

9    the relevant range, which I have already discussed with you,

10   and I have to consider the need to avoid unnecessary

11   sentence disparities among Defendants who have similar

12   records, who have been found guilty of similar conduct.

13             So, Mr. Douglas, do you understand that I will not

14   be able to finally determine the guidelines range here until

15   I have received a pre-sentence report and until after you

16   and your attorney and the Government have had the

17   opportunity to challenge the facts reported by the Probation

18   Officer?

19        **A.**    Yes, Your Honor.

20        **Q.**    Do you understand that the ranges in the plea

21   agreement, and in particular the estimated range of 12 to 18

22   months imprisonment, that that's just an estimate at this

23   point?

24        **A.**    Yes.

25        **Q.**    And do you understand that after I decide what the

1    guidelines range is, I still have the authority in my

2    discretion to impose a sentence that is more severe or less

3    severe than that range?

4        **A.**    Yes.

5        **Q.**    Finally, and just a few more questions.  As I

6    mentioned earlier, in our last hearing, before I can accept

7    your plea, I need to make sure you are pleading guilty

8    voluntarily.  So I will ask a few more questions to make

9    sure you are entering this plea of your own freewill.

10            Do you understand, Mr. Douglas, that the agreement

11    reached in this case resulted from negotiations agreements

12    between Mr. Ohm and the Government?

13        **A.**    Yes.

14        **Q.**    Has anyone forced, threatened or coerced you in

15    any way regarding your plea?

16        **A.**    No.

17        **Q.**    Has anyone made any promises to you as to what

18    sentence I will impose in this case if I do accept your

19    guilty plea?

20        **A.**    No.

21        **Q.**    Has anyone made you any other promises or

22    representations beyond the ones in the plea agreement or the

23    ones discussed during this hearing, both the earlier part of

24    the hearing and today, to induce you to give up your right

25    to a trial?

1    **A.**   No.

2    **Q.**   And are you entering this plea of guilty

3    voluntarily and of your own freewill?

4    **A.**   Yes.

5    **Q.**   Is there anything about this proceeding you don't

6    understand, either the plea you are about to enter or any of

7    the rights that you are waiving?

8    **A.**   No.

9    **Q.**   Is there anything you would like to ask me or Mr.

10   Ohm before you decide whether to plead guilty?

11   **A.**   No.

12   **Q.**   Are you ready to decide whether you wish to plead

13   guilty?  Are you ready to proceed?

14   **A.**   Yes.

15             THE COURT:  Ms. Lesley, could you please take

16   Mr. Douglas' plea?

17             COURTROOM DEPUTY:  Yes, Your Honor.

18             Mr. Theodore B. Douglas, in Criminal Case 20-121,

19   in which you are charged with unlawful transport of

20   firearms, unlawful possession of a firearm and ammunition by

21   a person convicted of a crime, punishable by imprisonment of

22   a term of 1 year in violation of 18 USC 922(g)(1), how do

23   you wish to plea?

24             THE DEFENDANT:  Guilty.

25             THE COURT:  I find in the case of United States

1    versus Douglas, the Defendant, Theodore Douglas, is fully

2    competent and capable of making a decision today, that he

3    understands the nature of the charges and the consequences

4    of his guilty plea; that the plea is knowing and voluntary;

5    that he is acting of his own freewill; and that there is

6    adequate factual basis containing each of the essential

7    elements of the offense for the plea, I therefore accept the

8    plea of guilty and Mr. Douglas is now adjudged guilty of the

9    offense.

10          As I've explained, Mr. Douglas, there will be a

11   presentence investigation, and the Probation Officer will

12   prepare a report to assist me in sentencing.  You will be

13   interviewed by the Probation Officer.  You are required to

14   give truthful information for the report.  Mr. Ohm may be

15   present, if you wish.  You and Mr. Ohm will be permitted to

16   review the presentence report, as I mentioned, before the

17   sentencing hearing and make any objections to any errors

18   that you believe are in the report.  And as I already said

19   at the sentencing hearing, both you and Mr. Ohm will be

20   given the opportunity to speak on your behalf.

21          So that then brings us, I think, to the question

22   of next steps.  Mr. Wasserman, so we have 70 days from

23   today's date for purposes of a sentencing hearing would be

24   around May 26th, 90 days would be around June 15th.  I don't

25   know whether probation is backed up these days.  I don't

1    have a preference as between those two dates.  But,

2    obviously, we have the question of the case as it relates to

3    Mr. Williams.  Do you have a proposal for how we proceed

4    either with respect to Mr. Douglas' sentencing or this case

5    more generally?

6         MR. WASSERMAN:  Your Honor, with respect to the

7    sentencing of Mr. Douglas, I am going to be on leave --

8    extended leave from about May 3rd and back on June 28th.  In

9    terms of sentencing memos, you know, I certainly could get

10   those in prior to the 28th.  I would request the 28th

11   because it is the first day I will be back.

12        THE COURT:  Thank you.

13        Let me hear from Mr. Ohm first, and then I think I

14   would like to then have a conversation about how these dates

15   relate to proceedings, basically, of Mr. Williams.

16        MR. OHM:  All right, Your Honor.  It would be our

17   request to do it in May.  I would note that Mr. Douglas --

18   right now the estimated guideline range is 12 to 18 months.

19   The Government's allocution for the plea is 12 months, and

20   he was arrested in May.  If he was sentenced to a year and a

21   day, then he would have served all of his time by the time

22   May 23rd comes around.  I would ask for that date.

23        The other situation with Mr. Douglas is because he

24   is on supervised release, there is sort of an experience in

25   dead time being past.  If he gets sentenced to a year and a

1    day here, which is essentially time served, there is still

2    going to be a period of dead time where he is not getting

3    any credit until the parole warrant issues because the

4    parole warrant hasn't executed yet, and then he is going to

5    have to be transported to a different jurisdiction to do his

6    parole hearing.  So from his perspective, obviously, getting

7    that ball moving is something we are really interested in.

8    We would like to come in for sentencing as soon as possible.

9              THE COURT:  So, Mr. Wasserman, I think certainly

10   the notion that May would mark the 12th month anniversary of

11   when Mr. Douglas was detained here seems relevant to me.

12   Assuming that a pre-sentence report could be done in time to

13   do a hearing by April 30th, because that's the day -- the

14   last day before you become unavailable, Mr. Wasserman.

15   Would that be possible?

16             Alternatively, is there someone perhaps, Mr.

17   Wasserman, who could take your place in effect for that

18   sentencing hearing, if we can't do it in May?

19             MR. WASSERMAN:  The answer to both questions is,

20   yes.  I can do the 30th, although I have a hearing at 11:30

21   before Judge Bates on that day.  Then should it be necessary

22   to move the hearing to May, you know, I'm sure it could be

23   covered by somebody if need be.

24             THE COURT:  Mr. Copes, I know this is probably

25   faster than you would like, but is there -- would it be

1   possible, you think, to do a pre-sentence report in time to

2   do a sentencing on April 30th in light of, I think most

3   importantly, the fact that the Government's allocution as to

4   the appropriate sentence here will have run right around,

5   you know, sometime in May.  And in light of Mr. Wasserman's

6   leave, April 30th is the last date he is available before

7   the 12-month period would run.

8           I apologize.  Mr. Copes, you are pre-trial.  You

9   wouldn't know.

10          MR. WASSERMAN:  Your Honor, I misspoke.  I am free

11  on the 30th.  I have that hearing on the 29th.  So I am

12  flexible on time on the 30th, should that date be chosen.

13          THE COURT:  Thank you.  We are a little bit more

14  flexible on the 30th.  And, Mr. Copes, I apologize.  I posed

15  the question to the wrong person there.  Let's do this,

16  let's set the sentencing hearing in this matter for April

17  30th.  We will do it by videoconference.  And assuming there

18  are no serious time constraints, let's do it at 2:00 p.m. on

19  April 30th.  What I think that means is ideally you would

20  get sentencing memoranda April 23rd.  So we are going to set

21  all of those dates.  So sentencing memoranda due April 23rd,

22  videoconference sentencing April 30th.

23          Mr. Ohm, is it Mr. Douglas' position or what is

24  Mr. Douglas' view or your view on having the sentencing by

25  video?

1          MR. OHM:  Given the accommodations of the Court, I

2     think that that's fine.

3          THE COURT:  Okay.  It may be that we may be in a

4     somewhat more resumed state by then, but I think it is

5     probably prudent to assume we are not and therefore we would

6     be proceeding by video.  So I think that that covers the

7     sentencing hearing.

8          I am assuming that probation will be able to get

9     the pre-sentence report done in time for all of this to

10    happen.  If for some reason that becomes a significant

11    problem, I will probably have Ms. Lesley circle back with

12    the parties to see if there is another time that would

13    accommodate their schedule.  If that happens, Mr. Wasserman,

14    it may be the case that I calendar the sentencing hearing

15    for sometime in May, and then we just have to have somebody

16    from the US Attorney's Office cover for you.

17         MR. WASSERMAN:  I understand, Your Honor.

18         THE COURT:  Thank you.

19         So that covers Mr. Douglas' sentencing hearing.

20         Mr. Marston, I think that turns the floor over to

21    you.  Right now we are -- and I suppose Mr. Ohm as well --

22    although, if we do the hearing on April 30th, perhaps your

23    Fifth Amendment issue may not arise with respect to possible

24    testimony of Mr. Douglas.  We are currently holding still a

25    May 3rd trial date.  Mr. Marston, do you have thoughts about

1    that in light of that?

2                MR. MARSTON:  Thank you, Your Honor.

3                Thinking through the timing and having discussed

4    it with Mr. Williams, the only person who can decide whether

5    Mr. Douglas will testify is Mr. Douglas.  I will not be able

6    to fully evaluate that prospect and -- not having had a

7    chance to talk to Mr. Douglas -- which is of course,

8    understandable.  I think it would take some time to evaluate

9    the potential testimony on Mr. Douglas' part, and given the

10   parole hearing Mr. Ohm mentioned, it is possible that it

11   would take some additional time to do so.

12               I don't think we could go forward as quickly as

13   early May.  I mean, Mr. Wasserman has mentioned not being

14   the person to try this case.  I guess I would ask to allow

15   us to put our case together and to allow us to evaluate

16   Mr. Douglas' testimony and Mr. Douglas to evaluate whether

17   he is truly prepared to testify, I would ask for a trial

18   date in early June, if possible.  Perhaps the week of the

19   7th or the 14th.

20               THE COURT:  Thank you.

21               So what I am doing now is I am looking at this

22   calendar that we have just to see if there are dates around

23   then that we should at least attempt to hold for present

24   purposes.  Just give me a second while I pull this up.  I

25   know there is availability in mid-June.  I just don't know

1        the specifics.  Okay.  Here we are.

2               So it appears to me that trial beginning on June

3        8th or June 9th -- and not June 7th because there is already

4        one scheduled for that day -- could work.  Again, I think

5        now, since we would be talking about a single-Defendant

6        trial, what would likely happen is we would do voir dire in

7        the ceremonial courtroom, under the procedures that I think

8        have now been posted online.  We would do the voir dire in

9        the ceremonial courtroom.  I don't know if we would have to,

10       depending on the schedule for the rest of the court, but we

11       would be available to move to my courtroom for the trial.

12              So we could start on the 8th.  I believe we could

13       also start on the 9th or the 10th.  And then the following

14       week it appears to me -- but Ms. Lesley, correct me if you

15       think I am reading this wrong -- that we could also start on

16       the 15th or 16th of the following week, under the same

17       general idea of doing, first, voir dire in the ceremonial

18       courtroom, and then moving to my courtroom for the actual

19       trial itself.

20              Mr. Marston, would you like to pick -- obviously,

21       Mr. Wasserman, you'll be on leave then.  I think your plan

22       was to have someone stand in your place for trial.  Should

23       we pick a date now, at least a notional trial date, or do

24       you need to confer, Mr. Wasserman or even Mr. Marston, with

25       your client on these questions, at least on the date

1    question?

2              MR. WASSERMAN:  Your Honor, I don't know at this

3    point who would handle the matter.  So I think we can set

4    one of those dates.  If that's what Mr. Marston wants, you

5    know, I will defer to him, whether he needs to confer with

6    his client on dates but those are fine at this point.

7              THE COURT:  Thank you.  Mr. Marston?

8              MR. WASSERMAN:  The only thing I would add, I

9    would note that given that Mr. Douglas just entered a

10   conditional plea, I don't believe that his Fifth Amendment

11   privilege will be extinguished by the time a trial date

12   rolls around in this matter for Mr. Williams.

13             MR. MARSTON:  This is Mr. Marston.

14             I understand and agree with what Mr. Wasserman is

15   saying.  My understanding is that Mr. Douglas' odds of

16   testifying will increase after his sentencing.  And while we

17   can all guess whether he will testify or not, the only

18   person who can decide that, of course, is Mr. Douglas.  He

19   can do so whether he has Fifth Amendment -- [inaudible] -- I

20   can certainly understand from his perspective why, after

21   sentencing, you know, his potential testimony, which I, of

22   course, don't know what the would be in full having not

23   talked to him, but I can certainly understand why his

24   chances of testifying might increase after sentencing, even

25   though he may maintain some Fifth Amendment rights.

1          All of that said, I have talked with Mr. Williams.

2    I would ask for June 15th as our trial date.  We discussed

3    middle of June and he's prepared to agree to a trial around

4    that time.

5          THE COURT:  Thank you, Mr. Marston.

6          Ms. Lesley, am I reading the materials correctly

7    when I say that June 15th is likely a date on which we could

8    begin this trial?

9          COURTROOM DEPUTY:  Yes.  I am looking at it.  It

10   does seem as though -- the fact that it doesn't show on the

11   one where it says highlight with voir dire 6/8 and 6/9, it

12   doesn't show that for the following date, but there aren't

13   any dates other than the 6/14 date.  So by looking at what

14   you are looking at, it looks like it is available.

15         Let me look at the jury calendar that we have to

16   actually enter as the courtroom deputies.  Give me one

17   moment.

18         THE COURT:  I apologize to the parties but we are,

19   at least the notional plan that we haven't really started

20   but is out there is to have -- and I think we discussed some

21   of this before -- is to have only one voir dire occur at a

22   time in the ceremonial courtroom.  Only three trials going

23   on at once in the courthouse as a whole.  We have this

24   schedule that Ms. Lesley and I are both looking at that

25   seems to have availability on the 15th and 16th, but it's

1    not as clear as the earlier week.  And it's obviously very

2    dependent on what is going on with the other trials that are

3    on that week.  There is only one other trial that both of us

4    can see, but there may be something about it that we are not

5    understanding.

6          Ms. Lesley, if you don't see anything to the

7    contrary, I think we should just go ahead and calendar this

8    trial to start June 15th.

9          COURTROOM DEPUTY:  Okay.  I can do that.  I am

10   looking at the --

11         MR. OHM:  Your Honor, that is my trial.  I could

12   shed some light if the Court has any questions.

13         THE COURT:  In front of Judge Kollar-Kotelly?  Is

14   that a single-Defendant trial?

15         MR. OHM:  It is and we are set to do voir dire on

16   June 14th.  I don't know if the Court is budgeting for one

17   or two days.

18         THE COURT:  I think everyone is trying to budget

19   one day for voir dire.  Have you discussed with Judge

20   Kollar-Kotelly whether you would move to her courtroom for

21   the trial?  That's really the question, I think.

22         MR. OHM:  I believe that that conversation has

23   happened.  I am trying to remember if she said -- I think

24   she did say she had one of the courtrooms that she could do

25   that in -- oh, no.  You know what?  I think she said it

1    depends on the weather.  If there is air conditioning, the

2    courtroom is good.  But if there's not, then it might not be

3    because of the air flow.  There was something not clear.

4    But it is a single-Defendant case.

5             THE COURT:  It's a single-Defendant case.  So are

6    there any witnesses --

7             MR. OHM:  You know what, Your Honor, Judge

8    Kollar-Kotelly said it would be in her courtroom or a

9    different non-ceremonial courtroom courtroom, that there was

10   the possibility she would be borrowing somebody's courtroom.

11            THE COURT:  All right.  That's the alternative

12   here.  So it sounds to me that nobody on this call has

13   reason to believe that we cannot start this trial on June

14   15th.  What we will do is we will set it here for a trial on

15   June 15th.  I will let the calendar committee know of that,

16   that this is not happening on May 3rd, which will obviously

17   free some other time up May 3rd for something possibly

18   happening, and we will do this matter on June 15th.

19            Mr. Marston, are you anticipating filing any other

20   other pre-trial motions, in addition to the ones I've

21   already resolved, obviously.

22            MR. MARSTON:  Not at this time.

23            THE COURT:  Okay.  So, Mr. Wasserman, are you

24   aware of any pre-trial motions, other than the ones I've

25   obviously resolved?

26

1          MR. WASSERMAN:  Not at this time, Your Honor.

2          THE COURT:  So that's helpful.

3          We will calendar this for the 15th, as I said.  I

4     will enter a scheduling order that lays out various dates on

5     the assumption that we are starting the 15th.  I will

6     include time for the filing of pre-trial motions but think

7     it's fair that we can assume those will not be happening or

8     at least if we do it will be unexpected ones.

9          The question you are asking, Ms. Lesley, I think

10    we do voir dire on the 15th.  Obviously, if we could start

11    trial that afternoon, I think we would try.  But I think the

12    safest bet is we would be doing the voir dire in the

13    ceremonial courtroom on June 15th and then start trial the

14    next day in either the ceremonial courtroom or my courtroom

15    or some other courtroom if the court decides it is more

16    appropriate to do somewhere else.  I am not up to speed, I

17    must admit, on what courtrooms have the best air flow and

18    whether my courtroom is determined to be a good one or a bad

19    one.  I think the easiest is to do voir dire on day one, the

20    15th, start the trial the next day because that might just

21    have to be in another courtroom wherever it is.

22          COURTROOM DEPUTY:  Okay.  Thank you, Your Honor.

23          THE COURT:  So having done all of that, is there

24    anything else we should discuss today?  Obviously, we will

25    have -- as to Mr. Williams' portion of this matter, we will

1    have some dates that will be relevant as we approach trial.

2    We will do another conference as we get close to trial, but

3    for present purposes, is there anything else we should

4    discuss today?

5              MR. WASSERMAN:  Your Honor, there is the matter of

6    Mr. Williams' noncompliance with heightened supervision.  I

7    believe pre-trial filed multiple status reports indicating

8    that he has violated the terms of his release.

9              THE COURT:  Mr. Copes.

10             MR. OHM:  Your Honor, not to interrupt, I have

11   another hearing scheduled for 2.  May I be excused?

12             THE COURT:  Yes, Mr. Ohm, you may be excused.

13             MR. OHM:  And Mr. Douglas as well.

14             THE COURT:  Yes, and Mr. Douglas as well.

15             MR. OHM:  Thank you, Your Honor.

16             THE COURT:  Mr. Copes, could you describe to me

17   the nature of the non-compliances from pre-trial's

18   perspective?

19             PROBATION:  Yes, John Copes, pre-trial services.

20   The Defendant has been warned on several occasions to ask

21   for permission or approval prior to leaving his residence.

22   The Defendant is currently on home detention, location

23   restriction program, and is to comply as directed.  He is

24   restricted to his residence due to being on home detention,

25   except for employment, education, religious services,

1   medical, substance abuse, mental health treatment, attorney

2   visits, court appearances, court obligations or other

3   activities approved in advance of pre-trial.

4          According to his records, the Defendant has left

5   his house often, many times to go to the store, and on

6   several occasions to go and spend significant time near the

7   Brentwood Recreational Center on the 2300 block of 15th

8   Street Northeast.  The Defendant has not been approved to go

9   to that location, and when the Defendant leaves -- he has on

10   occasion asked for permission to leave, but he does not on a

11   daily basis ask for permission to leave.  Typically, we

12   wouldn't approve, when the Defendant is on home detention,

13   this is not part of his employment or education or one of

14   the things listed while participating in home detention.  We

15   wouldn't approve to leave every day to go to the store, but

16   maybe on a weekly basis go to the store to pick up items

17   that he can cook, and potentially set up time frames when he

18   could go to the store, per se.

19          This is why PSA is requesting the Defendant's

20   removal from -- [inaudible] -- program due to that

21   non-compliance.  The Defendant mainly needs permission to

22   leave his residence before he leaves the residence, whenever

23   he wants to or needs to leave for any purpose.

24          THE COURT:  Thank you.

25          Mr. Copes, do you have a proposal or a

1    recommendation as to anything I should do other than warn

2    Mr. Williams that if he continues to fail to comply with the

3    conditions of his release and home detention that he may end

4    up detained pre-trial?

5             PROBATION:  Mr. Williams does communicate with me.

6    And Mr. Williams -- I don't have movement from Mr. Williams

7    over nighttime.  It is mainly the communication that he

8    lacks during the day when he is leaving.  So I think the

9    Court's admonishment at the time would suffice, but the

10   Defendant needs to fully understand that he needs to

11   communicate with pre-trial before he leaves his residence.

12             Also, I would like to -- I don't know the activity

13   that he has had at the Brentwood Recreation Center.  I would

14   like that added as a stay-away.  It looks like he has some

15   interests in that location.

16             THE COURT:  Thank you, Mr. Copes.

17             Mr. Wasserman, do you have a view?

18             MR. WASSERMAN:  Your Honor, I would note that,

19   first of all, the Brentwood Recreation Center is in the same

20   block where the charged offense occurred.  It is my

21   understanding that the Defendant does not live in that area,

22   and I am not aware of any legitimate reason why he needs to

23   be over there, and certainly not while he is on electronic

24   monitoring.

25             I would also note that this is now the second

1    violation where he has failed to comply with home detention

2    and traveled outside of his home without permission and, I

3    believe the last time he had issues with charging his

4    electronic bracelet.  So I am concerned that he is just

5    blowing off his conditions.

6          I would note that the pre-trial services'

7    recommendation is program removal, although I don't know

8    that Mr. Copes -- and it appears that Mr. Copes is not

9    necessarily asking for that now.  But if the Defendant is

10   just going to continue to fail to abide by his conditions

11   then, I am going to be moving to, you know, that he be

12   revoked and detained pending trial.

13          THE COURT:  Thank you, Mr. Wasserman.

14          Mr. Marston, what say you?

15          MR. MARSTON:  Thank you, Your Honor.

16          I will just note that Mr. Wasserman's reference to

17   a prior violation was before Your Honor had this case, I

18   believe preindictment.  In any event, many, many months ago.

19   If there were issues with his charging his ankle monitor, it

20   was because there was an issue with the ankle monitor.  He

21   submitted to pre-trial services and went and got a new

22   monitor, if I recall correctly.

23          Overall, he's been subjected to this high level of

24   supervision for nearly one year, and he's been highly

25   compliant.  There have been, as one might expect, a few

1   hiccups along the way, including recently, which I discussed

2   with Mr. Williams.  He understands the seriousness of it.

3   As the weather gets better, he is at home, and wants to get

4   some exercise or whatever down at the rec, which is a

5   common, typical, positive thing to do.  It might occur to

6   him to be a positive place to go and positive activities

7   occur there.  So I don't know on those particular days what

8   was happening there.  Other than he didn't do anything

9   wrong.  He simply went out, if he went out.  With his

10   monitor charged still.  It's not like he has been trying to

11   hide anything.

12          He has been highly compliant for nearly one year

13   in this program.  It is my understanding from Mr. Copes by

14   program removal he simply meant that the Court should just

15   allow Mr. Williams to be on PR, with perhaps in-person or

16   telephone check-in, not revocation.

17          I think Mr. Copes is correct that Mr. Williams has

18   been in communication with Mr. Copes, basically, constantly

19   for a year, and has done incredibly well with staying at

20   home.  He's not on full home confinement.  I will also note.

21   Mr. Wasserman mentioned that he is on, essentially, full

22   home detention.

23          There are two levels of home confinement in the

24   pre-trial program, in the Court's standard order for

25   pre-trial release.  One is you can't leave home at all.

1    It's total home confinement and that's where Mr. Williams

2    started.  Because he did so well there, the Magistrate Judge

3    lowered Mr. Williams' conditions to allow him to leave, as

4    it says on the pre-trial services report, with advance

5    approval, which Mr. Williams has obtained numerous times

6    from Mr. Copes.  I think there was a recent breakdown in

7    communication or Mr. Williams' request for permission to

8    leave, but the overall totality of Mr. Williams' compliance

9    during the last 11 months indicates that he has been -- the

10   HISP has worked very well from him.  Frankly, he probably

11   should be removed.  It is a lengthy program.  I think he has

12   done everything he can to show he is willing to comply and

13   deal with this case, appear at his hearings and appear by

14   video.

15            So I had, actually, you know, suggested that he be

16   placed on personal recognizance; that the Court, if it so

17   desires, for him to remain in the HISP program.  I think an

18   admonishment, I guess, to stay away from the rec, I can

19   guess we could accept that.  But I think, actually,

20   continuing to check in with Mr. Copes and seek his approval

21   prior to departing his home is appropriate.

22            THE COURT:  Thank you, Mr. Marston.

23            So I'm not going to change the key terms of his

24   release.  I am not going to remove him from the program so

25   to speak.  I am going to keep him on the current conditions.

1   Mr. Williams, it sounds like maybe some difference of

2   opinions about how much checking in.  It sounds like you

3   haven't actually haven't been letting Mr. Copes know, at

4   least sometimes, when you would like to leave the house.  I

5   do think that that is a violation of the conditions on which

6   you are released.

7           It doesn't seem, at this point, serious enough to

8   detain you.  I think it is incumbent on you to reach out to

9   Mr. Copes and tell him or seek his permission for you to

10  leave your house whenever it is.  So I think that is an

11  appropriate condition at this point.  And I think that, you

12  know, my just reiterating it is very important here is the

13  thing to do.

14          Certainly, if that continues to be a problem, and

15  if there are any other problems, I will hear it.  And if it

16  means that there is a significant enough violation of the

17  conditions, that we need to detain Mr. Williams, I will

18  consider that.  It doesn't seem to me to be the case here.

19          As to the rec center, I am concerned that that is

20  very close to the location where Mr. Williams and

21  Mr. Douglas were arrested.  Mr. Marston, on the other hand,

22  makes a point that, perhaps, what Mr. Williams is doing

23  there is good, outdoor exercise or otherwise or something

24  like that.  I don't have enough information to make that

25  judgment.  It seems to me that that is the kind of

1      conversation, Mr. Copes, you should be having with Mr.

2      Williams when he calls you and asks for permission to go to

3      that location.  You need to determine what the purpose of

4      that is and have judgment around whether it's a good thing

5      for him to be doing that or problematic.

6              If you think it's problematic, then we should have

7      another hearing, and I will consider at that point the

8      stay-away order, with a little bit more information around

9      what you think he's up to there.

10             PROBATION:  Yes, Your Honor.

11             THE COURT:  Mr. Wasserman, I appreciate you

12     bringing that to my attention.  I, obviously, was aware of

13     the reports.  The net of it all is let's keep things where

14     they are.  Mr. Williams, I think it is very, very important

15     for you to be as in touch as possible with Mr. Copes, and

16     certainly as much as is required by the conditions of your

17     release and the HISP program as humanly possible, because it

18     is very important for Mr. Copes to have complete confidence

19     that you are where you are supposed to be.

20             Again, Mr. Copes, as to -- and that includes,

21     Mr. Williams, if you want to go to the Brentwood Rec Center,

22     you need to tell Mr. Copes that that's the plan.  And I

23     think very appropriate for him to ask you what you are up to

24     there and what the plan is.  And then, Mr. Copes, if you are

25     not comfortable with what you hear, come back to me and we

1    is can have another hearing next week or whatever.  Okay?

2              PROBATION:  Yes, Your Honor.

3              THE COURT:  Any other issues, Mr. Wasserman, for

4    today?

5              MR. WASSERMAN:  No, Your Honor.

6              THE COURT:  Thank you.  Mr. Marston?

7              MR. MARSTON:  No, Your Honor.  Thank you.

8              THE COURT:  Okay.  Obviously, we will do

9    Mr. Douglas' sentencing.  We will confirm, to the extent

10   that we can, that the trial date we set is on.  And assuming

11   we get all of that clarity, we will then issue an order that

12   sets out various pre-trial dates and the like.

13             Thank you, Counsel.

14             MR. WASSERMAN:  Thank you, Your Honor.

15             MR. MARSTON:  Thank you, Your Honor.

16             (Hearing concluded at 2:20 p.m.)

17

18

19

20

21

22

23

24

25

1                        **C E R T I F I C A T E**

2

3                  I, **Lorraine T. Herman, Official Court**

4    **Reporter,** certify that the foregoing is a true and correct

5    transcript of the record of proceedings in the

6    above-entitled matter.

7

8                  **Please Note:**  This hearing occurred during

9    the COVID-19 pandemic and is therefore subject to the

10   technological limitations of court reporting remotely.

11

12

13

14   ____**July 15, 2021**____        ___**/s/**_____
                **DATE**                      **Lorraine T. Herman**

15

16

17

18

19

20

21

22

23

24

25